> Approved for Public Filing by the CSO

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                              )
**ABDUL HAMID ABDUL SALAM AL-GHIZZAWI**       )
    **Detainee,**                             )
    **Guantanamo Bay Naval Station**          )
    **Guantanamo Bay, Cuba;**                 )
                                              )     **Civil Action No. 05-cv-02378**
                **Petitioner,**   )
                                              )     **Judge John B. Bates**
    *v.*                                     )
                                              )     **Magistrate Judge Alan Kay**
**GEORGE W. BUSH,** *et al.,*                 )
                                              )
                **Respondents.**  )
_____)

### PETITIONER AL-GHIZZAWI'S SUPPLEMENTAL OPPOSITION TO RESPONDENTS' MOTION TO EXAMINE PRIVILEGED COMMUNICATIONS SEIZED WITHOUT NOTICE OR APPROVAL AND RESPONDENT'S "NOTICE"

### I. INTRODUCTION

As the Court is aware, Counsel for Mr. Al-Ghizzawi had her first trip to Guantanamo Saturday, July 15 returning from the base on July 20th. This Court, in an Order dated July 19, 2006, allowed Counsel to rely on the briefs filed in related cases and to file a supplemental response upon returning to her office so that Counsel could have the opportunity to fully develop legal arguments and factual details responsive to the government's motion as it relates to her client. Counsel has requested that her notes from that visit be cleared by the privilege team, but as of the writing of this supplemental response has not received those cleared notes.

Mr. Al-Ghizzawi is a Libyan man in his mid-forties who had been living in Afghanistan for approximately 10 years prior to his being seized by the Northern Alliance in the late fall of 2001. Al-Ghizzawi and his wife were shopkeepers in the city of Jalalabad where they lived with

1

their infant daughter until October 2001. They had a bakery and also sold honey. When the war

started in October 2001 and the city became unsafe, Al-Ghizzawi took his wife and baby to his

wife's family farm further to the north where he thought that they would be safe.  Shortly after

their arrival, Mr. Al-Ghizzawi was apprehended (at the family home) and turned over to the

Northern Alliance in return for a bounty. (Ex. 1) The promise of huge amounts of money

frequently resulted in the seizure of Arabs or other non-Afghani's in Afghanistan. (*See*, Mark

Denbeaux, *Report on Guantanamo Detainee: A Profile of 517 Detainees through Analysis of

DOD Data,* at 14,  February 2006)  Mr. Al-Ghizzawi has been held at Guantánamo since

approximately January of 2002.  As outlined in the two emergency Motions for Entry of the

Protective Order filed by counsel, Mr. Al-Ghizzawi has repeatedly asked for and sought out the

assistance of an attorney. As more fully described below, issues related to Mr. Al-Ghizzawi's

home country, Libya, not only complicates his release but made his cry for legal representation

more emphatic.

Although Counsel for Mr. Al-Ghizzawi filed an appearance on his behalf in December,

2005, it was not until the week of July 15th that counsel was finally allowed to meet with her

client.  Those meetings took place over three full days.  Prior to that visit, the only way that Mr.

Al-Ghizzawi and his attorney have been allowed to communicate has been through letters sent

and received through the legal mail system. Those communications must be protected by the

sanctity of the attorney client privilege not only because this is the law, but also because for a

lengthy period those communications were the only communications between counsel and her

client.  In addition, because of the amount of time between visits, Mr. Al-Ghizzawi and his

attorney must be allowed to freely discuss legal strategy in their written communications.  To

hold otherwise eviscerates the already precarious attorney client relationship. In counsel's

meeting with her client last week, Mr. Al-Ghizzawi was temporarily given access to the letters

from his attorney, although letters and pictures from his family were still being withheld. The

last letter that counsel sent to Mr. Al-Ghizzawi prior to her visit had never been received by Mr.

Al-Ghizzawi.  That letter was sent more than a month earlier, on June 14th 2006.

