IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ABDUL HAMID ABDUL SALAM AL-GHIZZAWI,<br><br>Petitioner,<br><br>v.<br><br>GEORGE W. BUSH, *et al.*,<br><br>Respondents. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 05-2378 (JDB)

**RESPONDENTS' OPPOSITION TO PETITIONER'S
EMERGENCY MOTION TO COMPEL ACCESS TO MEDICAL RECORDS
AND TO REQUIRE EMERGENCY MEDICAL TREATMENT**

Respondents hereby oppose petitioner Abdul Hamid Abdul Salam Al-Ghizzawi's emergency motion for access to petitioner's medical records and for emergency medical treatment (dkt. no. 29) ("Petr's Memo."), which seeks extraordinary court intervention in and governance of the medical care provided petitioner at the United States Naval Base at Guantanamo Bay, Cuba ("Guantanamo"). Petitioner's motion claims that petitioner may be suffering from liver cancer and has never been treated for the condition. *See* Petr's Memo. ¶ 8. The motion demands that various blood and other tests be performed immediately and that petitioner be transferred to "a state of the art medical facility that can properly treat his condition." *See id.* at p. 5.

As explained below, however, since his arrival at Guantanamo petitioner has received thorough and appropriate medical care, and he has not been diagnosed with liver disease of any sort, despite testing for such a malady. Medical care provided petitioner, as well as other Guantanamo detainees, is comprehensive and includes, where warranted, full hospital facilities

and the use of appropriate medical specialists.  Accordingly, there is no factual or legal basis for

the extraordinary relief sought by petitioner, which seeks to inject the Court improperly into a

process of second-guessing the Executive in the administration of the detention of enemy

combatants, an essential matter of national defense, and the delivery of medical care to detainees.

Petitioner's emergency motion, therefore, should be denied.

## ARGUMENT

## I.     PRELIMINARY INJUNCTION STANDARD

Petitioner's motion is devoid of any discussion of the legal standard applicable to

petitioner's requests for relief.  Given that the motion seeks to compel and direct the delivery of

medical care, however, the motion can fairly be characterized as a motion for preliminary

injunctive relief.  It is well-established that a request for preliminary injunctive relief "is an

extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear

showing, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997);

*Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).  To prevail in a request for a preliminary

injunction, a movant "must 'demonstrate 1) a substantial likelihood of success on the merits, 2)

that [he] would suffer irreparable injury if the injunction is not granted, 3) that an injunction

would not substantially injure other interested parties, and 4) that the public interest would be

furthered by the injunction.'"  *See Katz v. Georgetown Univ.*, 246 F.3d 685, 687-88 (D.C. Cir.

2001) (quoting *CityFed Financial Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C.

Cir. 1995)).

The irreparable harm that must be shown to justify a preliminary injunction "must be both

certain and great; it must be actual and not theoretical."  *Wisconsin Gas Co. v. FERC*, 758 F.2d

669, 674 (D.C. Cir. 1985). "Injunctive relief will not be granted against something merely feared

as liable to occur at some indefinite time; the party seeking injunctive relief must show that the

injury complained of is of such *imminence* that there is a clear and present need for equitable

relief to prevent irreparable harm." *Id.* (citations and internal quotation marks omitted; emphasis

in original). Injunctions are not intended "to prevent injuries neither extant nor presently

threatened, but only merely feared." *Comm. in Solidarity v. Sessions*, 929 F.2d 742, 745-46

(D.C. Cir. 1991); *see also Milk Indus. Found v. Glickman*, 949 F. Supp. 2d 882, 897 (movant

must show that the threatened injury is not merely "remote and speculative").

## II.     PETITIONER FAILS TO ESTABLISH THAT HE FACES IMMINENT IRREPARABLE INJURY.

Petitioner has failed to carry his burden of establishing imminent irreparable injury, and

his motion may be denied on that ground alone. *See CityFed Financial Corp.*, 58 F.3d at 747

(failure to make showing of irreparable injury sufficient to deny preliminary injunction);

*Wisconsin Gas Co.,* 758 F.2d at 674 (same).

Petitioner's motion for preliminary injunction is based on the faulty premise that

Guantanamo medical personnel have failed to provide adequate medical care to petitioner.

Petitioner's motion relies upon symptoms reported by petitioner to his counsel during their initial

meeting in mid-July 2006, including alleged overall weight loss since his detention began,

bloated abdomen, severe and constant abdominal pain, vomiting, diarrhea, and lack of medical

care "except for the occasional pain medication." *See* Petr's Memo. ¶¶ 6, 8 & Gorman Decl.

