**Cleared for Public Filing**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                            )
ABDUL HAMID ABDUL SALAM AL-GHIZZAWI )
    Detainee,                          )
    Guantanamo Bay Naval Station       )
    Guantanamo Bay, Cuba;              )
                                            )   Civil Action No.
                                            )      05-cv- 2378
                     *Petitioner*,     )
                                            )   Judge John B. Bates
          *v.*                            )
                                            )
GEORGE W. BUSH, *et al.*,                   )
                                            )
                   *Respondents.*    )
_____)

**REPLY MEMORANDUM IN SUPPORT OF PETITIONER'S EMERGENCY
MOTION TO COMPEL ACCESS TO MEDICAL RECORDS AND TO REQUIRE
EMERGENCY MEDICAL TREATMENT**

Now comes the Petitioner Abdul Hamid Abdul Salam Al-Ghizzawi (hereinafter Al-Ghizzawi) by and through his counsel and replies to the Respondents' Opposition as follows:

1. Respondents take the incredible position that they have the right to condemn Mr. Al-Ghizzawi to a medical death sentence because he has no constitutional or other right to require he be cared for while being held in U.S. captivity, and additionally that this Court has no jurisdiction to interject itself into issues of Mr. Al-Ghizzawi's well being. (Res. Br. 3-14) However, the Supreme Court made clear that, at a minimum, the guarantees under Article 3 of the Geneva Conventions that the sick "be cared for" apply to the detainees being held at Guantanamo. *See*, Hamdan v. Rumsfeld, 126 S.Ct. 2749 (2006).

1

See Hamdan at *2796 ("Common Article 3 . . . is applicable here"); see id. at 2802 (Breyer, J., concurring) (the law of war "derives from 'rules and precepts of the law of nations'; it is the body of international law governing armed conflict. . . The Court is correct to concentrate on one provision of the law of war that is applicable to our Nation's armed conflict with al Qaeda in Afghanistan . . .   That provision is Common Article 3 of the four Geneva Conventions of 1949.")  Specifically, Common Article 3 provides that "the following acts are and shall remain prohibited at any time and in any place whatsoever . . . (a) violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture) Leaving Mr. Al-Ghizzawi to die from diseases that are readily treatable is not only tantamount to torture but also provides cruel treatment. The Respondents' absurd claim is without merit.

2. Respondents also take the position that requiring proper medical treatment and the tendering of Mr. Al-Ghizzawi's complete medical file imposes "undue burdens" on the government. (Resp. Br. 15-16)  Petitioner fails to see how providing Mr. Al-Ghizzawi with proper medical care could possibly interfere with the interests of the Respondents. The affidavit and supplemental affidavit of Dr. Jensen and the affidavit of Dr. Reichen provide substantial good cause for the release of all medical records to Petitioner's counsel. (*See,* Ex. C to original petition for medical records and Exs. D and E, attached herein)

3. In support of Respondents' position, they attached the September 2005 affidavit of the former commander at Guantanamo, Major General Jay Hood (Respondents' Ex. 3)  That would be the same General Hood who acknowledged to *The Wall Street Journal* a few months prior to that affidavit  that: "Sometimes we just didn't get the right folks," and

that the reason those "folks" were still in Guantanamo was that "[n]obody wants to be the one to sign the release papers . . . There's no muscle in the system." General Hood added that there were "significant numbers of men here" whom he expected would be transferred to their home governments or released, and that "[i]f that doesn't happen, I'm going to be doing some yelling." (*Wall Street Journal*, Jan. 26, 2005). Instead of yelling, General Hood left Guantánamo.

4. The Respondents have admitted that Mr. Al-Ghizzawi was diagnosed with chronic Hepatitis B shortly after his arrival at Guantánamo and has not been treated for his condition. (Respondents Ex. 1 ¶ 12) They also admit that Mr. Al-Ghizzawi has been diagnosed with Tuberculosis and has not been treated for that condition. (Supra at ¶ 13) Incredibly, Respondents suggest that Mr. Al-Ghizzawi has allowed the facility to perform out patient surgery on in-grown toenails, but refuses to let them treat him for conditions which he knows could be life threatening. Equally incredible is an assertion that only now, just this September, Mr. Al-Ghizzawi has finally *changed his mind* and is now willing to have the tests performed that the Respondents claim they wanted to perform in June.[1] (Supra at ¶'s 14 and 15) As this Court knows, Mr. Al-Ghizzawi had been seeking an attorney for over one year prior to counsel filing an appearance. Mr. Al-Ghizzawi's

---

[1] Counsel for Petitioner points out that it was not until after counsel for Petitioner alerted this Court to the possibility that her client was very ill and after this Court entered the protective order that the Respondents finally got around to even looking at Mr. Al-Ghizzawi.

3

requests often mentioned his failing medical condition and his possible liver disease. These requests were submitted to this court when counsel sought an emergency motion to enter the protective order (Doc. Entry 5) and the renewed emergency motion to enter the protective order (Doc. Entry 6), which this court entered on June 2, 2006.

5. Although counsel recognizes that this court may hesitate to accept the word of a detainee over the word of a doctor at the facility, counsel asks this court to credit the observation of counsel, which, except for the jaundiced appearance of Mr. Al-Ghizzawi, is not properly contradicted by the Respondents.(See, Ex. B to original petition for medical records) Respondents admit that Mr. Al-Ghizzawi has complained of pain in his upper right quadrant since his initial medical examination. Respondents insist the pain has been and continues to be "mild," but clearly those statements from Respondents are self serving. Mr. Al-Ghizzawi has repeatedly complained of the increased pain that is now becoming debilitating and as noted in counsel for Petitioner's Affidavit, the pain Mr. Al-Ghizzawi was experiencing was evident despite his reluctance to voice his complaints. Counsel for Petitioner also asks this Court to give substantial weight to the opinions of two independent and prestigious doctors whose concern over the treatment of Mr. Al-Ghizzawi has only increased after reviewing the affidavit of Captain Sollock MD.

