# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

---

**ABDUL HAMID ABDUL SALAM AL-GHIZZAWI,**

**Petitioner,**

**v.**

**GEORGE W. BUSH, et al.,**

**Respondents.**

---

**Civil Action No.  05-2378 (JDB)**

## MEMORANDUM OPINION & ORDER

Petitioner Abdul Hamid Abdul Salam Al-Ghizzawi, a citizen of Libya, is currently detained by the United States at the United States Naval Base in Guantanamo Bay, Cuba ("Guantanamo"), and has challenged the legality of his confinement in a petition for a writ of habeas corpus.  The Court ordered a stay in this case pending resolution of the appeals in In re Guantanamo Detainee Cases, 355 F. Supp. 2d 443 (D.D.C. 2005), and Khalid v. Bush, 355 F. Supp. 2d 311 (D.D.C. 2005).  See Al-Ghizzawi v. Bush, No. 05-cv-2378, Order (July 19, 2006) (staying case).  This opinion resolves only petitioner's recently-filed emergency motion to compel access to medical records and to require emergency medical treatment.

As a preliminary matter, respondents argue that the United States Court of Appeals for the District of Columbia Circuit is vested with exclusive jurisdiction over petitioner's motion. The impact of the Detainee Treatment Act of 2005, Pub. L. No. 109-148, § 1005(e), 119 Stat. 2739, 2742, on *this* Court's jurisdiction over pending habeas cases is one of the issues now pending before the Court of Appeals.  Moreover, new legislation entitled the Military

Commissions Act of 2006, S.3930, 109th Cong. (2006), has just been passed by Congress but has not yet been signed by the President; it, too, raises a serious question regarding this Court's continuing jurisdiction over this and other Guantanamo detainee cases. The Court does not find it necessary to resolve that jurisdictional question for purposes of this motion because, for the reasons that follow, petitioner clearly is not entitled to the relief he seeks.

## BACKGROUND

Petitioner, a man in his mid-forties, has been in the custody of the United States since late 2001, Pet'r's Mem. at 2, and arrived at Guantanamo in June 2002, Resp'ts' Opp'n Ex. 1 (Decl. of Captain Ronald L. Sollock, M.D., Ph. D. ("Sollock Decl.")) ¶ 10. Because petitioner alleges that he is being provided with inadequate medical care, it is necessary to detail the parties' accounts of petitioner's physical condition, the medical treatment petitioner has been receiving, and the course of treatment petitioner now requests.[1]

Petitioner states that his health has deteriorated steadily over the course of his detention. Pet'r's Mem. Ex. B (Aff. of Attorney H. Candace Gorman ("Gorman Aff.")) ¶ 4. At a meeting with counsel in July 2006, petitioner described his symptoms of poor health, which include weight loss of between ten to fifteen kilos (twenty-two to thirty-three pounds); constant and

---

[1] Petitioner also alleges that he was provided with foul-tasting and -smelling water prior to late 2004 and that he was mistakenly listed as a participant in a hunger strike and denied meals for ten days during the summer of 2005. Pet'r's Mem. Ex. B (Aff. of Attorney H. Candace Gorman ("Gorman Aff.")) ¶¶ 6, 9. Respondents deny these allegations. See Resp'ts' Opp. Ex. 2 (Decl. of Wade F. Dennis) ¶¶ 2, 3 (asserting that detainees have always been provided with potable drinking water); id. ¶¶ 5, 6 (stating that petitioner was offered a meal at every mealtime but refused fourteen consecutive meals in 2005); Resp'ts' Opp. Ex. 3 (Decl. of MG Jay W. Hood) (describing Guantanamo's hunger-strike protocol). The Court need not consider these allegations further because they concern past events unrelated to the provision of medical care and have no bearing on the present need for injunctive relief.

severe abdominal, back, and leg pain; stomach bloating and the appearance of two black lines on his stomach; and digestive problems, including vomiting and diarrhea.  Id. ¶ 5.  Petitioner also complained to counsel of pain so severe in recent months that it renders him unable to stand or run, and on one occasion caused him to pass out.  Id.  Petitioner's counsel further asserts that petitioner appeared to be jaundiced and in pain during their July 2006 meeting.  Id. ¶ 7.

