# EXHIBIT 4

**SECOND SOLLOCK DECLARATION**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ABDUL HAMID ABDUL SALAM AL-GHIZZAWI )<br>Petitioners/Plaintiffs )<br> )<br>v. )<br> )<br>GEORGE W. BUSH, et al., )<br>Respondents )<br> ) | CIVIL ACTION<br>NO. 05-cv-02378 |

**SECOND DECLARATION OF CAPT RONALD L. SOLLOCK, M.D., Ph.D.**

Pursuant to 28 U.S.C.§ 1746, I, Ronald L. Sollock, M.D., Ph. D., hereby declare that to the best of my knowledge, information, and belief, the following is true, accurate, and correct. This declaration is provided to respond to certain allegations made by the attorney for Mr. Abdul Hamid Abdul Salaam Al-Ghizzawi (ISN 654).

1. Through his attorney, Mr. Al-Ghizzawi claims he had "never been informed that he had been diagnosed with Hepatitis B or Tuberculosis" and that he did not learn this information until his attorney told him on September 19, 2006. He claims that he was always told by medical personnel that there was "nothing wrong with him," that medical personnel refused to tell him the results of past testing and attempted to convince him to submit to more testing even though they would not tell him the results of past testing. Mr. Al-Ghizzawi's statements are untrue. The treatment standards for detainees at Joint Task Force-Guantanamo Bay (JTF-GTMO) are the same treatment standards used for uniformed and civilian personnel on base. Detainees are informed of their medical problems and are involved in the testing and treatment options for

1

them. It is the standard practice of medical providers in the Joint Medical Group (JMG) at JTF-GTMO to discuss with detainees their diagnoses and provide recommendations for further evaluation and treatment. Counseling is provided on the potential risks and benefits of treatment, as well as the consequences involved with decisions, including the risks associated with rejection of care. The communication is facilitated with the assistance of an interpreter, and opportunities for the detainee to ask questions are available at every encounter with medical providers. Obtaining direct or implied informed consent is a routine part of any testing, treatment, and medical procedure, which includes a review of risks and benefits, as well as any available alternatives.

2. Mr. Al-Ghizzawi's lawyer wrongly contends that he was never informed that he had been diagnosed with Hepatitis B and that he had never refused any treatment for this disease. In accordance with the practice discussed in paragraph 1, Mr. Al-Ghizzawi was specifically informed about his diagnosis and his treatment options.

    a. The medical protocol followed at JTF-GTMO for the evaluation and treatment of detainees who test positive for Hepatitis B has been coordinated through the Gastroenterology Division of the Naval Medical Center San Diego and meets the current standard of care for the treatment of this disease. A Department of Defense (DoD) medical professional serving at JTF-GTMO, or at any other DoD facility, would follow the same protocol as their civilian counterparts. This care is facilitated by periodic visits from a Gastroenterologist, as well as the availability provided by phone consultation with Gastroenterology and Infectious Disease as

2

needed. The specialists make recommendations according to the latest prevailing standards of care, including the availability of new diagnostic testing or treatment options.

    b. Hepatitis B is endemic to certain areas of the world, including the Middle East. Accordingly, all detainees are screened at arrival for serological evidence of this disease. Each detainee found to be positive for the HbsAg (Hepatitis B surface antigen) is offered further evaluation at the medical clinic as such a test result would serve to identify individuals with ongoing active Hepatitis. Each detainee is given the appropriate information regarding Hepatitis B to enable him to make a decision regarding accepting or declining the evaluation and possible treatment of his disease. Both the evaluation and treatment are completely voluntary.

    c. If a detainee desires evaluation of his Hepatitis B situation, an evaluation and testing will be conducted. Following consultation with a board-certified infectious disease and/or gastroenterologist, the results of the evaluation and testing are then used to determine the appropriate course of treatment for the detainee, or will serve as the basis for further testing as deemed medically appropriate. The medical professionals at JTF-GTMO adhere to the standards contained in standard operating procedures that include the American Association for the Study of Liver Diseases (AASLD) practice guidelines such as are referred to in the Supplemental Affidavit of Dr. Juerg Reichen. While the standard operating procedures specifically refer to the 2001 AASLD guidelines, as noted above, care protocols are adjusted in accordance with prevailing standards. Further, while the 2004 AASLD practices guidelines update the medical treatment guidelines from 2001, the 2004 update did not affect the diagnosis of Hepatitis B.

