

Medizinische Fakultät

**Institut für Klinische Pharmakologie und viszerale Forschung**

# AFFIDAVIT OF DR. JUERG REICHEN

I, Dr. Juerg Reichen, state the following under oath:

1. That I am a doctor of medicine with a specialty in clinical pharmacology and hepatology. I have over thirty five years of experience in my profession and am currently chief of Hepatology at University Hospital, Berne, Switzerland.

2. I have conducted extensive research in the treatment and diagnosis of liver disorders including hepatitis, cirrhosis and fibrosis of the liver. My research has been published by numerous peer-reviewed journals including the New England Journal of Medicine, Annals of Internal Medicine, Gastroenterology, Hepatology and Journal of Hepatology. I am a co-editor of the standard textbook in Hepatology.

3. My qualifications including my training, membership in numerous learned societies, publications, public service and different National and International awards have been enumerated in previous affidavits. My curriculum vitae is available to the public and the court at http://www.ikp.unibe.ch/lab2/cvnet.htm.

4. I submitted affidavits on behalf of Mr. Al-Ghizzawi in September and October of 2006 and December 2007 with my recommendations regarding tests that should be performed to properly diagnose Mr. Al-Ghizzawi's condition. Attorney Gorman has regularly updated me regarding Mr. Al-Ghizzawi's state of health. There are four areas of concern that one can divine out of the cryptic, incomplete and often inaccurate descriptions of the physicians in charge for the detainees at Guantanamo, namely:
   - A 'history' of hepatitis B
   - 'Latent' tuberculosis, probably acquired in Guantanamo
   - A suspicion of HIV infection
   - Diarrhea and nausea
   - Itching

5. A 'history of hepatitis B'. This term was employed in the first affidavit of Dr. Sollock (paragraph 12); in the same paragraph he alludes to guidelines regarding

Prof. Dr. med. Jürg Reichen  +41-31 632 3570
Institut für Klinische Pharmakologie  031 632 4997
Murtenstrasse 35  reichen@ikp.unibe.ch
3010 Bern  http://www.ikp.unibe.ch/lab2



the work-up of hepatitis B but fails to indicate that a complete serology for hepatitis B viral markers and HBV-DNA quantification was obtained. After my first affidavit, apparently a HBV-DNA was obtained (paragraph 15 in the same affidavit), results of which were still pending at that time. Without the results of this DNA Dr. Sollock declared the patient as 'an inactive hepatitis B carrier state' (paragraph 2e in the second affidavit). In the same affidavit follows a bizarre statement (paragraph 2f), namely that 'Mr. Al-Ghizzawi consented to having several lab tests performed that day, however, he refused to give a DNA sample. The tests were returned as normal'. His successor, Dr. B.C. Meneley retains the diagnosis inactive carrier state but alludes to tests shedding doubts on that diagnosis. I quote from his affidavit (February 15th 2008, paragraph 6): 'This slight elevation in these separate tests is a possible sign of precore murtant hepatitis B (active hepatitis B) and/or cirrhosis of the liver, but not diagnostic of this fact'. He goes on to state that the only way to determine what Mr. Al-Ghizzawi is suffering from is a liver biopsy. With all due respect to my colleagues, Drs. Sollock and Meneley I have to to set a few facts straight:

5.1. There is no such thing as a 'history of hepatitis B'. The patient can have a constellation where he eliminated the virus (s.p. hepatitis B). We know that such patients are still potentially infectious and can reactivate their hepatitis B at any time, in particular when there immune system is weakened. If they are hepatitis B surface antigen positive, as seems to be the case for Mr. Al-Ghizzawi, they have chronic hepatitis B or are inactive carriers. Some authors – me included – use the term inactive carrier with great circumspection since in areas of the world where there is potential exposure to aflatoxins even 'inactive carriers' have a markedly increased risk of developing hepatocellular carcinoma. This applies certainly to Mr. Al-Ghizzawi.

5.2. Captain Sollock retrospectively justified his procedures with the 2001 AASL guidelines on the diagnosis of an inactive carrier state. He justified this in paragraph 2c of his second affidavit as 'while the 2004 practices guidelines update the medical treatment guidelines from 2001, the 2004 update did not affect the diagnosis of hepatitis B'. This is patently wrong since the 2004 guidelines included the need for HBV-DNA testing – results of which are still pending…

5.3. HBV-DNA testing is a routine blood test for which a patient does not have to give informed consent – it is not 'his' DNA that is examined. It appears that Dr. Sollock is not cognizant of the fact that many infectious agents can be determined by simple molecular biology techniques. Furthermore, this statement contradicts his first affidavit (paragraph 15).

5.4. Dr. Meneley raises the issue of a precore mutant. This diagnosis is made on serology (anti-HBe positive, HBV DNA positive > $10^5$). If this constellation is present, the typical mutations can be found by direct sequencing of the virus or a line-probe assay. Liver biopsy will not be helpful in making the distinction between inactive carrier state and chronic hepatitis.

5.5. Dr. Meneley ought to be commended that he recognizes that precore mutants can lead to liver cirrhosis. Advanced fibrosis can be also detected on clinical grounds, non-invasive fibrosis markers such as determination of serum hyaluronate, the Fibrotest or by advanced ultrasound techniques such as the Fibroscan. Even if these tests were not available or refused by the patient, a treatment deci-



        sion can and should be reached when the patient does not meet the criteria of an inactive carrier.

