## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ABDUL HAMID ABDUL SALAM**
**AL-GHIZZAWI,**

        **Petitioner,**

        **v.**

**GEORGE W. BUSH, et al.,**

        **Respondents.**

        **Civil Action No.  05-2378 (JDB)**

### MEMORANDUM OPINION & ORDER

Petitioner Abdul Hamid Abdul Salam Al-Ghizzawi, a citizen of Libya, is currently

detained at the United States Naval Base in Guantanamo Bay, Cuba ("Guantanamo"), and he has

challenged the legality of his confinement in a petition for a writ of habeas corpus.  This Court

previously ordered a stay in this case pending resolution of related appeals in the D.C. Circuit,

see July 19, 2006 Order, and the Court is now awaiting the Supreme Court's decision in

Boumediene v. Bush, 476 F.3d 981 (2007), cert. granted, 127 S. Ct. 3078 (June 29, 2007), which

was argued on December 5, 2007.

Currently before the Court is Al-Ghizzawi's New Emergency Motion for Medical

Treatment and Medical Records.  As the title implies, this is not the first time Al-Ghizzawi has

requested preliminary injunctive relief seeking this Court's direct intervention into the medical

treatment provided to individuals in United States custody at Guantanamo.  After careful

consideration, the Court previously denied Al-Ghizzawi's similar motion filed in August 2006,

finding that he had "not provided evidence of misconduct on the part of respondents with respect

-1-

to his medical care." Al-Ghizzawi v. Bush, 2006 WL 2844781, at *4 (D.D.C. Oct. 2, 2006). And the Court previously denied his October 2006 motion for reconsideration, stating that "the Court still cannot conclude that petitioner's health is in immediate danger from deficient medical treatment." Nov. 2, 2006 Mem. Op. & Order at 5 (Dkt. No. 56). Now, once again, Al-Ghizzawi has failed to demonstrate on this most recent occasion that he is not receiving thorough, appropriate, professional medical care. The Court will therefore deny his new emergency motion.[1]

## BACKGROUND

Al-Ghizzawi, a man in his mid-forties who has been in the custody of the United States since late 2001, arrived at Guantanamo in June 2002. Pet'r's Mot. Ex. C (Aff. of Attorney H. Candace Gorman) ¶¶ 1, 5. In his opening brief to this Court, Al-Ghizzawi made grave accusations about the U.S. government's failure to provide any medication or treatment for his alleged "life threatening illnesses." Pet'r's Mot. at 3. As the briefing progressed, however, his accusations regarding the lack of medical care weakened, and he was forced to concede that his most serious allegation was, in fact, inaccurate. Because he still maintains that the government is providing inadequate medical care, however, it is necessary to detail the parties' accounts of his

_____

[1]The Court takes seriously its obligation to review carefully and resolve every matter based upon the parties' memoranda and exhibits, the applicable law, and the entire record. In this case, Al-Ghizzawi's counsel has attempted to add another factor into the mix by encouraging interested parties to submit a litany of letters to this Court expressing their opinions on Al-Ghizzawi's behalf. Although the Court has read the letters that were submitted and understands the emotions and sentiments expressed, the Court is not confident that counsel's attempt to influence the resolution of this matter by marshalling a letter-writing campaign was appropriate. The Court hopes that all interested persons can set aside the emotions and sympathies understandably triggered by Guantanamo detainee cases and remember that the Court must resolve this matter based on the law and the medical declarations that detail the care available to Al-Ghizzawi.

physical condition, the medical treatment he has been offered and is (or is not) receiving, and the relief he now requests.