The government's motion, which seeks the Court's post-hoc rubber stamp on their illegal

and unsupportable violation of both the attorney-client privilege and the Protective Order entered

in this case, and also seeks authorization for future seizure and review of Mr. Al-Ghizzawi's

privileged materials that the Respondents may carry out for any reason, must be denied.[1]

Respondents' sole justification for their prior actions and their proposed plan seems to rest on the

fact that detainees who are now deceased wrote their last words on the back of letters from some

counsel to their clients.  These facts, even if taken as true, should not be used to strip all

detainees of their fundamental right to have privileged communications with their counsel.

Mr. Al-Ghizzawi was not in the same camp where the unfortunate deaths took place.  His

papers were not used by other detainees and indeed the government does not in its motion

suggest that there was any conduct on the part of Mr. Al-Ghizzawi that imperiled anyone or

anything at the Guantánamo base. If this Court accepts Respondents' argument that the legal

rights and protections afforded to Mr. Al-Ghizzawi are completely subject to Respondent's

discretion, then the four years of court battles to secure these basic rights will be for naught. Mr.

Al-Ghizzawi should have the right to expect that the protections of the attorney-client privilege

will be respected, and certainly will not be disturbed without grave justification and prior review

by the Court. As further discussed below, abrogation of the attorney-client privilege in any

---

[1] The American Bar Association has called for an investigation of the military's violation of the
attorney-client privilege. *See* Letter from Michael S. Greco, President, American Bar Association, to
Senators Arlen Specter and Patrick Leahy (July 11, 2006) (attached hereto as Exhibit 2).

context requires the government to make a specific, *individualized* showing that there is sufficiently compelling justification for invading the privilege. Respondents have not even attempted to demonstrate any connection between the three deaths and Mr. Al-Ghizzawi that would justify this seizure. Indeed, under these circumstances, it is hard to resist the conclusion that Respondents' purpose in seizing and reviewing the detainees' privileged communications is driven by the opportunistic interest in eavesdropping on attorney-client communication, and chilling the attorney-client relationships.

This Court should order the government to return Mr. Al-Ghizzawi's legal papers to him (and his personal letters and the picture of his baby) and destroy any copies and to refrain from any future seizure of attorney-client privileged documents without first making a clear and convincing *individualized* showing to the Court that justifies such an invasion. The Court should deny Respondents' motion, and do so in terms that clearly and finally shut the door on the persistent threat of Respondents' interference with Mr. Al-Ghizzawi's attorney-client relationship. If the Court decides to allow any further review, any such review should be conducted in the first instance by the Court or a special master without the involvement of the military or the Department of Justice to prevent any further breach of the attorney-client privilege.

## II.  BACKGROUND

Pursuant to this Court's Order of July 19, Petitioner relies on and adopts the factual background and introductory statements of the briefs filed by Petitioners in related cases in opposition to the Respondents' Motion, namely the Petitioner's Opposition to Respondents' Motion to Examine Privileged Communications Seized without Notice or Approval filed in *Zaid, et. al.  v. Bush, et. al,* 05-cv-1646 Docket No. 21, p. 1-2 and Petitioners Memorandum of Points

and Authorities in Opposition to Respondents' Motion for Procedures Related to Review of

Certain Detainee Materials filed in *Al-Shabany, et. al. v.Bush, et.al*, 05-cv-2029 Docket No. 25,

p. 3-5.

### III. RESPONDENTS HAVE FAILED TO OFFER ANY REASONS SUPPORTED BY LAW FOR THEIR SEIZURE OF MR. AL-GHIZZAWI'S PAPERS.

#### A. Mr. Al-Ghizzawi and Counsel have an Attorney Client Relationship

"The attorney-client privilege is the oldest of the privileges for confidential

communications known to the common law. Its purpose is to encourage full and frank

communication between attorneys and their clients and thereby promote broader public interests

in the observance of law and administration of justice."[2] Despite the government's contrary

claim, the privilege has Constitutional significance, given that it is key to the constitutional

guarantees of the right to effective assistance of counsel and a fair trial.  *Coplon v. United States,*

191 F.2d 749, 757 (D.C. Cir. 1951). As the Circuit Court for this district has recognized in the

context of the Guantánamo litigation, "[t]he privilege that attaches to communications between

counsel and client has long held an exceptional place in the legal system of the United States."[3]