¶¶ 5-6, 11-13. Petitioner's counsel, admitting that she entered the meeting with the view that

petitioner was possibly suffering from liver disease, Petr's Memo., Gorman Decl. ¶ 2, adds in her

own subjective, and suggestive, characterization that petitioner appeared "jaundiced." *Id.* ¶¶ 5, 7.
Petitioner's motion is supplemented with a declaration from a medical doctor, who, while
admitting the difficulty of diagnosing an individual without examining him or his records, asserts
that the symptoms described by petitioner's counsel[1] are suggestive of liver cancer and
recommends a number of blood and urine tests and transfer of petitioner "to a state of the art
hospital with a top quality liver and gastroenterology department." *See* Petr's Memo., Jensen
Decl. ¶¶ 12-14.

The Declaration of Dr. Ronald L. Sollock, attached hereto as Exhibit 1, however, directly
refutes petitioner's description of a number of his symptoms, as well as his claims of inadequate
medical care.  Dr. Sollock is the Commander, U.S. Navy Hospital, Guantanamo Bay, Cuba, and
he serves as the Joint Task Force Surgeon for Joint Task Force - Guantanamo Bay, Cuba.  *See*
Exhibit 1 ("Sollock Decl.") ¶ 1.  He is directly responsible for the medical care provided to
personnel living at Guantanamo Bay and oversees the operation of the detention hospital that
provides medical care to the detainees held at Guantanamo.  *Id.*  As noted by Dr. Sollock,
Guantanamo provides extensive medical care facilities and resources for detainees.

The detention hospital at Guantanamo provides an 20-bed facility with a hospital medical
staff of approximately 100, including five medical doctors, a physician's assistant, nurses,
corpsman, various technicians (laboratory, radiology, pharmacy, operating room, respiratory,
physical therapy), and administrative staff.  *Id.* ¶ 3.  All incoming detainees are given a complete
physical examination.  *Id.* ¶ 4.  Detainees continue to receive medical care, the quality of which

---

[1] These symptoms reported by petitioner's counsel to the doctor include one not included
in counsel's description of petitioner's own description of his symptoms, *i.e.*, "chills very easily /
always cold."  *Compare* Petr's Memo., Jensen Decl. ¶ 9 *with* Gorman Decl.

is comparable to that provided to active duty military members, throughout their detention.  *Id.*
¶¶ 4-5, 7.  Medical issues identified in initial physical examinations, or subsequently, are
followed by medical staff.  *Id.* ¶ 4.  A detainee can request medical care not only by notifying
guards, who make rounds on the cellblocks multiple times daily, but also by directly approaching
medical personnel who make rounds on the cellblocks every day.  *Id.*  In addition to following up
on detainee requests, the medical staff investigates any medical issues observed by guards or
other staff.  *Id.*  The availability of this medical care has led to thousands of out-patient contacts
between detainees and medical staff, followed by in-patient treatment and care as needed.  *See id.*

Detainees have been treated for a variety of medical conditions, including hepatitis, heart
ailments, hypertension, combat wounds, diabetes, tuberculosis, appendicitis, inguinal hernia,
leishmaniasis, malaria, and malnutrition, and have been provided prescription eyeglasses and
prosthetic limbs.  *Id.* ¶ 6.  The medical staff at Guantanamo has performed over 290 surgical
procedures, some as advanced as coronary artery stent replacement, on detainees since January
2002.  *Id.* ¶ 8.  When necessary, detainees are transferred to the Naval Base Hospital at
Guantanamo to receive types of care not available at the detention hospital, and medical
specialists are flown in from outside Guantanamo in appropriate cases.  *Id.* ¶ 5.  Thus, the
provision of health care for Guantanamo detainees is comprehensive.

Furthermore, petitioner himself has been provided extensive medical care, including
individualized examination, diagnosis, and treatment.  Consistent with Guantanamo's provision
of health care to detainees, since being detained at Guantanamo petitioner has been treated for a

number of physical ailments, or has been offered treatment but has refused it.  *Id.* ¶¶ 13, 15.[2]

Furthermore, since being detained at Guantanamo, petitioner has not lost weight as he alleges,

but, overall, has gained approximately 12 pounds (from 138 pounds to 150 pounds) since his

detention began.  *Id.* ¶ 11.