6. Respondents' affiant Captain Sollock stated that after diagnosing Mr. Al-Ghizzawi with chronic Hepatitis B "routine evaluations were instituted per guidelines provided by Gastroenterology." The guidelines that Captain Sollock was referring to require *much* more than Captain Sollock has expressed, as per the affidavits of Dr. Jensen and Dr. Reichen. (Exs. D and E)

7. According to Dr. Reichen and Dr. Jensen, diagnosing liver cancer is very difficult and therefore, the following test should have been performed on Mr. Al-Ghizzawi and should now be done immediately: hepatitis Delta ought to be searched for; in Libya hepatitis C is quite frequent and should be ruled out, as co-infection with hepatitis B and C substantially increases the risk of liver cancer; that the results of the last alpha-fetoprotein, sonography and HBV-DNA be provided as soon as available; and the actual results of CMP and hepatitis B serology be provided. Patients with Hepatitis B may also benefit from treatments including interferon or a virostatic such as lamivudine, telbivudine, entecavir or adefovir. Mr. Al-Ghizzawi should be regularly monitored for liver cancer in a program where screening tests are standardized, regularly scheduled at intervals of 6-12 months, and where results are closely monitored in order to catch the disease in an early enough stage of it's development to increase the individual's chances of surviving the disease- the most widely used surveillance test is ultrasonography, which is best performed by individuals specially trained to use the machine. (Ex D, ¶ 15-18; Ex. E ¶ 12-15)

8. Additionally, as Dr. Reichen stated in his affidavit, there is also concern about the diagnosis of Mr. Al-Ghizzawi of latent tuberculosis after a PPD conversion was documented. (Ex E ¶ 16) It is dangerous not only to Mr. Al-Ghizzawi but to others around him to leave this condition untreated, particularly under prison conditions. (Id) Mr. Al-Ghizzawi should immediately be given the quantiferon test (a more modern version of the ppd test) and a chest x-ray. (Id) Finally, multiple times in his affidavit Captain Sollock mentions 'mild upper abdominal pain,' 'as per gastroenterology'

5

according to Dr. Reichen these comments should have led to an upper endoscopy to rule out helicobacter pylori infection or other upper gastrointestinal disease(s). (Id. ¶ 17)

9. As it is clear from the Respondents' own admissions that they have not performed even the minimally necessary tests and observations, Counsel for Petitioner requests that all of the medical records, test results, lab results and actual photo images be immediately sent to her for the review by the two doctors who have volunteered their services and that the lab results for the tests that were only performed this past week be sent to counsel immediately when available.  In addition, counsel asks that the tests that Drs. Jensen and Reichen have recommended be performed immediately and the results turned over to counsel.

10. Counsel points to the affidavit of Dr. Reichen in which he makes it clear that his clinic is willing to treat Mr. Al-Ghizzawi if transport could be made to his facility in Berne Switzerland.  (Ex. E ¶ 18) Dr. Reichen, who is a world renowned physician in Hepatology, works in a state of the art facility that regularly treats individuals with conditions similar to Mr. Al-Ghizzawi. Although the United States has many such institutions, counsel recognizes that it is not practical to look for such an arrangement in this country.

**CONCLUSION**

Because the Respondents do not have the unfettered right to allow Mr. Al-Ghizzawi to die of medical conditions which if found and responsibly acted upon could be readily treated in appropriate locations, Petitioner asks this Court to immediately order the disclosure of the full medical records of  Mr. Al-Ghizzawi, require the government to immediately perform the tests as outlined in the affidavits of Doctors Jensen and Reichen and allow counsel for

Petitioner to begin procedures for the transfer of Mr. Al-Ghizzawi to the clinic in Switzerland under the care of Dr. Reichen.

Dated:  13 September , 2006

                                                  Respectfully Submitted,
                                                  Counsel for Petitioner

                                                  /s/ *H. Candace Gorman*
                                                    H. Candace Gorman

LAW OFFICE OF H. CANDACE GORMAN
H. Candace Gorman
Elizabeth Popolis
542 S. Dearborn St., Suite 1060
Chicago, IL 60605
(312) 427-2313

# CERTIFICATE OF SERVICE

      I, H. Candace Gorman, certify that I today caused a true and accurate copy of PETITIONER'S REPLY IN SUPPORT OF EMERGENCY MOTION TO COMPEL ACCESS TO MEDICAL RECORDS AND TO REQUIRE EMERGENCY MEDICAL TREATMENT to be served upon the following persons by virtue of filing the above listed document with the U. S. Department of Justice Litigation Security Section:

      Terry Henry, Esq., Senior Trial Attorney
      Andrew I. Warden, Esq., Trial Attorney
      U.S. Department of Justice
      Civil Division, Federal Programs Branch
      20 Massachusetts Ave., NW, Room 7144
      Washington, DC  20530

This 13th day of September, 2006.

      /s/ H. Candace Gorman
      Counsel for Petitioner

Law Office of H. Candace Gorman
H. Candace Gorman (IL Bar #6184278)
Elizabeth Popolis  (IL Bar #6285095)
542 S. Dearborn Street - Suite 1060
Chicago, IL 60605
Tel:  (312) 427-2313