Petitioner informed his counsel that he had been to the medical clinic at Guantanamo on several occasions and had been given pain medication by a nurse on at least one occasion.  Id. ¶¶ 11, 12.  Petitioner asserts, however, that he "was not treated" for his health problems during his clinic visits.  Id. ¶ 11.

According to Captain Ronald L. Sollock, Commander of the Naval Hospital at Guantanamo, detainees are treated at a twenty-bed facility with a medical staff consisting of approximately one hundred military personnel, including five medical doctors, one physician's assistant, and myriad technicians and nurses.  Sollock Decl. ¶ 3.  For medical treatment beyond the capability of the detention hospital, detainees are transferred to the Naval Base Hospital at Guantanamo, where they can also be seen by outside specialists if the care even at the Naval Base Hospital is insufficient.  Id. ¶ 5.  All detainees are given a complete physical examination upon their arrival at Guantanamo, and they can obtain medical care at any time by making a request to a guard or to one of the medical personnel who make rounds on the cellblock every day.  Id. ¶ 4.

Contrary to petitioner's claims, respondents assert that petitioner has been in good health since his arrival at Guantanamo, id. ¶ 10, and has in fact gained over ten pounds during his detention, id. ¶ 11.  Respondents also assert that petitioner has not complained to medical staff

about stomach bloating or digestive problems, and that petitioner is able to stand.[2] Id. ¶ 17.

During petitioner's initial physical examination at Guantanamo, medical personnel noted mild abdominal tenderness.  Id. ¶ 12.   Because of his history of Hepatitis B, which was confirmed shortly after the initial physical exam, petitioner has been given routine evaluations that include ultrasound evaluations and serum laboratory testing in accordance with guidelines issued by Guantanamo's gastroenterology department.[3]  Id.  The results of petitioner's most recent liver test in February 2006 and ultrasounds performed on petitioner's abdomen in October 2002 and May 2003 were all interpreted as normal.  Id.  Respondents assert that petitioner was given an opportunity for a follow-up ultrasound in January 2006 but refused.  Id.

According to Captain Sollock, petitioner was given another physical examination on June 28, 2006, following complaints of abdominal pain.  Id. ¶ 14.  That examination produced no evidence of jaundice or other indications of liver problems, and petitioner allegedly declined further testing.  Id.  A routine follow-up evaluation was performed on September 5, 2006, during which mild abdominal pain was again noted.  Id. ¶ 15.  Medical personnel conducted additional

---

[2] Respondents state that petitioner has received, and in a few cases refused, treatment for a range of medical issues not directly relevant to the symptoms complained of here.  See Sollock Decl. ¶¶ 13, 16.  Petitioner's reply memorandum questions the credibility of respondents' assertions that petitioner would refuse treatment for certain maladies but agree to treatment for other, less-serious ailments.  See Pet'r's Reply at 3.  Petitioner does not, however, challenge the veracity of respondents' description of examinations and tests conducted with respect to the symptoms described above.

[3] These tests include liver function tests, complete blood counts ("CBC"), electrolytes, tumor marker, alpha-fetoprotein, serum liver transaminases, and bilirubin levels.  Sollock Decl. ¶ 12.

blood work,[4] the results of which were either normal or were still pending as of September 8, 2006.  Id.  Respondents state that petitioner will also be scheduled for the next available appointment for an abdominal ultrasound.  Id.