3

d. According to his lawyer, blood testing of Mr. Al-Ghizzawi prior to his detention had shown a positive result for Hepatitis B but a follow-up test showed a negative result. He claims to not have suffered any symptoms of Hepatitis B until he was at Guantanamo. Mr. Al-Ghizzawi's in-processing medical evaluation included a review of his medical history. This information is normally obtained by interviewing the detainee. Mr. Al-Ghizzawi's in-processing medical history indicates that Mr. Al-Ghizzawi said he had a liver infection approximately 10 years prior to his detention at Guantanamo and that he had a history of Hepatitis B, thus giving rise to the inference that he had a liver infection that may have been caused by Hepatitis B.

e. After testing in August 2002 confirmed that Mr. Al-Ghizzawi had Hepatitis B, he was advised of the test results and of the screening and treatment options available to him. Mr. Al-Ghizzawi's laboratory testing revealed a pattern consistent with inactive Hepatitis B carrier state, meaning that he was not an active Hepatitis B carrier. According to the 2004 AASLD Practice Guidelines, patients who carry inactive Hepatitis B should be monitored with periodic liver chemistries every 6 to 12 months. Mr. Al-Ghizzawi did not warrant additional monitoring at that time.

f. Mr. Al-Ghizzawi has subsequently been offered testing for Hepatitis B on several occasions, refusing laboratory testing at times and consenting at others. When he consented, appropriate laboratory testing was performed in accordance with standard operating procedures and the standard of care. His liver biochemistries have been sought or obtained on multiple occasions at JTF-GTMO. All have resulted in normal transaminase and bilrubin levels. According to the 2004 AASLD Practice Guidelines, treatment for inactive Hepatitis B carrier is

4

not recommended. For example, on 11 and 15 September 2002, Mr. Al-Ghizzawi refused to have blood drawn during a normal follow-up visit for his inactive Hepatitis B. He consented to have his blood drawn during an additional follow-up for Hepatitis B on September 18, 2002, and his test results were normal. On October 8, 2002, Mr. Al-Ghizzawi had another follow-up for Hepatitis B, after he complained of right upper quad pain. Labs were repeated and came back normal. On March 20, 2003, Mr. Al-Ghizzawi had an additional routine follow-up for Hepatitis B. His labs were taken and came back normal. On August 14, 2003, medical staff had a discussion with Mr. Al-Ghizzawi concerning Hepatitis B including the need for continued routine evaluation and treatment, if indicated. Mr. Al-Ghizzawi refused an evaluation at that time. On 27 January 2004, a discussion was held by medical staff with Mr. Al-Ghizzawi regarding issues involving Hepatitis B, no further evaluations were given. On September 23, 2005, Mr. Al-Ghizzawi refused additional testing regarding his liver and he was counseled on the importance of taking the appropriate tests. On March 27, 2006, Mr. Al-Ghizzawi received a routine Hepatitis B evaluation. He refused the examination and displayed no symptoms of the disease. On June 28, 2006, Mr. Al-Ghizzawi once again refused lab tests for his liver. He was being seen in response to a complaint of abdominal pain. Mr. Al-Ghizzawi continued to refuse testing despite an explanation of the risks involved. On September 5, 2006, Mr. Al-Ghizzawi was given a routine Hepatitis B follow-up. Mr. Al-Ghizzawi consented to having several lab tests performed that day, however, he refused to give a DNA sample. The tests were returned as normal.