5.6.  From the considerations above it is evident that the physicians at Guantanamo do not follow the guidelines 2004 of AASLD and/or are unable to translate them into clinical practice. It is also evident that they withhold information without any military value, misinterpret it and try to withhold treatment from Mr. Al-Ghizzawi. Furthermore, with each affidavit a little piece of more information is released. None of these pieces permits to assess the liver disease Mr. Al-Ghizzawi is suffering from. However, it is interesting and disturbing to observe that the labeling of his liver condition goes from 'a history of hepatitis B' (point 12 of the first Sollock affidavit) to 'inactive carrier' (paragraph 2e in the second Sollock affidavit) to the consideration of the presence of a precore mutant with possible cirrhosis (paragraph 6 in the Meneley affidavit). It should be pointed out that precore mutants often lead to flares in transaminases which can be associated with symptoms such as fatigue, nausea and right upper quadrant pain.

5.7.  For Attorney Gorman and her medical advisors to judge the need for medical treatment of the hepatitis B of Mr. Al-Ghizzawi the following information has to be provided from his physicians at Guantanamo:
- Complete hepatitis B serology (HBs-Antigen, HBe-Antigen, anti-HBe, anti-HBs
- Hepatitis B DNA viral load
- Genotype, precore-mutations of HBV-DNA either by direct sequencing or by line-probe assay
- Copies of all ALT and AST tests performed on Mr. Al-Ghizzawi.
- Non-invasive tests of advanced liver fibrosis as lined out above.

6.  Latent tuberculosis: Captain Sollock concedes that this condition was acquired in Guantanamo (paragraph 13 of his first affidavit). Reportedly, a chest X-ray in August 2004 was normal. In all three affidavits by Drs. Sollock and Meneley it is pointed out that the patient 'refused treatment'.

7.  Suspicion of HIV infection.
According to his Attorney Mr. Al-Ghizzawi was informed that he has HIV infection. This is vehemently denied by Dr. Meneley. It is difficult to accept that Mr. Al-Ghizzawi would invent such an infection since it would diminish his chances for release given the public prejudice against patients so affected. Some answers by Dr. Meneley ring some alarm bells, though:

7.1.  It seems reasonable practice to test detainees when they arrive at the compound.

7.2.  Which practices at the compound led the physicians to repeat HIV testing?

7.3.  Which test(s) were employed, what were the results?

7.4.  A CD4 count and tests for other immune deficiencies should be performed on the patient's blood.



8. The patient has repeatedly asked for medical help for diarrhea and nausea. Apparently, H. pylori infection was diagnosed and treated. No details are given. Was eradication treatment given and its success confirmed? Southern Mediterranean diet is presumably healthier than what one would be served at Guantanamo. Of particular concern in this context is the question about celiac sprue, an allergy to wheat proteins, in particular gluten.

    8.1. Has an anti-Transglutaminase antibody ever been obtained? Has sprue been ruled out by the appropriate procedures?

9. Itching: This latest symptom could be an indicator that something serious is happening in the liver of Mr. Al-Ghizzawi. One wonders whether the specialty of Dr. Meneley would be Dermatology – the statement (his affidavit from February 15th 2008, paragraph 11) demonstrates that there was no physical substrate for pruritus (itching). The reflex of the dermatologist is to prescribe topical steroids. That of the internist / hepatologist to search for other causes. One of them could be a complication of hepatitis B or – more frequent – hepatitis C. According to all three affidavits by the physicians in charge this was never sought – but since it is as frequent as hepatitis B in Libya appropriate testing is mandatory.

    9.1. Obtain and transmit anti-HCV status to the Attorney.

    9.2. Repeat ultrasound to rule out any potentially obstructive lesion in the liver.

10. The statements of Dr's. Sollock and Meneley are filled up with resentful statements about Mr. Al-Ghizzawi refusing this and that test. Both have made their medical carreer in the military. Having served both in the army of my country as a physician, in the VA system in the U.S. and having consulted in Libya, the homeland of Mr. Al-Ghizzawi I should like to point out the following:

    10.1. It is obvious and natural that there exists no patient – physician relationship between Mr. Al-Ghizzawi and the medical staff at Guantanamo. Mr. Al-Ghizzawi considers the medical staff as part of the system which detains him illegally there.

    10.2. It can for this and many other reasons – pointed out above – not be held against him if he refuses invasive procedures. Dr. Meneley considers liver biopsy minimally invasive – if he informs the patient correctly about the risks, he will give a figure of 10 % post-interventional pain, 1 % of major bleeding, 0.1 % of need for surgical intervention and less than 0.01 % of death. Many patients not under the stress and distrust of Mr. Al-Ghizzawi will refuse this 'minimally invasive' procedure when informed of these facts.

    10.3. I cannot explain why Mr. Al-Ghizzawi is under the impression to be infected by HIV. Either he has misunderstood some information given to him by medical staff (which has to use interpreters) or he has been willfully fed false information by medical staff.



10.4.  I do not know the ethnic background of Mr. Al-Ghizzawi – if he is Bedouin I know that there is distrust to start with. It requires time, patience and a profound understanding of this fascinating culture to establish trust. Mission impossible for any American physician, in particular anybody associated with the U.S. army.


FURTHER AFFIDANT SAYETH NAUGHT
Dr. Juerg Reichen
Signed and sworn to


February 19th 2008