Al-Ghizzawi first makes the serious allegation that Guantanamo medical personnel diagnosed him with acquired immune deficiency syndrome ("AIDS") and offered him no medication or treatment for this condition. Id. at 2, 9. Contrary to Al-Ghizzawi's unsubstantiated assertions, however, the sworn declaration of Dr. Bruce C. Meneley, the Commanding Officer, Naval Hospital, Commander, Joint Medical Group, Guantanamo Bay, Cuba, states that "Mr. Al-Ghizzawi is not correct." Resp'ts' Opp. Ex. B (Declaration of Captain Bruce C. Meneley, M.D. ("Meneley Decl.")) ¶ 5. As is the typical processing procedure, Al-Ghizzawi was tested for human immunodeficiency virus ("HIV") upon his arrival at Guantanamo, and the result was negative. Resp'ts' Response Ex. C (Declaration of Captain Bruce C. Meneley, M.D. ("Second Meneley Decl.")) ¶ 7. In case a detainee contracted HIV just before his arrival at Guantanamo, which would be too recent to show up on the first round of testing, each detainee is tested again several weeks later. Id. Al-Ghizzawi's test result was again negative. Id. According to Dr. Meneley, "[s]ubsequent HIV tests were performed in an attempt to reassure Mr. Al-Ghizzawi that he is not HIV positive." Id.

Each and every test result has been negative, and Al-Ghizzawi has been informed of these results. Meneley Decl. ¶ 5. Although Al-Ghizzawi contends that the medical staff told him he was HIV positive, there is no evidence of this, other than Al-Ghizzawi's unsubstantiated assertions, and his medical file contains multiple notations "stating that he does not believe the physicians who have told him he is HIV negative." Id. As Dr. Meneley points out, to tell Al-Ghizzawi anything other than a truthful diagnosis would violate the rules and protocols under

-3-

which the Guantanamo medical staff operate.  Id.  Respondents therefore argue that Al-Ghizzawi

"is simply not telling the truth or has somehow deceived himself into believing something that is

not true."  Resp'ts' Opp. at 16.  The Court need not determine the source of confusion over this

serious issue, however, because Al-Ghizzawi seeks relief for his medical conditions -- and AIDS

is not one of his medical conditions.  Al-Ghizzawi's counsel now accepts Dr. Meneley's

representations and concedes "that Al-Ghizzawi does not, in fact, suffer from AIDS."  Pet'r's

Supp. Mem. at 1.  Hence, this issue, which sounded so alarming at first, does not warrant this

Court's further attention.

Al-Ghizzawi next asserts that he has been diagnosed with a severe liver infection, has not

been given any medication or treatment for this ailment, and was "scared out of having a liver

biopsy provided by camp medical staff at Guantanamo."  Pet'r's Mot. at 9 (citing Ex. A, Affidavit

of Abdul Hamid Al-Ghizzawi).  Al-Ghizzawi's status as a Hepatitis B carrier was confirmed

shortly after his arrival at Guantanamo.  At that time, he was advised of the screening and

treatment options that were available to him.  As the Court noted in its Memorandum Opinion &

Order on October 2, 2006, "[b]ecause of his history of Hepatitis B, which was confirmed shortly

after the initial physical exam, petitioner has been given routine evaluations that include

ultrasound evaluations and serum laboratory testing in accordance with guidelines issued by

Guantanamo's gastroenterology department."  Al-Ghizzawi, 2006 WL 2844781, at *2 (noting

that those tests included "liver function tests, complete blood counts, electrolytes, tumor marker,

alpha-fetoprotein, serum liver transaminases, and bilirubin levels").

Laboratory results from November 2006 and August 2007 "revealed that Mr. Al-

Ghizzawi's viral markers were slightly elevated above what would normally be seen with a

typical Hepatitis B carrier."  Meneley Decl. ¶ 6.[2]  Because these results suggested the possibility

of active Hepatitis B and/or cirrhosis of the liver, but were not diagnostic of either, medical

personnel recommended that a liver biopsy be performed.  Id.  After Al-Ghizzawi was informed

of the nature, risks, and benefits of the proposed procedure, he refused to consent to the biopsy.