It is well-established that incarcerated or detained individuals do not forfeit the attorney client

privilege upon detention. *United States v. Defonte*, 441 F.3d 92, 94 (2d Cir. 2006). The right to

this privilege does not diminish when the clients stand accused of terrorism charges that

implicate national security. For instance, in *Lonegan v. Hasty*, 2006 WL 1707258 (E.D.N.Y.June

22, 2006), the court found that a terrorism suspect and his attorney had a "constitutionally

---

[2] Upjohn Co. v. United States, 449 U.S. 383, 389 (1981); see also Swidler & Berlin v.United States, 524 U.S. 399, 403 (1998) (quoting Upjohn); Lanza v. State of New York, 370 U.S. 139, 143-44 (1962) ("[I]t may be assumed that even in a jail, or perhaps especially there, the relationships which the law has endowed with particularized confidentiality must continue to receive unceasing protection.")..

[3] *Al Odah v. United States*, 346 F. Supp. 2d 1, 10 (D.D.C. 2004), *appeal argued*, No. 05- 5096 (D.C. Cir. Mar. 22, 2006).

protected reasonable expectation of privacy in their communications." *Id.* at *18. Recognizing and protecting the attorney-client privilege of prisoners, courts have acted with "heightened concern" when prison officials open and read mail that "has import for . . . the attorney-client privilege." *Sallier v. Brooks*, 343 F.3d 868, 874 (6th Cir. 2003).

Mr. Al-Ghizzawi has been held for almost five years without *any* charges filed against him and without any notice as to what he is accused of doing. During pre-trial detention, the protection of the privilege is especially necessary to ensure effective assistance of counsel: "An inmate's need for confidentiality in his communications with attorneys through whom he is attempting to redress his grievances is particularly important."[4] For such prisoners, "contact with an attorney and the opportunity to communicate privately is a vital ingredient to the effective assistance of counsel and access to the courts."[5] Even for prisoners *convicted* of crimes, the Supreme Court has held, "[r]egulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right to access to the courts are invalid."[6] Furthermore, the Supreme Court has ruled that prisoners held at Guantánamo have a right to representation by and access to counsel.

This Court has recognized that the attorney-client privilege attaches to communications between the prisoners and their lawyers, and it has protected that privilege by creating Access Procedures, which created avenues of confidential communication between prisoners and their attorneys by laying the ground rules for in-person meetings, and for written communication

---

[4] *Bach v. Illinois*, 504 F.2d 1100, 1102 (7th Cir. 1974); *see also Johnson-El v. Schoemehl*, 878 F.2d 1043, 1051 (8th Cir. 1989) ("Pre-trial detainees have a substantial due process interest in effective communication with their counsel and in access to legal materials. When this interest is inadequately respected during pretrial confinement, the ultimate fairness of their eventual trial can be compromised.").
[5] *Bach*, 504 F.2d at 1102.
[6] Procunier v. Martinez, 416 U.S. 396, 419 (1974), overruled on other grounds, Thornburgh v. Abbott, 490 U.S. 401, 407-414 (1989).

between these parties. The government sought the ability to monitor these communications, but that request was squarely rejected.

The threat of losing the confidential nature of the attorney client privilege is particularly troubling in Mr. Al-Ghizzawi's situation because he is a native Libyan (although he has not lived in his home country for almost 20 years).  While being held at Guantánamo, the U.S. military has repeatedly allowed Libyan *thugs* to interrogate the Libyan prisoners, including Mr. Al-Ghizzawi. Because counsel's notes from her visit have not yet been cleared, counsel cannot elaborate on the threats and other actions taken by these thugs, but another detainee from Libya has elaborated and counsel directs this Court's attention to that detainee's pleadings. (Omar Deghayes 04-2215, Motion for Entry of 30 Day Order pgs. 7-12[7] and Reply Pgs.3-4 (doc. Entry 16))  Since these interrogations have been allowed for several years (long before the recent reestablishment of diplomatic ties between the U.S. and Libya this spring), it does not take any great leap to conclude that the attorney client notes will also be shared with the brutal dictatorship of Omar Ghadafi and will be used in future "interrogation" sessions with the Libyan thugs.