Petitioner has not been diagnosed with liver disease or cancer of any type, though he has

received comprehensive evaluation and monitoring.  *See id.* ¶ 10.  In his initial medical

evaluation, a history of hepatitis B was noted and subsequently confirmed by laboratory testing in

the summer of 2002.  *Id.* ¶ 12.  Petitioner's initial medical examination was normal, except for

mild tenderness in petitioner's upper right abdomen.  *Id.*  Given his hepatitis B history, routine

physical evaluations of petitioner, including ultrasound evaluations and blood testing to ascertain

liver function, were instituted by Guantanamo.  *Id.*  Ultrasounds of the upper right abdominal

area were performed in October 2002 and again in May 2003.  *Id.*  Both tests produced normal

results.  *Id.*  As recently as January 2006, another ultrasound was offered, but petitioner refused

it.  *Id.*  Petitioner's most recent series of blood and related tests to assess liver function in

February 2006 produced normal results.  *Id.*

---

[2] More specific information concerning these ailments is contained in ¶¶ 13 and 16 of the
Sollock Declaration.  Because such information is not directly pertinent to petitioner's public
allegations of untreated liver cancer, the information has been provisionally designated by
respondents as "protected information" under ¶¶ 11, 35-45 of the Amended Protective Order in
place in this case (*see* June 2, 2006 Minute Order) and redacted from the publicly filed version of
the declaration.  Consistent with the Amended Protective Order, the full, unredacted version of
the declaration is being filed with the Court Security Officer and served on petitioner's counsel.
Respondents, however, have no objection to the public filing or other disclosure of the redacted
information subject to petitioner's consent to such disclosure.

As a result of complaints of abdominal pain,[3] petitioner was given a physical examination

on June 28, 2006 – roughly two weeks prior to the petitioner's meeting with counsel that forms

the basis of petitioner's emergency motion. *Id.* ¶ 14. That examination revealed no abdominal

issues: no masses, no swelling of the liver, no discomfort upon palpation, no dilation of the

superficial veins of abdomen or chest. *Id.* Nor was jaundice or abdominal distension due to

excess fluid, which might be indicative of liver problems, observed. *Id.* Petition did not consent

to further testing or intervention for his complaint, including laboratory tests and radiology. *Id.*

Furthermore, petitioner had a routine follow-up examination just three days ago, on September 5,

2006. *Id.* ¶ 15. Again, no abdominal issues were discovered, except for mild pain in the upper

right abdomen. *Id.* For this most recent examination, petitioner consented to a battery of

laboratory blood and urine tests, the majority of which were normal, with results of the remaining

tests pending. *Id.* In addition, petitioner is to be scheduled for an additional ultrasound test. *Id.*

As illustrated above, the story petitioner has conveyed to his counsel, compounded with

counsel's own embellishments, is refuted by the detailed declarations provided by those

responsible for his care and detention at Guantanamo.[4] Far from neglecting petitioner's health,

---

[3] Petitioner has not complained to medical personnel regarding having symptoms such as bloated stomach, vomiting, or diarrhea. Sollock Decl. ¶ 17. Nor is there any record of petitioner having "passed-out" from pain, as he alleges. *Id.*

[4] Petitioner seeks to bolster his tale with allegations that previously during his detention he was forced to subsist on unpotable water and was purposefully not provided food by Guantanamo guards for some ten days in the summer of 2005 as a result of being mistakenly listed as a hunger striker. *See* Petr's Memo. ¶¶ 9-10 & Gorman Decl. ¶¶ 6, 9. While a series of historical allegations manifestly does not establish an entitlement to forward-looking injunctive relief such as petitioner seeks, *see City of Los Angeles v. Lyons*, 461 U.S. 95, 105, 110 (1982); *O.K. v. Bush*, 377 F. Supp. 2d 102, 113-14 (D.D.C. 2005) (Bates, J.), respondents nevertheless vigorously dispute petitioner's allegations. As explained in the declaration of the Commander of the Joint Detention Group, JTF-Guantanamo, who oversees detention operations for JTF-

Guantanamo medical personnel have provided and are providing petitioner with comprehensive

and attentive medical care.  Consequently, petitioner has not carried his burden of establishing an

imminent threat of irreparable harm related to Guantanamo's provision of medical care to him.

Petitioner's motion for preliminary injunction, therefore, should be denied.

### III.    PETITIONER'S MOTION IS NOT LIKELY TO SUCCEED ON THE MERITS BECAUSE THERE IS NO ADEQUATE LEGAL BASIS FOR THE RELIEF REQUESTED.

In addition to lacking a justifiable factual basis, petitioner's motion lacks an adequate

legal basis for the requested intervention into the medical care provided Guantanamo detainees.

---

Guantanamo, appended as Exhibit 2, detainees have had access to the same potable tap water
provided to and consumed by military personnel and others at Guantanamo; they have never been
provided unpotable water.  *See* Exhibit 2, Declaration of Colonel Wade F. Dennis ¶¶ 2-3
("Dennis Decl.").   In addition, for some time they have regularly received bottled water.  *Id.* ¶ 4.