In support of his allegations of inadequate medical care, petitioner has submitted affidavits from two medical doctors who specialize in liver disease.  The affidavit accompanying petitioner's motion is from Dr. Donald Jensen, a professor of medicine at the University of Chicago and Director of the Center for Liver Diseases Section of Gastroenterology at the University of Chicago Hospitals.  See Pet'r Mem. Ex. C (Aff. of Dr. Donald Jensen ("Jensen Aff.")) ¶ 1.  Dr. Jensen reviewed a list of the symptoms that petitioner described in his July 2006 meeting with counsel.  Id. ¶ 9.  Based on those symptoms, plus the additional symptoms of chilling easily and having a possible history of Hepatitis B,  and with the caveat that it is difficult to diagnose petitioner without reviewing his medical records, Dr. Jensen suggested that petitioner might be suffering from liver cancer.  Id. ¶ 12.  Dr. Jensen described a range of blood and urine tests that he typically would perform on a patient presenting the symptoms described by petitioner.[5]  See id. ¶ 13.

Dr. Jensen submitted a supplementary affidavit after he reviewed Captain Sollock's description of the medical care petitioner has been receiving at the detention hospital.  See Pet'r's

---

[4] The testing at this evaluation included a CBC, coagulation panel, complete metabolic profile, serum magensium, phosphorus, amylase, hepatitis B DNA viral load, alpa-fetoprotein, and urinalysis.  Sollock Decl. ¶ 15.

[5] Dr. Jensen stated that he would perform the following ten tests:  hepatic function panel; prothrombin time/INR; HBsAg, anti-HBs; HBV DNA by PCR; alpha-fetoprotein; CBC; basic metabolic panel (Na, K, Cl, $CO_2$, BUN, creat); urinalysis; sedimentation rate; and hepatitis C antibody.  Jensen Aff. ¶ 13.

Reply Ex. D (Supplemental Aff. of Dr. Donald Jensen ("Jensen Suppl. Aff.")) ¶ 15.  Based on

that description, Dr. Jensen stated that the guidelines for a patient with chronic Hepatitis B,

which call for regular monitoring that includes ultrasound testing, are not being followed in

petitioner's case.  Id. ¶16.  Dr. Jensen also suggests that petitioner should be tested for Hepatitis

C and delta, and undergo an upper endoscopy to rule out gastrointestinal diseases that might be

related to his abdominal pain.[6]  Id. ¶¶ 17, 18, 20.  Identical observations were made by

petitioner's second affiant, Dr. Juerg Reichen, who is the Chief of Hepatology at the University

Hospital of Bern, Switzerland.  Pet'r's Reply Ex. E (Affidavit of Dr. Juerg Reichen ("Reichen

Aff.")) ¶¶ 1, 13, 14, 17.

## STANDARD OF REVIEW

Petitioner does not explicitly style his motion as one for a preliminary injunction, but the

primary relief he seeks--access to medical records and provision of medical treatment--is best

characterized as preliminary injunctive relief.[7]  To prevail on a motion for a preliminary

injunction, petitioner must demonstrate (i) a substantial likelihood of success on the merits; (ii)

that he will suffer irreparable harm absent the relief requested; (iii) that other interested parties

will not be harmed if the requested relief is granted; and (iv) that the public interest supports

granting the requested relief.  E.g., Chaplaincy of Full Gospel Churches v. England, 454 F.3d

---

[6]Dr. Jensen additionally recommends treatment for petitioner's latent TB, Jensen Suppl. Aff. ¶ 19, but respondents assert that petitioner has refused treatment, Sollock Decl. ¶ 13.

[7]Petitioner's request that he be transferred to Dr. Reichen's clinic in Switzerland for treatment strains the bounds of a request for *preliminary* injunctive relief, see Cobell v. Kempthorne, 455 F.3d 301, 314 (D.C. Cir. 2006) ("The usual role of a preliminary injunction is to preserve the status quo pending the outcome of litigation." (internal quotation marks omitted)), but the Court considers it ancillary to petitioner's request for outside medical treatment.