3. Mr. Al-Ghizzawi's lawyer also contends that he was never informed that he had been diagnosed with latent Tuberculosis and that he had never refused treatment for this disease. This

5

is untrue. In accordance with the practice discussed in paragraph 1, Mr. Al-Ghizzawi was specifically informed about his latent Tuberculosis diagnosis and his treatment options.

a. If a person is diagnosed with "latent Tuberculosis," this means that the person's body has been exposed to the tuberculosis mycobacterium, but has no symptoms or findings of active disease. Although many people with latent Tuberculosis never develop active Tuberculosis, we recommend to detainees that they undergo a course of treatment to decrease the likelihood of such a development. Our standard treatment option for detainees diagnosed with latent Tuberculosis is to offer them treatment in the form of a medication called isoniazid (INH), which destroys the Tuberculosis bacteria present in the body. This treatment takes approximately 9 months and consists of taking 900 mg of isoniazid (INH) by mouth twice weekly, along with a 100 mg twice a week supplementation of pyridoxime, or Vitamin B6. This practice meets the standard of care for the treatment of this disease.

b. In accordance with our standard procedure, Mr. Al-Ghizzawi was informed about his latent Tuberculosis diagnosis on November 5, 2004, in the detention clinic. The diagnosis of latent tuberculosis was explained to the detainee through an interpreter. After the diagnosis was explained to him, Mr. Al-Ghizzawi expressed that he understood his risk of developing an active case of tuberculosis later in life. He has since refused any form of treatment. At this encounter, Mr. Al-Ghizzawi did not have any symptoms of active tuberculosis including night sweats, cough, hemoptysis (coughing up blood), or weight loss. He had had a normal chest x-ray that had been taken in August of 2004.

6

4. Mr. Al-Ghizzawi's lawyer also claims that a doctor "expressed surprise and concern" during an early September 2006 examination because Mr. Al-Ghizzawi's "stomach area was so bloated and blackened in color." Mr. Al-Ghizzawi was seen in the detention clinic on September 5, 2006, for a routine Hepatitis B follow-up evaluation, and again on September 6, 2006, after an episode of nausea and vomiting associated with mild stomach discomfort. (Paragraph 17 of my prior declaration incorrectly stated that Mr. Al-Ghizzawi had not complained of "vomiting or diarrhea." A review of the medical record does not document a pattern of complaints of such types of symptoms by Mr. Al-Ghizzawi consistent with liver malfunction or liver cancer. Further, the September 6, 2006 episode of nausea, vomiting, and stomach discomfort occurred subsequent to the completion of the review of medical information upon which my prior declaration was based.) On neither occasion was his abdomen on examination found to be bloated, distended, or blackened.

5. Mr. Al-Ghizzawi's attorney claims that during her September 19-20, 2006, meeting with Mr. Al-Ghizzawi, he was "obviously jaundiced, drawn and in visible pain (constantly rubbing his back and chest," that he "had a difficult time focusing his eyes," "appeared listless and had a difficult time concentrating," and that he also had a "lump near his rib cage on his right side that was causing him great discomfort." The detainee has recently been seen on September 5th, 6th and 28th, 2006. On none of these occasions was Mr. Al-Ghizzawi found to have jaundice. Additionally, he did not appear listless, nor did he appear to have any back and/or chest pain. A physical examination did not reveal any mass in his ribs, or other part of his body. Testing was completed on September 5, 2006, including CBC, a complete metabolic profile including a liver test, urinalysis, and an amylase. A Hepatitis B DNA viral load was also ordered at that time;

7

however, Mr. Al-Ghizzawi later refused to have his DNA drawn and the test was not taken. An AFP test came back at 9 ng/ml. This test, if greater than 500 ng/ml, is suggestive of hepatocellular cancer. Even though recent testing of Mr. Al-Ghizzawi's liver functions have been normal, an ultrasound to evaluate his liver has been ordered and is pending at this time. Also, the medical staff is considering whether additional consultation with a Gastroenterologist is indicated for Mr. Al-Ghizzawi, once all test results are available.

I declare under penalty of perjury pursuant to the laws of the United States that the foregoing is true and correct.

Dated: 16 October 2006

Ronald L. Sollock, M.D., Ph. D.