Id. ¶ 7.  The medical staff thereafter conducted an ultrasound of Al-Ghizzawi's liver and found no

evidence of cirrhosis or carcinoma.  Id. ¶ 6.  Al-Ghizzawi then subsequently "refused to have

blood tests for monitoring his liver enzymes and viral load," despite the warning that the refusal

of these tests could be detrimental to his health.  Id. ¶ 7.

    With his reply brief, Al-Ghizzawi submitted an affidavit from Dr. Juerg Reichen, who is

the Chief of Hepatology at the University Hospital of Bern, Switzerland.  Pet'r's Reply Ex. E

(Affidavit of Dr. Juerg Reichen ("Reichen Aff.")).  Relying on the information presented in

respondents' briefs and declarations, Dr. Reichen takes issue with the need for a liver biopsy and

points out that an active Hepatitis B determination can often be made from blood test results.  Id.

¶ 5.4.  Dr. Meneley acknowledges this possibility in his response but reiterates that here "Mr. Al-

Ghizzawi's blood test results are not diagnostic of precore mutant Hepatitis B; the tests do not

indicate either anti-HBe positive or an HBV DNA viral load of $>10^5$."  Second Meneley Decl. ¶

3.  Hence, relying on standards that include the American Association for the Study of Liver

Diseases practice guidelines, Guantanamo medical personnel recommended a liver biopsy as the

---

    [2]Al-Ghizzawi makes much ado about nothing regarding alleged contradictions between
Dr. Ronald Sollock's affidavits, filed in September and October 2006, and Dr. Meneley's
affidavit, filed in February 2008.  See Pet'r's Reply at 7-9.  Although Al-Ghizzawi speculates
with harsh language, there are no obvious contradictions regarding Al-Ghizzawi's Hepatitis B test
results.  Indeed, Dr. Meneley's affidavit discusses tests that were performed and treatment that
was offered after Dr. Sollock's affidavits had been submitted to this Court.

"gold standard and most medically appropriate test that would allow [them] to make definitive treatment decisions." Id.[3]  Because Al-Ghizzawi has failed to consent to follow-up procedures, the medical staff has been unable to make an appropriate determination of his condition.[4]

Following counsel's visit with Al-Ghizzawi on February 26 and 27, 2008, a supplemental memorandum was submitted containing additional symptoms that Al-Ghizzawi complained of and additional symptoms that counsel observed.  According to counsel, Al-Ghizzawi found it difficult to talk, appeared jaundiced, complained of diarrhea, had difficulty urinating, complained about the eyeglasses he was prescribed, felt constant body aches and pains, and experienced itchy skin.  Pet'r's Supp. Mem. at 6-9.  Al-Ghizzawi told his counsel that a Guantanamo doctor had prescribed him an antibiotic along with other medication, but because the guards gave him very cold water to swallow the pills, he would not take the medication.  Id. at 6-7.  He apparently asked the doctor to include a note with the medication instructing the guards to bring him warm water, but the doctor allegedly declined this request.  Id.  Al-Ghizzawi also told his counsel that

---

[3]Dr. Reichen also picks up on Al-Ghizzawi's alleged symptom of skin itching and states in the abstract that this "could be an indicator that something serious is happening in the liver of Mr. Al-Ghizzawi." Reichen Aff. ¶ 9.  Dr. Meneley clearly states, however, that "Mr. Al-Ghizzawi's blood test results do not suggest liver disease as a cause of the itching" and that an appropriate topical treatment was provided for the itching.  Second Meneley Decl. ¶ 5.