This Court should not now ratify the government's blatant disregard of this Court's orders by permitting further review of privileged communications[8]. This Court should consider the government's recent actions, and its instant motion, in light of its fierce five-year effort to

_____

[7] The Motion itself is apparently filed under seal but the reply brief and the government's response brief refer to the five pages of allegations in that Motion that describe the interrogations by the Libyan thugs. Counsel believes that this Court is allowed to review that document if it so chooses. Also the Court's Order in that case refers to the "visits" by the Libyan thugs (Order dated 6-14-2005, at pgs. 7-10, document #18)

[8] Counsel takes this opportunity to point out that while at the base she relayed to an official that she had a court order to see her other client, at which point she was told "judges' orders don't work here, we consider those only *advisory*."  In fact, the judge's order did not work and counsel was not allowed to see that other client.  Obviously officials at the base also considered the Protective Order "only advisory," as they disregarded that Order when they confiscated the legal materials without notice.

7

deny detainees access to counsel and to undermine the attorney-client relationship. These principles are reinforced by the Court's entry of the Protective Order, which allows for confidential communications despite the conditions of confinement. Seizure of legal papers is particularly egregious because it strikes at the heart of the attorney-client relationship and interferes with access to the courts. "The taking of legal papers will often (though perhaps not always) interfere with an inmate's right of access to the courts. . . . [T]he destruction or withholding of inmates' legal papers burdens a constitutional right, and can only be justified if it is reasonably related to a legitimate penological interest."[9]

### B. The Respondents Have Made No Showing to Justify Seizing and Reviewing Mr. Al-Ghizzawi's Materials

Respondents' alleged justification for the confiscation of Mr. Al-Ghizzawi's legal materials rests in the purported discovery of notes written by the deceased on paper bearing an attorney-client designation that were discovered when NCIS searched the cells of prisoners in the same cell block as the deceased individuals. Petitioner relies on and adopts the detailed discussion of the additional documents cited by the Respondents in Petitioners' Opposition filed in *Zaid*, 05-cv-1646, Docket No 21, p 9-11. In any event, none of these notes is related in any way to Mr. Al-Ghizzawi, and Respondents do not suggest otherwise. The government's vague allegations of notes found in a dead prisoners' cell written by another prisoner cannot rise to the level of providing a "legitimate penological  interest" in seizing *all* legal documents from *all*

---

[9] *Goff v. Nix*, 113 F.3d 887, 892 (8th Cir. 1997) (internal citations omitted) ; *see also Simmons v. Dickhaut*, 804 F.2d 182, 183–84 (1st Cir. 1986) ("Many courts have found a cause of action for violation of the right of access stated where it was alleged that prison officials confiscated and/or destroyed legal materials or papers."); *Carter v. Hutto*, 781 F.2d 1028, 1031–32 (4th Cir. 1986) (plaintiff alleged a valid claim of denial of access to courts when he alleged that his legal materials were confiscated or destroyed); *Hiney v. Wilson*, 520 F.2d 589, 591 (2d Cir. 1975) (alleged confiscation of legal papers, if proven, may have denied plaintiff access to the courts).

prisoners.  Indeed, seizing Mr. Al-Ghizzawi's legal papers chills the giving, receiving, and

continued possession of communications between Mr.Al-Ghizzawi and his attorney.  The

government does not attempt to justify its actions under the Protective Order, but rather admits

that the seized materials "will likely include some number of attorney-client communications

potentially subject to attorney-client privilege."[10]  But the government's unilateral abrogation of

the privilege would have been unlawful even if it had not directly violated a Court order.  Courts

have consistently held that abrogation of the attorney-client privilege in any context requires the

government to make a specific, *individualized* showing that there is sufficiently compelling

justification for invading the privilege. For example, where the government invokes the crime-

fraud exception to the attorney-client privilege, it bears the burden of making an adequate

showing that the exception applies to *that* client.[11]  Similarly, when the government seizes

materials from a location that likely contains privileged papers, that seizure must be supported by

probable cause and a warrant, and it still must employ appropriate means of screening out

privileged materials.[12]

Respondents bear the burden of making a particularized factual showing that the

protections of the attorney-client privilege should yield. The government has not cited any cases

that suggest the privilege may be invaded without an *individualized*, sufficiently rigorous

---

[10]  Resps.' Mot. at 9.