Furthermore, petitioner's tale of being purposefully denied meals due to a mistake is pure
fantasy.  As explained by Colonel Dennis, the Guantanamo guard staff does not deny a detainee a
meal based on a detainee being listed as a hunger striker or having previously refused a meal, as
alleged by petitioner.  In fact, not only would a detainee have to affirmatively *refuse* nine
consecutive meals from the guards to be regarded as a hunger striker, all detainees are offered a
meal at every meal, three times a day, regardless of whether they ate or refused the previous
meal.  *Id.* ¶¶ 2, 5.  Even once a detainee is classified as a hunger striker, he is referred to
Guantanamo medical personnel for observation and monitoring.  *Id*. ¶ 5.  Moreover, had
petitioner been considered on a hunger strike last summer, at the time petitioner alleges the
"mistake" occurred, Guantanamo's policy was (and remains) that medical personnel undertake
efforts to counsel and encourage hunger striking detainees to eat meals; meals would not have
been affirmatively denied to detainees, including petitioner, because they were on some kind of
hunger strike list.  *See id.*; *see also* Sept. 9, 2005 Declaration of Major General Jay W. Hood
(former Commander, JTF-Guantanamo) ¶¶ 6-8 (attached as Exhibit 3) (noting policies and
practices pertaining to hunger striking detainees).  (The Hood Declaration was submitted in other
cases in connection with prior litigation regarding hunger strike treatment, including *Hamlily v.
Bush*, No. 05-CV-0763 (JDB) (dkt. no. 11)).  Thus, the facts with respect to petitioner are that
petitioner did affirmatively participate in a hunger strike for a short time during late August 2005.
*See* Dennis Decl. ¶ 6.  He was not mistakenly denied meals, however; rather, he affirmatively
*refused* 14 consecutive meals beginning on August 24, 2005.  *Id.* ¶ 6.  He then resumed eating
meals regularly just over a week later.  *Id.*

As noted *supra* § I, petitioner's motion is completely devoid of discussion of a legal standard applicable to petitioner's requests for relief.  In an analogous circumstance arising with respect to a motion for relief related to allegedly inadequate medical care in another Guantanamo case before the Court, the Court stated,

> Although petitioner does not assert a constitutional violation (or any other violation of a substantive legal right) in the present motion, the issue of a dereliction of medical care for a person detained by the government usually arises in the context of constitutional challenges to prison conditions.  The Supreme Court has emphasized on several occasions that a claim of deficient medical care will not be cognizable under the Constitution unless a prisoner can show a level of dereliction so grave that it amounts to a ''deliberate indifference'' to the prisoner's ''serious medical needs.''  *Neitzke v. Williams,* 490 U.S. 319, 321, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989); *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).  A prisoner challenging his medical care must be prepared to show that officials ''were knowingly and unreasonably disregarding an objectively intolerable risk of harm to the prisoners' health or safety.''  *Scott v. District of Columbia,* 139 F.3d 940, 943 (D.C. Cir.1998) (quoting *Farmer v. Brennan,* 511 U.S. 825, 846, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)).

> This standard means that ''courts will not intervene upon allegations of mere negligence, mistake or difference of opinion.''  *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir.1977); *see also Estelle*, 429 U.S. at 106, 97 S. Ct. 285 (''Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.'').  Absent a showing of misconduct that rises to the level of deliberate indifference, courts will not sit as boards of review over the medical decisions of prison officials, and they will not second-guess the adequacy of a particular course of treatment.  *Bowring*, 551 F.2d at 48; *see also Berman*, 874 F.Supp. at 106 (''[I]t is not in the public's interest for the court to usurp the Bureau of Prisons' authority and micromanage the medical needs of a particular inmate.'').  In particular, a prisoner has no discrete right to outside or independent medical treatment.  *See Roberts v. Spalding*, 783 F.2d 867, 870 (9th Cir.1986) (''A prison inmate has no independent constitutional right to outside medical care additional and supplemental to the medical care provided by the prison staff within the institution.'').

> Petitioners do not explain why these principles should be diluted in the context of military detention centers . . . .