290, 297 (D.C. Cir. 2006); Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004).  In assessing a motion for a preliminary injunction, the district court should "balance the strengths of the requesting party's arguments in each of the four required areas."  Chaplaincy of Full Gospel Churches, 454 F.3d at 297 (internal quotation marks omitted).  Because a showing of irreparable harm is the basis of injunctive relief, however, a "movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction."  Id.  A failure to show any likelihood of success on the merits is also grounds to deny a motion for a preliminary injunction.  See, e.g., Trudeau v. Fed. Trade Comm'n, 456 F.3d 178, 182 n.2 (D.C. Cir. 2006) (affirming denial of preliminary injunction where plaintiff had no likelihood of success on merits); Apotex, Inc. v. FDA, 449 F.3d 1249, 1253-54 (D.C. Cir. 2006) (same).  Furthermore, "a preliminary injunction is an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion."  Cobell v. Norton, 391 F.3d at 258.

## ANALYSIS

The emergency motion before the Court challenges the adequacy of medical treatment furnished to an individual in United States custody.  This Court has previously resolved a similar motion in the Guantanamo detainee context.  See O.K. v. Bush, 344 F. Supp. 2d 44 (D.D.C. 2004) (denying detainee's emergency motion to compel independent medical evaluation and production of medical records).  As in that case, petitioner's motion here "must be assessed against the background of a consistent body of law reflecting the reluctance of courts to second-guess the medical treatment provided to prisoners by government officials."  Id. at 60-61.  This reluctance is embodied in the requirement that a prisoner demonstrate that government officials have exhibited "deliberate indifference" to the prisoner's "serious medical needs."  Neitzke v.

Williams, 490 U.S. 319, 321 (1989); Estelle v. Gamble, 429 U.S. 97, 104 (1976).[8]  Deliberate

indifference is found where officials were "'knowingly and unreasonably disregarding an

objectively intolerable risk of harm to the prisoners' health or safety.'"  Scott v. District of

Columbia, 139 F.3d 940, 943 (D.C. Cir. 1998) (quoting Farmer v. Brennan, 511 U.S. 825, 846

(1994)).

The "deliberate indifference" standard is not satisfied by allegations of "mere negligence,

mistake or difference of opinion."  Bowring v. Godwin, 551 F.2d 44, 48 (4th Cir. 1977).  As this

Court has explained:

> Absent a showing of misconduct that rises to the level of deliberate indifference, courts
> will not sit as boards of review over the medical decisions of prison officials, and they
> will not second-guess the adequacy of a particular course of treatment.  Bowring, 551
> F.2d at 48.  In particular, a prisoner has no discrete right to outside or independent
> medical treatment.  See Roberts v. Spalding, 783 F.2d 867, 870 (9th Cir. 1986) ("A
> prison inmate has no independent constitutional right to outside medical care additional
> and supplemental to the medical care provided by the prison staff within the
> institution.").

O.K., 344 F. Supp. 2d at 61 (citation omitted).

Petitioner has not demonstrated a likelihood of success on the merits of his claim because

he has not shown that his medical care at Guantanamo has been deficient to the point of violating

_____

[8]The "deliberate indifference" standard was developed in the context of Eighth
Amendment challenges to prison-provided medical care, see Estelle, 429 U.S. at 104, and has
been applied in cases involving the rights of pretrial detainees under the Due Process Clause of
the Fourteenth Amendment, see Hill v. Nicodemus, 979 F.2d 987, 991-92 (4th Cir. 1992)
(collecting cases).  Petitioner has not asserted a constitutional basis for his right to adequate
medical care, and argues only that, "at a minimum," the lesser-standard of Article 3 of the
Geneva Convention "that the sick 'be cared for'" applies.  Pet'r's Reply at 1 (quoting Geneva
Convention Relative to the Treatment of Prisoners of War art. 3, Aug. 12, 1949, 6 U.S.T. 3316,
75 U.N.T.S. 135).  Without deciding that the "deliberate indifference" standard applies to
petitioner, this Court will again refer to this body of law to frame its analysis of this emergency
motion.  Cf. O.K., 344 F. Supp. 2d at 61 n.23.