[4]Al-Ghizzawi also attempts to resurrect a claim that was resolved in his first emergency motion for medical treatment and the subsequent motion for reconsideration.  He again argues that he has "Tuberculosis and has not been treated for [this] condition."  Pet'r's Mot. at 8.  As the Court previously noted, however, "petitioner was diagnosed with latent tuberculosis," with "no symptoms or findings of active disease."  Nov. 2, 2006 Mem. Op. & Order at 4, 5 (Dkt. No. 56). "'Although many people with latent Tuberculosis never develop active Tuberculosis,' Guantanamo medical personnel recommend to detainees that they undergo nine months of treatment consisting of oral medication and Vitamin B6 supplements in order to destroy the tuberculosis mycobacterium."  Id. at 5.  In Dr. Meneley's updated declaration, he states that "[t]here has been no change to Mr. Al-Ghizzawi's diagnosis of latent Tuberculosis," and "Mr. Al-Ghizzawi continues to refuse treatment."  Meneley Decl. ¶ 8.

he had refused to allow any blood tests or a liver biopsy. Counsel noted that two of the tests the Guantanamo doctors wanted to perform were tests that Dr. Reichen had also recommended. Id. at 8-9.

Responding to the allegations in Al-Ghizzawi's supplemental memorandum, the government briefly describes the treatment he has received in the last year alone: "blood testing, ultrasound, the offer of a liver biopsy, medical counseling, prescription eyeglasses, ten medical visits related to gastrointestinal complaints, and treatment for H.Pylori." Resp'ts' Response at 5. After Al-Ghizzawi returned the eyeglasses that were prescribed for him, he was scheduled for another optometry visit even though he has indicated that he does not want to see an optometrist. Second Meneley Decl. ¶ 8. The medical staff at Guantanamo is also prepared to conduct an "ultrasound of the liver, routine follow up blood work, tissue transglutaminase IgA, anti-gliadin antibody tests, . . . a percutaneous liver biopsy," and tests for gluten sensitive enteropathy as soon as Al-Ghizzawi gives his consent. Id. ¶¶ 2, 5.[5]

On March 2, 2008, just days after counsel's visit, a Guantanamo physician met with Al-Ghizzawi for forty-five minutes, counseling him about the need for follow-up testing. Id. ¶ 2. Despite the encouragement of Al-Ghizzawi's counsel and the Guantanamo medical staff, Al-Ghizzawi persisted in his refusal to allow any additional testing. Id. During the meeting with the physician, Al-Ghizzawi did not complain of any significant body pains, did not exhibit difficulty speaking, and did not appear to suffer from jaundice. Id. ¶ 4.

Upset at the care he has received, Al-Ghizzawi, through his counsel, now seeks an order

---

[5]It is important to note that Al-Ghizzawi and all Guantanamo detainees may seek medical care at any time by making a request to a guard or to one of the medical personnel who make several rounds on the cellblock each day. Meneley Decl. ¶ 4.

from this Court requiring the government to provide him with emergency medical treatment and

requiring the government to tender his complete medical records to counsel.[6]  In his reply and

supplemental memorandum, counsel for Al-Ghizzawi focuses on how distrustful Al-Ghizzawi is

of the Guantanamo medical staff, and also seeks his transfer to a civilian medical facility.[7]

### STANDARD OF REVIEW

To prevail on his motion for a preliminary injunction, Al-Ghizzawi must demonstrate (i)

a substantial likelihood of success on the merits; (ii) that he will suffer irreparable harm absent

the relief requested; (iii) that other interested parties will not be harmed if the requested relief is

granted; and (iv) that the public interest supports granting the requested relief.  E.g., Chaplaincy

of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006); Cobell v. Norton, 391

F.3d 251, 258 (D.C. Cir. 2004).  In assessing a motion for a preliminary injunction, the district

court should "balance the strengths of the requesting party's arguments in each of the four

required areas."  Chaplaincy of Full Gospel Churches, 454 F.3d at 297 (internal quotation marks

omitted).  Because a showing of irreparable harm is the basis of injunctive relief, however, a

"movant's failure to show any irreparable harm is therefore grounds for refusing to issue a

preliminary injunction."  Id.  Furthermore, "a preliminary injunction is an extraordinary remedy

that should be granted only when the party seeking the relief, by a clear showing, carries the

---

[6]On January 28, 2008, Al-Ghizzawi filed an emergency application in the Supreme Court in his original habeas action seeking similar relief.  The next day, the Chief Justice denied the application without comment.  Resp'ts' Opp. Ex. A.