[11]  *In re Sealed Case*, 107 F.3d 46, 49 (D.C. Cir. 1997); *see also Doe v. United States*, 2003 WL
22879314 (2d Cir. Dec. 4, 2003) (reversing contempt order where government failed to meet burden of
showing that crime-fraud exception applied); *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995)
(requiring a showing of probable cause to believe that a crime or fraud has been attempted or committed
and that attorney-client communications were used to further that crime or fraud); *In re Grand Jury
Subpoenas Duces Tecum*, 798 F.2d 32, 34 (2d Cir. 1986) (reversing civil contempt order because the
government did not satisfy its burden of showing that the crime-fraud exception applied to the documents
the corporation failed to produce).

[12]  *See, e.g., United States v. Stewart*, 2002 WL 1300059 (S.D.N.Y. June 11, 2002).

showing that materials of a particular client or particular attorney are likely to have been abused in furtherance of a crime.[13]   Even when such documents will be reviewed *in camera* by the court – and not by the government – "the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies."[14]

The government has presented no specific evidence that Mr. al-Ghizzawi has misused his attorney-client materials.  Indeed, the government does not even purport to do so.  Respondents' motion contains no allegations that Mr. Al-Ghizzawi had any relationship with the three detainees who died or that his privileged material had been linked to those detainees. Respondents do not allege that the notes described in its motion were in Mr. Al-Ghizzawi's possession, in his handwriting, or refer to him. Respondents do not even allege that Mr. Al-Ghizzawi was held in the cellblock or camp where the deaths occurred. Respondents have presented no specific evidence that Mr. Al-Ghizzawi misused his attorney client materials in furtherance of such a "plot" or for any other purpose. There is certainly no basis for invading Mr. Al-Ghizzawi's fundamental attorney-client privilege.

Finally, the government's generalized security concerns are of the type already rejected by the Court.  The government, when it sought to justify the real-time monitoring and recording of attorney-client meetings, claimed that the prisoners would use meetings with counsel "to further terrorist operations or otherwise disclose information that will cause immediate and

---

[13]   *See, e.g.*, *United States v. Skeddle*, 989 F. Supp. 890, 894 (N.D. Ohio 1997) (permitting review of attorney-client materials "[i]n light of the finding of probable cause that had preceded the issuance and execution of the warrant"); *United States v. Grant*, No. 04 CR 207, 2004 WL 1171258, at *2 (S.D.N.Y. Dec. 14, 1982) (documents "seized pursuant to a valid warrant, which was based upon a [judicial] finding of probable cause").

[14]   *Zolin*, 491 U.S. at 572 (quotations and citations omitted).

substantial harm to national security."[15]  The Court rejected the government's claims, finding

them "thinly supported." As for the government's speculation that Petitioners' counsel are

improperly sharing classified information with their clients, this Court long ago reminded the

government that "the government's decision to grant an individual attorney a security clearance

amounts to a determination that the attorney can be trusted with information at that level of

clearance."[16] As to the government's arguments that the countervailing public policy interests

outweigh the attorney client privilege in this case and that the Access Procedures empower the

government to limit the attorney client privilege, Petitioner relies on and adopts the arguments

made in Petitioners' Opposition filed in *Zaid*, 05-cv-1646, Docket No 21, p 7-8.


### IV. THE GOVERNMENT'S PROPOSED PROCEDURES ARE INAPPROPRIATE AND THEIR PROPOSAL OF A FILTER TEAM SHOULD BE DENIED

If further review of Mr. Al-Ghizzawi's legal papers is allowed, the use of a Department

of Defense Filter Team is inappropriate here.  As the government hints in its filing, *see* Resps.'

Mot. 21 n.12, courts are reluctant to entrust attorney-client privileged materials to such

governmental teams.  Indeed, "the use of government taint teams has often been questioned or

outright rejected by the courts."[17]  Just last week, the Sixth Circuit overruled a district court's

decision to permit review of potentially privileged documents by an independent government

---

[15] *Al Odah*, 346 F.2d at 4 n.4.

[16] *Al Odah*, 346 F. Supp. 2d at 14.