*See O.K. v. Bush*, 344 F. Supp. 2d 44, 61 (D.D.C. 2004) (Bates, J.) (footnote omitted). The Court

further noted,

> The ''deliberate indifference'' standard was developed to assess the claims
> of prisoners under the Eighth Amendment. *Estelle*, 429 U.S. at 104, 97 S. Ct.
> 285. The standard of care for a pre-trial detainee who has not yet been convicted,
> however, is governed by the Due Process Clause of the Fifth and Fourteenth
> Amendments rather than by the Eighth Amendment. *See, e.g., Hill v. Nicodemus*,
> 979 F.2d 987, 990 (4th Cir. 1992). Although the Supreme Court has said that the
> due process rights of pre-trial detainees are ''at least as great'' as the Eighth
> Amendment rights of a convicted prisoner, *see City of Revere v. Massachusetts
> Gen. Hosp.*, 463 U.S. 239, 244, 103 S. Ct. 2979, 77 L. Ed. 2d 605 (1983), most
> courts have applied the ''deliberate indifference'' standard in both settings, *see
> Hill*, 979 F.2d at 991–92 (collecting cases). Without concluding that the
> ''deliberate indifference'' doctrine is the correct standard for any constitutional
> claims that petitioners might raise in this case, the Court will draw on this well
> developed body of law to guide its analysis on this emergency motion.

*See O.K.*, 344 F. Supp. at 61 n.23. The Court ultimately rejected the request for relief. *Id.* at 62-

63. *See also Al Odah v. United States*, 406 F. Supp. 2d 37, 42-44 (D.D.C. 2005) (Kollar-Kotelly,

J.) (applying "deliberate indifference" standard in rejecting request for Court intervention into

medical care provided hunger-striking Guantanamo detainees).

Of course, such an analysis assumes that Guantanamo detainees possess constitutional

rights and that petitioner's case is properly before the Court. As to the latter point, as

respondents have previously argued in this case, the Court lacks jurisdiction over this case

because the Detainee Treatment Act of 2005, Pub. L. No. 109-148, Tit. X, 119 Stat. 2680

("DTA"), vests exclusive jurisdiction over this action in the Court of Appeals.[5]

---

[5] *See* Respondents' Status Report in Response to Court's July 19, 2006 Minute Order
(dkt. no. 18). As explained in the Status Report, the DTA, among other things, amends 28
U.S.C. § 2241 to eliminate court jurisdiction to consider petitions for writ of habeas corpus and
other claims by aliens held as enemy combatants at Guantanamo Bay, § 1005(e)(1), and creates
an exclusive review mechanism in the D.C. Circuit to address the validity of a final decision of a
Combatant Status Review Tribunal that an alien is properly detained as an enemy combatant.

And as to the former point, no decision of the Court, including the decisions of Judges Green and Leon in the Guantanamo detainee cases currently pending before the Court of Appeals,[6] has held that Guantanamo detainees are possessed of constitutional rights with respect to conditions of confinement claims.  Indeed, Judge Leon in *Khalid v. Bush*, *Boumediene v. Bush*, 355 F. Supp. 2d 311 (D.D.C. 2005), found that aliens held at Guantanamo, that is, outside the sovereign territory of the United States, are not possessed of any constitutional rights, *id.* at 320-21, and concluded that "no viable legal theory exists" by which the Court "could issue a writ of habeas corpus" in favor of the Guantanamo detainees, *id.* at 314.  Judge Leon also noted that challenges to the conditions of confinement did not support the issuance of a writ of *habeas corpus* because such claims, even if true, would not render the custody itself unlawful.  *Id.* at 324-25.  Judge Leon explained that separation of powers principles prevent the judiciary from scrutinizing the conditions of the aliens' detention because such matters are the province of the Executive and Legislative branches.  *Id.* at 328.

---

§ 1005(e)(1), (e)(3).  This case is a such a case challenging petitioners' designation as an enemy combatant through the Combatant Status Review Tribunal.  *See* Petition (dkt. no. 1).  Given the DTA's investment of exclusive review in the Court of Appeals, the District Court lacks jurisdiction over this case for it is well-settled that an exclusive-review scheme, where applicable, precludes the exercise of jurisdiction under more general grants of jurisdiction, including habeas corpus.  *Cf., e.g.*, 5 U.S.C. § 703; *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207-09 (1994); *FCC v. ITT World Commc'ns, Inc.*, 466 U.S. 463, 468 (1984); *Laing v. Ashcroft*, 370 F.3d 994, 999-1000 (9th Cir. 2004); *Lopez v. Heinauer*, 332 F.3d 507, 511 (8th Cir. 2003); *Telecomm. Research and Action Ctr. v. FCC*, 750 F.2d 70, 75, 77-79 (D.C. Cir. 1984).  The issue of the effect of the DTA on cases like this remains pending before the Court of Appeals in the pending Guantanamo detainee appeals, *see Boumediene v. Bush*, Nos. 05-5062 and *Al Odah v. United States*, No. 05-5064 (D.C. Cir.).