any rights he may possess.  Instead, the affidavits and declarations submitted by the parties reveal at most a difference of opinion as to which particular diagnostic tests and treatments should be administered.  That difference of opinion does not even appear to be particularly substantial, given that most of the procedures recommended by Dr. Jensen in his first affidavit have already been performed on petitioner. Compare Jensen Aff. ¶ 13, with Sollock Decl. ¶¶ 12, 15. Petitioner's experts are now essentially offering to give a second opinion of petitioner's condition on the basis of the previous test results and four additional tests they would like to see conducted. See Jensen Suppl. Aff. ¶¶ 17, 18, 19, 20; Reichen Aff. ¶¶ 14, 15, 16, 17.  Although Dr. Jensen and Dr. Reichen also state that petitioner's care is not consistent with the guidelines for treating a patient with chronic Hepatitis B, Jensen Suppl. Aff. ¶ 16, Reichen Aff. ¶ 13, they do not explain why the routine tests and ultrasounds that have been and continue to be performed on petitioner are insufficient under those guidelines, see Sollock Decl. ¶ 12.  In short, petitioner has not provided evidence of misconduct on the part of respondents with respect to his medical care, particularly in light of the "deliberate indifference" standard.

Petitioner has also failed to demonstrate that he will suffer irreparable injury if his motion is denied.  The D.C. Circuit "has set a high standard for irreparable injury. First, the injury must be both certain and great; it must be actual and not theoretical.  The moving party must show [t]he injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." Chaplaincy of Full Gospel Churches, 454 F.3d at 297 (citations and internal quotation marks omitted) (alteration in original); see also Wisc. Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam).  Although petitioner has characterized respondents' actions as "[l]eaving Mr. Al-Ghizzawi to die from diseases that are

-9-

readily treatable," Pet'r's Reply at 2, he has not specifically denied receiving a medical examination, extensive testing and treatment during his time at Guantanamo, and undergoing follow-up lab work as recently as September 2006.[9]   That treatment, which petitioner has not demonstrated is deficient, is ongoing and will include the scheduling of an additional ultrasound. Sollock Decl. ¶ 15.   After fully and carefully considering petitioner's allegations, this Court cannot conclude that petitioner's health is in immediate danger from deficient medical treatment.

With respect to the effect of a preliminary injunction on the interests of respondents and the public, this Court notes that petitioner has requested relief that would require direct judicial intervention into the operations of the medical facility at Guantanamo.   In particular, petitioner has asked for an order requiring respondents to perform the additional medical tests suggested by Dr. Jensen and Dr. Reichen.   The request for petitioner's medical records, while arguably less intrusive to the operations at Guantanamo, is nonetheless being made for the purpose of obtaining second opinions from outside medical practitioners.   See Pet'r's Mem. at 5; Pet'r's Reply at 6. Petitioner asserts that he "fails to see how providing Mr. Al-Ghizzawi with proper medical care could possibly interfere with the interests of Respondents."   Pet'r's Reply at 2.   Such a conclusory assertion would simply dispense with the substantial interests that lie behind creation of the "deliberate indifference" standard in the prison context.   However, there is no need to analyze further the strength of petitioner's arguments with respect to respondents' and the public's interests; the denial of petitioner's motion is warranted because he has not demonstrated a likelihood of success on the merits or that he will suffer irreparable harm absent the requested

---

[9]Petitioner does question the assertion by respondents that petitioner declined any further laboratory, radiology, or medical intervention following his June 28, 2006, examination.  Pet'r's Reply at 3; see Sollock Decl. ¶ 14.

relief.

Accordingly, it is this <u>2nd</u> day of <u>October</u>, 2006, hereby

**ORDERED** that [29] petitioner's emergency motion to compel access to medical records and to require emergency medical treatment is **DENIED**.

<u>          /s/ John D. Bates          </u>
JOHN D. BATES
United States District Judge