[7]As the Court noted in connection with Al-Ghizzawi's first request for a transfer to Dr. Reichen's clinic in Switzerland, a transfer request strains the bounds of preliminary injunctive relief.  See Al-Ghizzawi, 2006 WL 2844781, at *3 n.7 (citing Cobell v. Kempthorne, 455 F.3d 301, 314 (D.C. Cir. 2006) ("The usual role of a preliminary injunction is to preserve the status quo pending the outcome of litigation.") (internal quotation marks omitted)).

burden of persuasion." Cobell v. Norton, 391 F.3d at 258.

## ANALYSIS

**I.    Jurisdiction**

As a preliminary matter, respondents argue that this Court is deprived of jurisdiction to entertain Al-Ghizzawi's motion by the Military Commissions Act of 2006, Pub. L. No. 109-366, § 7, 120 Stat. 2600, and the law of this Circuit following Boumediene v. Bush, 476 F.3d 981 (D.C. Cir. 2007), cert. granted, 127 S. Ct. 3078 (June 29, 2007).  The Military Commissions Act specifically states that no court shall have jurisdiction "to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination," 28 U.S.C. § 2241(e)(1), and that no court shall have jurisdiction "to hear or consider any other action against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement" of such an alien, except as provided by the Detainee Treatment Act of 2005, id. § 2241(e)(2).  In Boumediene, the D.C. Circuit held that the Military Commissions Act's removal of federal court jurisdiction over detainees' habeas petitions is constitutional and does not violate the Suspension Clause.  476 F.3d at 993-94.  Under this authority, then, there was serious doubt that this Court had jurisdiction to grant the relief that Al-Ghizzawi seeks.

But another aspect of the analysis is now the D.C. Circuit's recent opinion in Belbacha v. Bush, 2008 WL 680637 (D.C. Cir. Mar. 14, 2008).  Belbacha, a Guantanamo detainee, had previously petitioned the district court for a writ of habeas corpus.  Id. at *1.  While his petition was pending, he sought preliminary injunctive relief barring his transfer to Algeria.  The district

court denied the motion on the ground that it had no power to grant the requested relief under the

Military Commissions Act and <u>Boumediene</u>.  <u>Id.</u>  On appeal, the D.C. Circuit held "that when the

Supreme Court grants certiorari to review [the Court of Appeals'] determination that the district

court lacks jurisdiction, a court can, pursuant to the All Writs Act, 28 U.S.C. § 1651, and during

the pendency of the Supreme Court's review, act to preserve the status quo in other cases raising

the same jurisdictional issue if a party satisfies the criteria for issuing a preliminary injunction."

<u>Id.</u> at *3.

       Respondents raise a colorable argument that because Al-Ghizzawi's motion involves

issues of his ongoing medical care, it "therefore cannot be characterized, within the bounds of the

record in this case, as seeking jurisdiction-preserving relief, which is the feature of the relief

sought in <u>Belbacha</u>."  Resp'ts' Response at 2 n.1.  Al-Ghizzawi, on the other hand, responds that

adequate medical care is surely an essential ingredient for preserving his life and hence the status

quo.  This context is arguably different from that raised in <u>Belbacha</u> by a motion to enjoin a

transfer, and hence the answer to the jurisdictional issue is uncertain.  But in any event, for the

reasons that follow, Al-Ghizzawi clearly is not entitled to the relief he seeks.

## II.    Preliminary Injunction Requirements

       Al-Ghizzawi has failed to demonstrate that he will suffer irreparable injury if his motion

is denied.  The D.C. Circuit "has set a high standard for irreparable injury.  First, the injury must

be both certain and great; it must be actual and not theoretical.  The moving party must show

[t]he injury complained of is of such imminence that there is a clear and present need for

equitable relief to prevent irreparable harm."  <u>Chaplaincy of Full Gospel Churches</u>, 454 F.3d at

297 (citations and internal quotation marks omitted) (alteration in original); <u>see also</u> <u>Wisc. Gas</u>

Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam).