[17] *In re Search of the Scranton Hous. Auth.*, 2006 WL 1722565, at *5 (M.D. Pa. Jun. 22, 2006).  *See, e.g.*, *Black v. United States*, 172 F.R.D. 511, 516 (S.D. Fla. 1997) (even though government needed documents to pursue escaped fugitive, court rejected proposed "taint team" and ordered that "a United States district judge or his designee" would review documents for privilege"); *United States v. Abbell*, 914 F. Supp. 519, 520–21 (S.D. Fla. 1995) (appointing special master rather than filter team to review potentially privileged documents obtained by search warrant).

"taint team" because the review posed unacceptable risks to the attorney-client privilege.[18] Even when such teams have been authorized, "at least three courts that have allowed for review by a government privilege team have opined, in retrospect, that the use of other methods of review would have been better."[19] Although it may lessen the burden on Respondents to use a filter team, we submit it is inappropriate to have team members associated with, employed by, and beholden to the Respondents.

Although Counsel vigorously contests the justification and need for the review of Mr. Al-Ghizzawi's legal materials, to the extent that the government can make a specific, individualized showing that Mr. Al-Ghizzawi has used his attorney-client materials for illegal ends, the Court at most should order that Mr. Al-Ghizzawi's documents to be reviewed *in camera* by the court, in the presence of habeas counsel and without government lawyers. This procedure would reduce the appearance of impropriety and relieve some of the concern about sharing Mr. Al-Ghizzawi's privileged papers with a party who is not his legal representative.

Moreover, to the extent that the documents have been reviewed, Respondents bear the burden to rebut the presumption that the material was provided to the prosecution team. As stated by Judge Green in *United States v. Neill*, 952 F. Supp. 834 (D.D.C. 1997), "where the government chooses to take matters into its own hand rather than using the more traditional alternatives of submitting disputed documents under seal for *in camera* review by a neutral and detached magistrate or by court-appointed special master, it bears the burden to rebut the presumption that tainted material was provided to the prosecution team." *Id.* at 839.

---

[18] See In re Grand Jury Subpoenas 04 -124-03 and 04-124-05, Nos. 05-2274/2275, slip op. at 6 (6th Cir. July 13, 2006), *available at* http://www.ca6.uscourts.gov/opinions.pdf/06a0245p-06.pdf.

[19] *United States v. Stewart*, No. 02 Cr. 395, 2002 WL 1300059, at *19 (S.D.N.Y. June 11, 2002)

Finally, the Court should reject the Respondents' suggestion that the Filter Team should be allowed to conduct its own review of the confiscated documents to determine whether they think the documents were properly "privileged" in nature, regardless of the document's relevance to the NCIS suicide-plot investigation.[20]  If the filter team determines that the documents are not privileged, the government proposes, then they will be "returned . . . to JTF-Guantánamo for appropriate action."[21]  This thinly veiled threat to habeas counsel is obviously designed to deter counsel from communicating effectively with their clients.  Habeas counsel with access to classified information are aware that they work under the shadow of possible contempt and criminal actions, those with access to the legal papers have security clearances, and they are all officers of the Court.  There is no warrant for a new team of Department of Defense lawyers to begin scouring the prisoners' legal papers in search of documents that *they* believe are not properly privileged. Such a ploy would surely be followed by the government's next round of distractions, which would clearly involve attacks on individual habeas counsel.

## IV. RESPONDENTS' ASSERTION THAT, NOTWITHSTANDING *HAMDAN*, THE DTA DIVESTS THIS COURT OF JURISDICTION SHOULD BE REJECTED

Respondents apparently believe they can avoid the inconsistency of their actions merely by including in their Motion for Procedures a statement that the Motion is filed "without prejudice to respondents' position that the Court lacks jurisdiction."  (Motion for Procedures at 2 n. 3.)  Respondents' insistance that the DTA applies to this petition is frivolous because Mr. Al-Ghizzawi apparently has never even had a CSRT.  The government asserts that this Court's jurisdiction is barred by the provision that vests the District of Columbia Circuit Court of

---

[20]  (*See* Mot. at 11.)