[6] *See Boumediene v. Bush*, Nos. 05-5062 and *Al Odah v. United States*, No. 05-5064 (D.C. Cir.).

In addition, Judge Green in *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443, 464 (D.D.C. 2005), while concluding that "the detainees at Guantanamo Bay have the fundamental right to due process of law under the Fifth Amendment" to challenge the legality of their detention through petitions for writs of *habeas corpus*, did not address whether alien enemy combatants have a constitutional basis to challenge their conditions of confinement, nor did her decision authorize such claims.[7] Judge Green's analysis of the constitutional issues was limited solely to whether Guantanamo detainees are "entitled to due process under the Fifth Amendment" to challenge "the government's determinations that they are 'enemy combatants.'" *See In re Guantanamo*, 355 F. Supp.2d at 465. The Court's focus on the legality of the detention – as opposed to the legality of the conditions of confinement – is reflected throughout the opinion. *See id.* at 464 ("In sum, there can be no question that the Fifth Amendment right asserted by the Guantanamo detainees in this litigation – the right not to be deprived of liberty without due process of law – is one of the most fundamental rights recognized by the U.S. Constitution."); *id.* at 476 ("[T]he detainee is entitled to fully litigate the factual basis for his detention in these habeas proceedings and to have a fair opportunity to prove that he is being detained on improper grounds."); *id.* at 477 (stating that a detainee must be provided with a "fair opportunity to challenge . . . the legality of his detention as an 'enemy combatant'"). Put simply,

---

[7] In fact, in light of the pending appeals, Judge Green, acting as coordinating judge, stayed the coordinated cases and twice rejected petitioners' requests to assert claims objecting to their confinement conditions. *See In re Guantanamo Detainee Cases*, Order Granting in Part and Denying in Part Respondents' Motion for Certification of Jan. 31, 2005 Orders and for Stay (Feb. 3, 2005); Order Denying Motion for Reconsideration of Order Granting Stay Pending Appeal (Feb. 7, 2005) (refusing to allow claims regarding conditions of confinement to proceed "in light of the substantial resources that would be expended and the significant burdens that would be incurred should this litigation go forward"). *See also O.K. v. Bush*, 377 F. Supp. 2d 102, 104-05 (D.D.C. 2005) (noting procedural posture of coordinated detainee cases).

Judge Green only addressed the scope of petitioners' Fifth Amendment rights to challenge the lawfulness of the procedures used to confirm their enemy combatant status; she did not make any findings or conclusions with respect to the scope of any Fifth Amendment right to challenge the conditions of their confinement.[8]

Even assuming that petitioner is entitled to constitutional protections under the Fifth Amendment or otherwise (which respondents contest), petitioner still has failed to demonstrate that his challenge to his medical care is likely to succeed.[9]  Petitioner has failed to establish that

---

[8]  The distinction between legal challenges to the fact or duration of custody and legal challenges to the conditions of confinement is well-established.  *See Preiser v. Rodriguez*, 411 U.S. 475, 498 (1973).  This distinction is based in part on the different legal bases underlying these types of challenges.  On the one hand, challenges to the procedures used to determine the lawfulness of custody invoke the procedural due process component of the Fifth Amendment, which requires the government to follow appropriate procedures when its agents or officials decide to deprive a person of liberty.  *See Daniels v. Williams*, 474 U.S. 327, 331 (1986).  On the other hand, challenges to conditions of confinement rely on the substantive due process component of the Fifth Amendment, which forbids "certain government actions regardless of the fairness of the procedures used to implement them."  *See id.*  Judge Green's opinion addressed only the Guanatanamo detainees' procedural due process rights to challenge the procedures used to confirm their status as enemy combatants.  *See In re Guantanamo*, 355 F. Supp.2d at 465-78 (discussing whether CSRTs comport with procedural due process).  Judge Green gave no consideration to whether the detainees have any rights under substantive due process to challenge their conditions of confinement.  *See also O.K. v. Bush*, 377 F. Supp. 2d at 112 (discussing procedural vs. substantive due process issue).