 Here, Al-Ghizzawi argues that "the irreparable harm that this Court found lacking at the time this Court denied his prior motion [is] now clearly established" in the form of "imminent death." Pet'r's Mot. at 5-6. According to counsel: "If Al-Ghizzawi goes much longer without treatment he will, in all likelihood, die of the many diseases he has acquired at Guantanamo despite his incredible will to survive." Id. at 11. Despite this emotionally-charged language to which Al-Ghizzawi consistently resorts throughout his briefing, the Court does not find that irreparable harm will result from declination of the emergency relief requested.

 Keeping in mind the "consistent body of law reflecting the reluctance of courts to second-guess the medical treatment provided to prisoners by government officials," Al-Ghizzawi has not demonstrated that his ongoing care is deficient in any way. See O.K. v. Bush, 344 F. Supp. 2d 44, 60-61 (D.D.C. 2004). A prisoner must usually demonstrate that government officials have exhibited "deliberate indifference" to his "serious medical needs." Neitzke v. Williams, 490 U.S. 319, 321 (1989); Estelle v. Gamble, 429 U.S. 97, 104 (1976).[8] Deliberate indifference is found where officials were "'knowingly and unreasonably disregarding an objectively intolerable risk of harm to the prisoners' health or safety.'" Scott v. District of Columbia, 139 F.3d 940, 943 (D.C. Cir. 1998) (quoting Farmer v. Brennan, 511 U.S. 825, 846 (1994)). The "deliberate indifference" standard is not satisfied by allegations of "mere negligence, mistake or difference of opinion."

---

 [8]The "deliberate indifference" standard was developed in the context of Eighth Amendment challenges to prison-provided medical care, see Estelle, 429 U.S. at 104, and has been applied in cases involving the rights of pretrial detainees under the Due Process Clause of the Fourteenth Amendment, see Hill v. Nicodemus, 979 F.2d 987, 991-92 (4th Cir. 1992) (collecting cases). Without deciding that the "deliberate indifference" standard applies to petitioner, this Court will again refer to this body of law to frame its analysis of this emergency motion. See Al-Ghizzawi, 2006 WL 2844781, at *4 n.8; O.K., 344 F. Supp. 2d at 61 n.23.

Bowring v. Godwin, 551 F.2d 44, 48 (4th Cir. 1977). This standard has been applied to Al-Ghizzawi's previous motions relating to his medical care. See Al-Ghizzawi, 2006 WL 2844781, at *4 n.8.

Here, at most, the parties have a difference of opinion as to which particular diagnostic tests and treatments should be administered, but respondents have amply documented and supported their efforts to provide Al-Ghizzawi with care that conforms to their own internal standards and to the standards of the American Association for the Study of Liver Diseases. Based upon respondents' declarations, it is apparent that Al-Ghizzawi is already being offered adequate medical care. Hence, the Court cannot conclude that his health is in imminent danger due to the actions of the Guantanamo medical staff.

First and foremost, all parties agree that Al-Ghizzawi does not, in fact, suffer from AIDS. Upon an objective review of the record, Al-Ghizzawi received an extensive medical examination upon his arrival at Guantanamo, wherein his history of Hepatitis B was revealed. When it was determined that he was a Hepatitis B carrier, the medical staff continuously monitored Al-Ghizzawi with multiple blood tests and ultrasounds. Upon their determination that his viral markers were slightly elevated, Al-Ghizzawi was offered but refused any additional tests or treatment. "Since 08 February 2008 Mr. Al-Ghizzawi has declined consent to have his blood tested on four occasions," and "[h]e has also declined to have an ultrasound of his liver performed." Second Meneley Decl. ¶ 2. Following his diagnosis with latent tuberculosis, Al-Ghizzawi also refused a nine-month treatment regime of oral antibiotics and a vitamin. See Nov. 2, 2006 Mem. Op. & Order at 5 (Dkt. No. 56); Meneley Decl. ¶ 8.