[21]  (*Id.*)

Appeals with exclusive authority to review "the validity of any final decision of a Combatant Status Review Tribunal that an alien is properly detained as an enemy combatant." § 1005(e)(2).[22]  However, as the *Hamdan* Court recognized, "subsections (e)(2) and (e)(3) grant jurisdiction only over actions 'to determine the validity of any final decision' of a CSRT or commission." 126 S. Ct. at 2768-69.  Thus, a petitioner, like Mr. Al-Ghizzawi who never had a CSRT cannot be deemed to be "contesting any 'final decision' of a CSRT or military commission (and). . . does not fall within the scope of subsection (e)(2) or (e)(3)." *Id*. at 2769. Expanding on this point, the Court indicated that, while a challenge to the final decision of the CSRT would be subject to the exclusive review requirement of Section 1005(e)(2), *habeas* actions seeking more fundamental relief would not. *Id.*

Mr. Al-Ghizzawi asserts numerous causes of action, alleges that the Executive's conduct and policies exceed the bounds of Article II of the Constitution, and seeks, in addition to declaratory and injunctive relief, *habeas corpus* – the remedy that permits him to demand either release or legal justification for imprisonment.  Accordingly, Respondents' attempt to recast Petitioner's action as nothing more than a challenge to the validity of the CSRT that he has never had is ridiculous.  Based upon the foregoing, Respondents' assertion that this Court lacks jurisdiction over this matter is clearly erroneous and should be rejected.[23]Moreover, Respondents have themselves recognized the continued authority of this Court to exercise its jurisdiction over these matters.

---

[22] Section 1005(e)(3) pertains to review of the decision of any military commission concerning the detainee.  Petitioner has not been the subject of any such commission. Therefore, Section 1005(e)(3) has no bearing on Mr. Al-Ghizzawi's case.

[23] Petitioners respectfully request the opportunity to fully brief the issues should the Court conclude that the DTA divests it of jurisdiction over this action.

**CONCLUSION**

Despite the Stay that has been entered in this case, the Respondents filed their "Notice" and Motion for Procedures Relating to Review of Certain Detainee Materials. Obviously Respondents believe that the Stay is only in place to keep the Petitioners from filing motions. Respondents should not be allowed to have it both ways: requesting the assistance of this Court when it suits their needs, and simultaneously denying the authority of the Court to act on any request for relief filed by Petitioners. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). For the foregoing reasons, the Respondents' motion should be denied in full. In addition, this Court should immediately lift the Stay in this case and allow Petitioner to move forward on his Petition for the Great Writ.

.

Dated: July 28th, 2006

                                  Respectfully Submitted,

                                  /s/ H. Candace Gorman
                                  H. Candace Gorman

LAW OFFICE OF H. CANDACE GORMAN
H. Candace Gorman
Elizabeth Popolis
542 S. Dearborn St., Suite 1060
Chicago, IL 60605
(312) 427-2313

## <u>CERTIFICATE OF SERVICE</u>

I, H. Candace Gorman, certify that I today caused true and accurate copies of

PETITIONER Al-GHIZZAWI'S SUPPLEMENTAL OPPOSITION TO RESPONDENTS'

MOTION TO EXAMINE PRIVILEGED COMMUNICATIONS SEIZED WITHOUT NOTICE

OR APPROVAL AND RESPONDENT'S NOTICE to be sent for processing by the U. S.

Department of Justice Litigation Security Section to be served upon the following persons:

> Terry Henry, Esq., Senior Trial Attorney
> Andrew I. Warden, Esq., Trial Attorney
> U.S. Department of Justice
> Civil Division, Federal Programs Branch
> 20 Massachusetts Ave., NW, Room 7144
> Washington, DC  20530

This 28th day of July, 2006.