[9]  It is not even settled that petitioner may assert a condition of confinement claim in a *habeas* case.  Neither the Supreme Court nor the D.C. Circuit have squarely resolved whether challenges to conditions of confinement may be brought under *habeas* proceedings.  *See Bell v. Wolfish*, 441 U.S. 520, 526 n.6 (1979) ("Thus, we leave for another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement, as distinct from the fact or length of confinement itself."); *Brown v. Plaut*, 131 F.3d 163, 168-69 (D.C. Cir. 1997) (acknowledging that habeas corpus might conceivably be used to challenge prison conditions, but indicating that requiring use of habeas corpus in such cases would extend the writ beyond its core).  Courts in other jurisdictions that have squarely addressed the issue, however, have affirmatively held that conditions of confinement claims that do not seek accelerated release from custody are not within the scope of the writ of *habeas corpus*.  *See, e.g.*, *Cochran v. Buss*, 381 F.3d 637, 639 (7th Cir. 2004); *Carson v. Johnson*, 112 F.3d 818, 820-21

the medical care he has received falls below even the "deliberate indifference" standard applied

in the domestic prison context; indeed, respondents' showing completely undermines any

challenge to petitioner's treatment.[10]  As the Court previously noted in *O.K.*, 344 F. Supp. 2d at

61, the "deliberate indifference" standard calls for deference to the judgment of prison

administrators, especially in the provision of medical care.[11]  And specifically, "a prisoner has no

discrete right to outside or independent medical treatment." *Id.*  Petitioner, however, seeks just

that.

---

(5th Cir.1997); *McIntosh v. United States Parole Commission*, 115 F.3d 809, 811-12 (10th Cir. 1997); *Badea v. Cox*, 931 F.2d 573, 574 (9th Cir. 1991).

[10] Whether the "deliberative indifference" standard applied in the domestic prison context translates without alteration to the context involved in this case, *i.e.*, the detention of enemy combatants by the military during a time of war, is debatable, at best.  *Cf. O.K.,* 377 F. Supp. 2d at 112-13 n.10 (noting that substantive due process analysis is dependent upon the precise circumstances involved and that "[n]o federal court has ever examined the nature of the substantive due process rights of a prisoner in a military interrogation or prisoner of war context").  Indeed, separation of powers principles would require satisfaction of an even more stringent standard before judicial intervention is warranted in a case like this.  *See, e.g., Hamdi v. Rumsfeld*, 542 U.S. 507, 124 S. Ct. 2633, 2647 (2004) (plurality opinion) (stating that "[w]ithout doubt, our Constitution recognizes that core strategic matters of warmaking belong in the hands of those who are best positioned and most politically accountable for making them"); *Almurbati v. Bush*, 366 F. Supp. 2d 72, 81 (D.D.C. 2005) (Walton, J.) (indicating that "it is a fundamental principle under our Constitution that deference to the Executive Branch must be afforded in matters concerning the military and national security matters."); *Khalid v. Bush*, 355 F. Supp. 2d 311, 328 (D.D.C. 2005) (explaining that management of wartime detainees' confinement conditions is the province of the Executive and Legislative branches, thus precluding judicial scrutiny of such conditions).

[11] *See also Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (stating that federal courts will "disallow any attempt to second-guess the propriety of a particular course of treatment" chosen by prison doctors); *Inmates of Occoquan v. Barry*, 844 F.2d 828, 841 (D.C. Cir. 1988) (noting that "courts are not to be in the business of running prisons" and that "questions of prison administration are to be left to the discretion of prison administrators).

Further, the facts do not support any finding that the Guantanamo staff has been deliberately indifferent to the health or well-being of petitioner. To the contrary, the record demonstrates that petitioner has been provided high-quality, comprehensive medical care. Petitioner is asking the Court to do nothing other than second-guess that care, a step that is improper under the law and particularly unwarranted in this case. Accordingly, a showing of deliberate indifference – which would be the minimum showing required in this context – is absent, and petitioner's requests for relief cannot succeed. His motion, therefore, should be denied.

## IV.   THE RELIEF REQUESTED WOULD IMPOSE UNDUE BURDENS ON THE GOVERNMENT AND INJURE ITS INTERESTS.

Petitioner's requests for relief also would impose substantial burdens on the Guantanamo staff and interfere with the appropriate operation of Guantanamo's provision of medical care. Petitioner's requested medical relief seeks to interfere with the competent medical judgment and expertise of the Guantanamo medical staff as to what medical tests are appropriate with respect to petitioner and when those tests should be performed. In addition, petitioner's request for transfer to some unnamed medical facility "that can properly treat his condition" is either nonsensical, given that petitioner is receiving appropriate medical care at the extensive facilities at Guantanamo, or unduly burdensome to the extent it contemplates transfer of petitioner out of Guantanamo contrary to the considered medical judgment of the Guantanamo medical staff and despite the provision of quality medical care for petitioner at Guantanamo. Furthermore, petitioner's requests for relief cannot be viewed in isolation or confined to just the petitioner at issue in the present motion, because any order granting the forms of relief petitioner seeks would

-15-

likely prompt counsel for many detainees in other cases to demand the same types of remedies. Accordingly, providing petitioner with the relief requested would be a significant burden for the military authorities and medical staff at Guantanamo.