When the medical staff prescribed an antibiotic and other medicine for the treatment of

-12-

H. Pylori, Al-Ghizzawi went so far as to complain about the temperature of the water he was given to take the medication. Because the water was allegedly too cold, he refused the treatment. When he was prescribed eyeglasses, he returned them, and although he continues to complain about his eyesight, he does not want to visit an optometrist. He has not given his consent to routine follow up blood work, to a liver biopsy, or to tests for gluten intolerance (suggested to address his digestive complaints). To be candid, then, if Al-Ghizzawi is currently suffering any harm from his medical condition, it is largely self-inflicted. Of course the cause of any medical harm is not the ultimate focus of this Court's inquiry, but it certainly sheds light on "the degree and imminence of harm that will result if the Court does not issue emergency relief." Al-Joudi v. Bush, 406 F. Supp. 2d 13, 20 (D.D.C. 2005). Here, it appears that granting the relief Al-Ghizzawi requests -- ordering treatment and the production of his medical records -- will not redress any imminent danger to his health because medical personnel have already made numerous testing and treatment recommendations, but Al-Ghizzawi has simply refused his consent. The record is clear -- adequate medical care is available and has either been provided or offered, and any present harm or future risk relating to the adequacy of care received is the result of Al-Ghizzawi's own refusals to cooperate in his treatment. Hence, respondents are not causing him irreparable harm.

Because Al-Ghizzawi has not demonstrated that he will suffer irreparable harm if the Court denies the relief he seeks, the Court will only briefly address the remaining preliminary injunction factors. As the D.C. Circuit noted in Belbacha, "the probability of [a detainee] prevailing on the merits of his habeas petition is far from clear." 2008 WL 680637, at *5. Moreover, Al-Ghizzawi comes up far short of the deliberate indifference standard for his medical

treatment claims on their merits.  And with respect to the effect of a preliminary injunction on the interests of respondents and the public, the Court notes that Al-Ghizzawi has requested relief that would require direct judicial intervention into the operations of the medical facility at Guantanamo.  Al-Ghizzawi's requested relief thus goes against the well-established case law cited above, which expresses the judicial reluctance to second-guess the medical treatment provided to prisoners or other detainees by government officials.

Although Al-Ghizzawi's request for medical records is arguably less intrusive to the operations at Guantanamo, he requests these records to "be sure that any 'treatment' he receives is applicable to his actual medical conditions."  Pet'r's Mot. at 6.  Again, then, this boils down to nothing more than another attempt to second-guess the medical treatment provided by the government.  See Al Odah v. United States, 406 F. Supp. 2d 37, 44 (D.D.C. 2005) (denying detainee's request for medical records while explaining that "logically the provision of medical records and/or medical reports will not result in any further protection of the life of a detainee without intermediate scrutiny of the records by medical professionals and challenges to the Court based on that scrutiny").

The Court is cognizant of Al-Ghizzawi's distrust for the authorities at Guantanamo, but that alone is insufficient to justify his failure to cooperate with the medical staff or to warrant the relief he seeks.  The Court agrees with respondents that "[i]t would not be in the public interest to permit a wartime detainee such as petitioner to leverage that lack of cooperation into a claim for Court intervention into the medical care provided detainees at Guantanamo."  Resp'ts' Response at 9.  Hence, and for the third time, Al-Ghizzawi's request for extraordinary emergency relief relating to his medical treatment at Guantanamo must be rejected.

Accordingly, and for the reasons stated above, it is this 8th day of April, 2008, hereby

**ORDERED** that [78] Al-Ghizzawi's New Emergency Motion for Medical Treatment and Medical Records is **DENIED**.

_____
/s/ John D. Bates
JOHN D. BATES
United States District Judge