/s/ H. Candace Gorman
Counsel for Petitioner

Law Office of H. Candace Gorman
H. Candace Gorman (IL Bar #6184278)
Elizabeth Popolis  (IL Bar #6285095)
542 S. Dearborn Street -  Suite 1060
Chicago, IL 60605
Tel:  (312) 427-2313

# EXHIBIT
# 1

# Afghanistan Leaflets



**TF11-RP09-1**

<u>FRONT</u>

**"Get wealth and power beyond your dreams. Help the Anti-Taliban Gorces rid Afghanistan of murderers and terrorists"**

<u>BACK</u>

<u>TEXT ONLY</u>

**"You can receive millions of dollars for helping the Anti-Taliban Force catch Al-Aaida and Taliban murderers. This is enough money to take care of your family, your village, your tribe for the rest of your life. Pay for livestock and doctors and school books and housing for all your people."**

# EXHIBIT
# 2

**ABA**  **Defending Liberty**
**Pursuing Justice**

Michael S. Greco
President

AMERICAN BAR ASSOCIATION

321 North Clark Street
Chicago, Illinois 60610-4714
(312) 988-5109
FAX: (312) 988-5100
E-mail: abapresident@abanet.org

July 11, 2006

The Honorable Arlen Specter
Chairman
U.S. Senate Committee on the Judiciary
Washington, D.C. 20510

The Honorable Patrick Leahy
Ranking Democratic Member
U.S. Senate Committee on the Judiciary
Washington, D.C. 20510

Dear Chairman Specter and Senator Leahy:

As the Senate moves forward with its consideration of legislation authorizing military commissions, I write on behalf of the American Bar Association ("ABA") to express our views on this issue.  The ABA applauds your effort to hold hearings exploring the issues surrounding the authorization of military commissions in light of the recent United States Supreme Court decision in *Hamdan v. Rumsfeld.*

Since February 2002, we have urged the President and the Congress to ensure that any military commissions be required to comply with the rules of the Uniform Code of Military Justice (UCMJ), to provide the rights afforded in courts-martial, and to fully comply with our international treaty obligations.  While the Guantanamo military commission system, as presently constituted, is inherently flawed, our nation has the finest military justice system in the world, and we therefore urge the Congress to insure that any legislation regarding military commissions rely to the greatest extent possible on the respected and tested framework of the UCMJ.

In August 2003, the ABA adopted a policy calling upon the Congress and the Executive Branch to insure that all defendants in any military commission trials receive the zealous and effective assistance of counsel.  We endorsed certain basic principles for the conduct of military commission trials, including that the "government should not monitor privileged conversations, or interfere with confidential communications, between any defense counsel and client."

We are therefore deeply troubled by the revelations contained in the July 7, 2006 Department of Justice filing in the Guantanamo habeas cases pending in the United States District Court or the District of Columbia that military investigators, in the course of investigating the deaths of three Guantanamo detainees in June, seized from Guantanamo detainees **more than a half-ton** of documents, including a large number of highly privileged attorney-client communications.

Page Two
July 11, 2006

While we respect the right of the military to conduct its investigation, it appears that this seizure of privileged documents was conducted without advance judicial approval or supervision and without any opportunity for counsel to be heard, and indeed, was not even disclosed to a court or counsel until a month after the fact. The fact that procedures were not in place to prevent such wholesale invasion of the attorney-client privilege is most disturbing.

As you know, almost all of the civilian lawyers involved in the Guantanamo military commission and habeas cases have appeared *pro bono* at great personal and financial sacrifice and under difficult conditions. Many have complained to the ABA that their efforts to provide effective assistance of counsel have been hampered by rules, policies, and tactics of the Departments of Defense and Justice. It has been a challenge for these dedicated lawyers to gain the trust of their clients, and the recent seizure of these highly privileged communications could chill the attorney-client relationship and shatter any confidence the detainees might have had in the sanctity of the attorney-client privilege.

We therefore respectfully ask the Committee to request that the Inspectors General for the Department of Defense and the Justice Department investigate this matter promptly and make their findings and conclusions public in a report to the Committee. We also ask the Committee to request that the Office of Professional Responsibility in the Department of Justice determine how the government's lawyers permitted this potentially serious breach to occur, and to take appropriate action. These inquiries will help maintain public confidence in our system of justice.

These issues may well merit separate oversight hearings, but as the Senate Judiciary Committee now explores legislation regarding the establishment of future military tribunals, the ABA urges you to be particularly sensitive to the need to preserve and protect the attorney-client privilege against any intrusion into communications between detainees and their lawyers.

Thank you for your consideration of these issues.

Sincerely,

*Michael S. Greco*

Michael S. Greco

cc: Members of the Senate Committee on the Judiciary