In addition, petitioner's request for access to his medical records is an improper attempt to take discovery that would also be unduly burdensome, and, in any event, any production of records is unnecessary. A petitioner in a *habeas* case is not entitled to discovery as a matter of right, but rather must first demonstrate good cause to conduct discovery and obtain court permission. *See*, *e.g.*, *Rich v. Calderon*, 187 F.3d 1064, 1068 (9th Cir. 1999) (explaining that "[a] habeas petitioner does not enjoy the presumptive entitlement to discovery of a traditional civil litigant," and that "discovery is available only in the discretion of the court and for good cause shown."); *Al Odah v. United States*, 329 F. Supp. 2d 106, 107-08 (D.D.C. 2004) (finding that Guantanamo detainee *habeas* petitioners must first seek leave of court before conducting discovery and denying leave to conduct discovery); *cf.* Rule 6(a) of the Rules Governing Section 2254 Cases[12] (requiring leave of court for good cause shown before discovery may be conducted). Petitioner has not requested leave of court to take discovery, and the Court should not permit him to evade this requirement simply by filing a motion for preliminary injunction. Discovery should be particularly disfavored in the present case, where petitioner is challenging the military's conduct of a war overseas and such discovery would interfere with military operations. <u>See</u> <u>Hamdi v. Rumsfeld</u>, 124 S. Ct. 2633, 2652 (2004) (plurality opinion) (adjuring lower courts generally to "proceed with the caution that is necessary" and to take only "prudent

---

[12] The Rules Governing Section 2254 Cases can apply to other *habeas corpus* petitions, including *habeas* petitions, such as the present one, brought under 28 U.S.C. § 2241. *See* Rule 1(b) of the Rules Governing Section 2254 Cases.

and incremental" steps when faced with novel issues pertaining to petitions for writs of habeas corpus from detainees involved in the current war on terror).

Furthermore, access to petitioner's medical records is not necessary, and petitioner cannot demonstrate good cause for their production, because as Dr. Sollock has explained, the Guantanamo medical staff is providing petitioner with attentive and thorough medical care. The only purpose for counsel's request for petitioner's medical records is to set the stage to invite the Court to second-guess the medical treatment provided by the Guantanamo medical staff, which, as explained previously, is improper.[13] There is no need for petitioner's counsel to access petitioner's medical records, and the request should be denied.

## V.    DENYING PETITIONER'S MOTION WOULD BEST SERVE THE PUBLIC INTEREST.

The public has a strong interest in assuring that the military operations and medical care provided at Guantanamo are not interrupted, overly burdened, and second-guessed by the unnecessary or contra-factual demands of a detainee pertaining to the particulars of his medical care. As demonstrated above, the Guantanamo staff has taken and will continue to take appropriate and careful measures to address the health and medical needs of petitioner. Accordingly, to avoid the unnecessary burdens imposed by petitioner's motion, the public interest would best be served if the Court denied the motion.

---

[13] *See also Al Odah*, 406 F. Supp. 2d at 44 (detainee lacked likelihood of success on merits of claim to entitlement to medical records given health care being provided by Guantanamo, "[s]ince logically the provision of medical records and/or medical reports will not result in any further protection of the life of a detainee without intermediate scrutiny of the records by medical professionals and challenges to the Court based on that scrutiny, and since courts are reluctant to interfere with the medical treatment of prisoners in general").

## CONCLUSION

For the reasons stated above, respondents respectfully request that petitioner's motion for access to petitioner's medical records and for emergency medical treatment be denied in all respects.

Dated: September 8, 2006                 Respectfully submitted,

                                         PETER D. KEISLER
                                         Assistant Attorney General

                                         DOUGLAS N. LETTER
                                         Terrorism Litigation Counsel

                                         ___/s/ Terry M. Henry_____
                                         JOSEPH H. HUNT (D.C. Bar No. 431134)
                                         VINCENT M. GARVEY (D.C. Bar No. 127191)
                                         TERRY M. HENRY
                                         JAMES J. SCHWARTZ
                                         PREEYA M. NORONHA
                                         ROBERT J. KATERBERG
                                         ANDREW I. WARDEN
                                         NICHOLAS J. PATTERSON
                                         EDWARD H. WHITE
                                         United States Department of Justice
                                         Civil Division, Federal Programs Branch
                                         20 Massachusetts Ave., N.W.
                                         Washington, DC  20530
                                         Tel:  (202) 514-4107
                                         Fax:  (202) 616-8470

                                         Attorneys for Respondents

-18-