**Approved for public filing by the CSO**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| ) | |
| **IN RE:** ) | |
| ) | Misc. No. 08-442 (TFH) |
| **GUANTANAMO BAY** ) | |
| **DETAINEE LITIGATION** ) | Civil Action Nos. |
| ) | 02-CV-0828, 04-CV-1136, 04-CV-1164, 04-CV-1194, |
| ) | 04-CV-1254, 04-CV-1937, 04-CV-2022, 04-CV-2035, |
| ) | 04-CV-2046, 04-CV-2215, 05-CV-0023, 05-CV-0247, |
| ) | 05-CV-0270, 05-CV-0280, 05-CV-0329, 05-CV-0359, |
| ) | 05-CV-0392, 05-CV-0492, 05-CV-0520, 05-CV-0526, |
| ) | 05-CV-0569, 05-CV-0634, 05-CV-0748, 05-CV-0763, |
| ) | 05-CV-0764, 05-CV-0833, 05-CV-0877, 05-CV-0881, |
| ) | 05-CV-0883, 05-CV-0889, 05-CV-0892, 05-CV-0993, |
| ) | 05-CV-0994, 05-CV-0995, 05-CV-0998, 05-CV-0999, |
| ) | 05-CV-1048, 05-CV-1124, 05-CV-1189, 05-CV-1220, |
| ) | 05-CV-1236, 05-CV-1244, 05-CV-1347, 05-CV-1353, |
| ) | 05-CV-1429, 05-CV-1457, 05-CV-1458, 05-CV-1487, |
| ) | 05-CV-1490, 05-CV-1497, 05-CV-1504, 05-CV-1505, |
| ) | 05-CV-1506, 05-CV-1509, 05-CV-1555, 05-CV-1590, |
| ) | 05-CV-1592, 05-CV-1601, 05-CV-1602, 05-CV-1607, |
| ) | 05-CV-1623, 05-CV-1638, 05-CV-1639, 05-CV-1645, |
| ) | 05-CV-1646, 05-CV-1649, 05-CV-1678, 05-CV-1704, |
| ) | 05-CV-1725, 05-CV-1971, 05-CV-1983, 05-CV-2010, |
| ) | 05-CV-2083, 05-CV-2088, 05-CV-2104, 05-CV-2112, |
| ) | 05-CV-2185, 05-CV-2186, 05-CV-2199, 05-CV-2200, |
| ) | 05-CV-2249, 05-CV-2349, 05-CV-2367, 05-CV-2371, |
| ) | 05-CV-2378, 05-CV-2379, 05-CV-2380, 05-CV-2381, |
| ) | 05-CV-2384, 05-CV-2385, 05-CV-2386, 05-CV-2387, |
| ) | 05-CV-2398, 05-CV-2444, 05-CV-2477, 05-CV-2479, |
| ) | 06-CV-0618, 06-CV-1668, 06-CV-1674, 06-CV-1684, |
| ) | 06-CV-1688, 06-CV-1690, 06-CV-1691, 06-CV-1758, |
| ) | 06-CV-1759, 06-CV-1761, 06-CV-1765, 06-CV-1766, |
| ) | 06-CV-1767, 07-CV-1710, 07-CV-2337, 07-CV-2338, |
| ) | 08-CV-0987, 08-CV-1085, 08-CV-1101, 08-CV-1104 |
| _____ ) | 08-CV-1153, 08-CV-1185, 08-CV-1207 |

**PETITIONERS' JOINT MEMORANDUM OF LAW
ADDRESSING PROCEDURAL FRAMEWORK ISSUES**

Petitioners hereby respectfully submit this Memorandum of Law addressing certain

issues identified in the Court's July 11, 2008 Scheduling Order related to the procedural

framework to govern the disposition of the Guantanamo Bay habeas corpus petitions and addressing whether such issues may be amenable to common resolution.

Petitioners propose the following procedural framework: (1) Petitioners are entitled to an evidentiary hearing on any material factual issue in dispute; (2) the government should bear the burden of demonstrating to the Court the sufficiency of the evidence in support of the detention by clear and convincing evidence, and should not receive any presumption of sufficiency or validity based upon its prior unilateral determinations regarding a Petitioner's "enemy combatant" status; (3) Petitioners are entitled to discovery through leave of court based on the needs in a particular case, and the government is obligated to produce all relevant exculpatory evidence in each of the cases; (4) hearsay evidence, while strongly disfavored, may be permitted consistent with the Federal Rules of Evidence and the habeas corpus statute, based upon the nature of the evidence offered, the Judge's ability to assess its reliability and the specific facts and issues raised by the case; (5) Petitioners generally have a right to confront the evidence against them and to meaningfully participate in their proceedings.

## INTRODUCTION

Habeas corpus entitles a petitioner to a searching, independent inquiry into the lawfulness of his detention. *Ex parte Watkins*, 28 U.S. 193, 202 (1830) ("[T]he great object of [the writ] is the liberation of those . . . imprisoned without sufficient cause. It is in the nature of a writ of error, to examine the legality of the commitment"); *Braden v. 30th Judicial Circuit Court of Kentucky*, 410 U.S. 484, 490 (1973) (the writ is "a swift and imperative remedy in all cases of illegal restraint or confinement") (internal citations omitted). As the Supreme Court recently explained in *Boumediene v. Bush*, habeas entitles a prisoner to determine whether the respondent has sufficient statutory, constitutional or other lawful authority to detain. 128 S. Ct. 2229, 2266

(2008) (citing *INS v. St. Cyr*, 533 U.S. 289, 302 (2001)).  In addition, the Court confirmed that, in the executive detention context, habeas must provide a meaningful opportunity to challenge the factual basis for the detention.  *Id.* at 2266–68, 2269 (because "the writ must be effective . . . [t]he habeas court must have sufficient authority to conduct a meaningful review of . . . the cause for detention"); *id.* at 2270 (habeas "includes some authority to assess the sufficiency of the Government's evidence against the detainee. [The court] also must have the authority to admit and consider relevant exculpatory evidence that was not introduced during the earlier proceeding").

Petitioners understand that the issues identified by the Court in its Scheduling Order will primarily relate to the manner in which district judges dispose of challenges to the factual sufficiency of the government's evidence.  Petitioners wish to bring to the Court's attention that some detainees may choose to concede, *arguendo*, the correctness of the government's factual allegations against them – thereby initially foregoing factual development and an evidentiary hearing – to argue that those stipulated facts cannot provide a lawful basis to detain.  *See, e.g.*, *Parhat v. Gates*, No. 06-1397, __ F.3d __, 2008 WL 2576977 (D.C. Cir. June 20, 2008) (holding that evidence in record was insufficient to support executive's authority to detain petitioner under AUMF); *Al-Marri v. Pucciarelli*, No. 06-7427, __F.3d __, 2008 WL 2736787 at *31 (4th Cir. July 15, 2008) (Motz, J, concurring) (concluding it unnecessary to reach the question whether petitioner received "sufficient process" in the course of the determination that he was an "enemy combatant" because detention was unlawful under the AUMF and the Constitution).

Petitioners who do intend to challenge the factual basis of their detention stress two governing principles.  First, the habeas corpus statute itself already provides a basic framework for adjudicating all habeas petitions brought, as these petitions are, pursuant to 28 U.S.C.

§ 2241(c).   That framework includes Petitioners' opportunity to traverse, or rebut, the government's proffered return to the writ, § 2243, ¶6, to undertake discovery where needed, § 2246, and to have disputed factual questions decided by an evidentiary hearing, § 2243, ¶7. The statutory framework thus reflects a common law court's plenary power to inquire into the lawfulness of the detention. *See Harris v. Nelson*, 395 U.S. 286, 293 (1969) ("The language of Congress, the history of the writ, the decisions of this Court, all make clear that the power of inquiry on federal habeas corpus is plenary.") (internal quotations and citations omitted).

Second, many of the issues identified by the Court for discussion by the parties are not suitable for common resolution.  This Court should establish Petitioners' baseline entitlement to several of the procedural devices listed in its order – including discovery, confrontation and an evidentiary hearing on disputed factual questions, with the burden on the government to justify the legal and factual sufficiency of the bases for the detentions.  But the actual application of such procedural devices will depend on the circumstances presented by particular cases; they are, accordingly, best reserved to disposition by individual judges.[1]

Individual judges operating within this broad statutory framework, and guided by elementary due process principles, can resolve most of these habeas cases. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 526 (2004) (plurality op.) ("The simple outline of § 2241 makes clear both that Congress envisioned that habeas petitioners would have some opportunity to present and rebut facts and that courts in cases like this retain some ability to vary the ways in which they do so as mandated by due process"); 28 U.S.C. § 2243, ¶8 (authorizing district court judges

---

[1]     Petitioners reiterate their previously-expressed concern regarding the extent to which the government will use collective rulings by this Court as a device to generate delay through interlocutory appeals.  It appears the process has already begun.  The government today noticed an appeal of the most ministerial of orders – this Court's directive that the government provide the court with notice before it transfers a petitioner within the Court's jurisdiction.

to "dispose of the matter as law and justice require").  The framework reflects the reality that habeas, unlike many other forms of action, is at its core a flexible, adaptable remedy well-suited to address the particular circumstances of any individual case.  *See Boumediene*, 128 S. Ct. at 2267 ("Habeas is not 'a static, narrow, formalistic remedy; its scope has grown to achieve its grand purpose.'") (quoting *Jones v. Cunningham*, 371 U.S. 236, 243 (1963)).

## I.    PETITIONERS ARE ENTITLED TO EVIDENTIARY HEARINGS

### A.    The Habeas Corpus Statute, 28 U.S.C. §§ 2243–2248, Provides the Basic Framework to Govern These Cases

In *Boumediene*, the Court held that Section 7 of the Military Commissions Act of 2006 ("MCA"), which amended 28 U.S.C. § 2241(e) to deny district judges habeas jurisdiction over petitions brought by Guantanamo Bay detainees, was unconstitutional.  128 S. Ct. at 2274.  Accordingly, detainees are now entitled to proceed with their habeas petitions.  All Petitioners invoke the court's jurisdiction pursuant to § 2241(c)(1), a provision that authorizes challenges to the "custody under, or by color of authority of the United States," 28 U.S.C. § 2241(c)(1).  The provision codifies § 14 of the Judiciary Act of 1789, and thus mirrors the core common law process available to challenge the factual and legal authority to detain, *see St. Cyr*, 533 U.S. at 305, which the *Boumediene* Court confirmed exists for these Petitioners, 128 S. Ct. at 2262, 2274; *see also Rasul v. Bush*, 542 U.S. 466, 484 (2004) (remanding habeas petitions to district courts to consider "the merits of petitioners' claims").

Petitioners also invoke § 2241(c)(3), which separately authorizes them to challenge "custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241(c)(3).  In *Boumediene*, the Supreme Court held that the fundamental constitutional right to habeas corpus protected by the Suspension Clause applies to Guantanamo, *see Boumediene*, 128 S. Ct. at 2253–58, rejecting the formalistic approach employed by the D.C. Circuit, which had

declined to recognize any fundamental rights of persons detained "without property or presence in the United States," *see Boumediene v. Bush*, 476 F.3d 981, 991 (D.C. Cir. 2007). Thus, in addition to the common law habeas rights protected by § 2241(c)(1), the Petitioners are now entitled to fundamental due process rights throughout the adjudication of their petitions. *See In re Guantanamo Bay Detainee Cases*, 355 F. Supp. 2d 443, 465 (D.D.C. 2005) (Green, J.) ("there can be no question that . . . the right not to be deprived of liberty without due process of law . . . is one of the most fundamental rights recognized by the U.S. Constitution").

Regardless of the source of the detainee's substantive rights, the habeas corpus statute sets out the basic framework for adjudicating all challenges to federal executive detention brought under § 2241(c).[2] Indeed, a portion of the framework has already been employed in these cases. In the consolidated cases before Judge Green and in numerous subsequent-filed cases, the government was ordered to produce "the return certifying the true cause of the detention," pursuant to 28 U.S.C. § 2243, ¶3. The next step in the statutorily-imposed process (though one that was arrested by the stays of the proceedings pending appeals of various legal questions) entitles the petitioner to traverse the return or, in other words, to "deny any of the facts set forth in the return or allege any other material facts." *Id.* § 2243, ¶6; *cf.* § 2248 ("allegations of a return . . . *if not traversed*, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true") (emphasis added). Amendments to the return or the traverse are permissible by leave of court. *Id.* § 2243, ¶7. The statute also expressly authorizes the taking of discovery in certain circumstances. *Id.* § 2246; *see also infra*, Section III ("Scope of Discovery"). Ultimately, the court must "summarily hear and determine

---

[2]    *See, e.g.*, *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) (plurality opinion) ("[A]ll agree that § 2241 and its companion provisions provide at least a skeletal outline of the procedures to be afforded a petitioner in federal habeas review.").

the facts, and dispose of the matter as law and justice require."  28 U.S.C. § 2243, ¶8.  Remedies

available to the court include a discharge where, "on the facts admitted, it may appear that, as a

matter of law, the prisoner is entitled to the writ." *Walker v. Johnston*, 312 U.S. 275, 284 (1941);

*see also Boumediene*, 128 S. Ct. at 2266.

In sum, although the statute provides the basic operating structure to manage these cases,

courts must apply and often augment that structure as required in each case.  Ultimately, because

"there is no higher duty of a court, under our constitutional system, than the careful processing

and adjudication of petitions for writs of habeas corpus," courts must fill in the "necessary

facilities and procedures for an adequate inquiry."  *Harris v. Nelson*, 394 U.S. 286, 291, 300

(1969).  The Supreme Court has explained:

> The scope and flexibility of the writ – its capacity to reach all manner of illegal
> detention – its ability to cut through barriers of form and procedural mazes – have
> always been emphasized and jealously guarded by courts and lawmakers.  The
> very nature of the writ demands that it be administered with the initiative and
> flexibility essential to insure that miscarriages of justice within its reach are
> surfaced and corrected.

*Id.* at 291.

**B.    All Petitioners Are Entitled to An Evidentiary Hearing on Disputed
Issues of Material Fact**

As described, the habeas statute both entitles a Petitioner to traverse the factual

allegations contained in the government's return and anticipates a judicially-managed procedure

to settle the factual disputes the court deems material to the resolution of the ultimate question at

issue – the legality of the detention.  Habeas procedure expressly contemplates resolution by

evidentiary hearing.  The Supreme Court explained:

> The Government properly concedes that if the petition, the return, and the traverse
> raise substantial issues of fact *it is the petitioner's right to have those issues heard*
> and determined in the manner the statute prescribes.

*Walker v. Johnston*, 312 U.S. at 286 (emphasis added); *accord Blackledge v. Allison*, 431 U.S. 63 (1977); *see also Johnson v. Zerbst*, 304 U.S. 458, 466-67 (habeas petitioner is entitled to "a judicial inquiry into the very truth and substance of the causes of the detention. . . . [s]uch a judicial inquiry involves the reception of testimony").

Indeed, the need for evidentiary hearings to resolve factual disputes is acknowledged throughout habeas corpus jurisprudence.  *See Boumediene*, 128 S. Ct. at 2266 (explaining that § 2241 "accommodates the necessity for factfinding that will arise in some cases" by authorizing an appellate court to transfer a case to a district court "whose institutional capacity for factfinding is superior to his or her own"); *Stewart v. Overholser*, 186 F.2d 339, 342 (D.C. Cir. 1950) ("When a factual issue is at the core of a detention challenged by an application for the writ it ordinarily must be resolved by the hearing process.  This is a chief purpose of the habeas corpus proceeding."); *id*. at 342-43 (collecting cases); *Kendzierski v. Brantley*, 447 F.2d 806, 808 (7th Cir. 1971) (Stevens, J.) ("Both parties – not just one – should be afforded an opportunity to argue the relevant facts to the district court.  Only after that has been done will it be possible to determine whether an evidentiary hearing is necessary.").

Moreover, the Supreme Court in *Boumediene* clearly recognized the obligation of the district court to conduct de novo hearings to decide contested factual questions.  First, the Court held insufficient the procedures contemplated by the Detainee Treatment Act ("DTA"), which only provided for appellate record review of the sufficiency of the evidence that *had been* considered by a Combatant Status Review Tribunal; it thus required the government to justify to a district court in a plenary proceeding the current sufficiency of the evidence to detain each Petitioner.  128 S. Ct. at 2270.  Relatedly, the Court held that Petitioners must be allowed to submit exculpatory evidence obtained subsequent to a CSRT determination that might prove a

detainee was improperly classified as an "enemy combatant." *Id.* Naturally, the Court would not have ordered the opportunity to present new factual evidence – and would not have bothered to strike down an act of Congress limiting such ability – if the Court did not contemplate full consideration of the factual evidence and, ultimately, the potential for a release from detention based upon it.

As part of the traverse and hearing process, Petitioners are entitled to present any credible evidence that may reasonably bear on their "enemy combatant" designation, including evidence that a confession from the detainee or the statements of persons implicating him was procured by torture. *See Whaley v. Johnston*, 316 U.S. 101, 104 (1942) (holding that petitioner is entitled to a hearing on "the material issue whether the plea was in fact coerced by the particular threats alleged"); *accord Machibroda* 368 U.S. at 493 ("There can be no doubt that, if the allegations [regarding coercion] contained in the petitioner's motion and affidavit are true, he is entitled to have his sentence vacated"); *see also Overholser*, 186 F.2d at 345 (ordering factual hearing "involving the taking of testimony followed by a decision based on the facts and the law" regarding the petitioner's sanity).

## II. STANDARDS OF PROOF AND PLENARY REVIEW

### A. The Government Bears the Burden of Proving the Factual Basis for Detention By Clear and Convincing Evidence

In *Boumediene*, although the Court recognized that it was the government which bears the burden of justifying the detention, it left open for the district courts to decide the "*extent* of the showing required of the Government in these cases." 128 S. Ct. at 2271. Habeas is a broad, equitable remedy, which imposes on the judiciary the obligation to "dispose of the case as law and justice require." 28 U.S.C. § 2243. In the executive detention context, where the

"protections [of the writ] have been strongest," St. Cyr, 533 U.S. at 301,[3] Petitioners maintain

that "law and justice require" that the government bear the burden of demonstrating the

lawfulness of the detention by clear and convincing evidence.  Because of the absence of any

competent or neutral adjudicatory process under which Petitioners' status has been determined,

the substantial liberty interests at stake in their continuing detention, and the "considerable risk

of error" associated with the detentions at Guantanamo, *Boumediene*, 128 S. Ct. at 2270, nothing

short of demonstrating the factual sufficiency of the detention by this exacting standard would

satisfy the high command of the writ in these cases.   As the D.C. Circuit has explained:

> [I]n situations where the various interests of society are pitted against restrictions
> on the liberty of the individual, a more demanding standard is frequently imposed,
> such as proof by clear, unequivocal and convincing evidence.

*In re Ballay*, 482 F.2d 648, 662 (D.C. Cir. 1973).

The federal habeas cases clearly do not suggest that the *Petitioners* bear the burden of

proof to demonstrate their factual innocence and that they must do so by a preponderance of the

evidence. Such a reading of the caselaw ignores the unique context of the Guantánamo Bay

detentions.

First, Petitioners are not collaterally attacking the judgment of a prior competent court of

record.  *Compare Ex parte Watkins*, 28 U.S. 103 (1833) (recognizing limitation on habeas courts

authority to review factual judgments of "court of competent jurisdiction"), *with Boumediene*,

128 S. Ct. at 2268 ("The present cases fall outside these categories, however; for here the

---

[3]     *See also Lonchar v. Thomas*, 517 U.S. 314, 322 (1996) (stating that the common law
writ's "most basic purpose [was] avoiding serious abuses of power by a government, say a king's
imprisonment of an individual, without referring the matter to a court"); *Swain v. Pressley*, 430
U.S. 372, 385 (1977) (Burger, C.J., concurring) (noting that traditionally the writ was used "to
inquire into the cause of commitment not pursuant to judicial process"); *Brown v. Allen*, 344
U.S. 443, 533 (1953) (Jackson, J., concurring in result) ("The historic purpose of the writ has
been to relieve detention by executive authorities without judicial trial").

detention is by executive order"); *see also Boumediene*, 128 S. Ct. at 2264 (explaining that "cases discussing implementation of that statute [AEDPA] give little instruction (save perhaps by contrast) for the instant cases, where no trial has been held"). Instead, they seek the core protections of habeas to review the executive's *unilateral* decision to detain them. Thus, in obvious contrast to a petition challenging a criminal conviction, the executive has not already demonstrated to the satisfaction of an a neutral adjudicator that the evidence is sufficient to meet the executive's asserted need for detention. "In this context, the need for habeas corpus is more urgent." *Boumediene*, 128 S. Ct. at 2269. Through habeas, the executive must, for the first time, satisfy a court that it has sufficient factual basis to detain Petitioners. *In re Winship*, 397 U.S. 358, 364 (1970) ("Due process commands that no man shall lose his liberty unless the Government has borne the burden of . . . convincing the factfinder of his guilt").

Second, the deprivation of liberty in these cases is severe. Many Petitioners are entering their seventh year of detention without charge. Because the asserted war under which the executive branch claims authority to detain could last "a generation or more," *Boumediene*, 128 S. Ct. at 2238, many Petitioners face the prospect of a life sentence justified by what has so far been nothing more than selective review by the Executive of the evidence that it has unilaterally chosen to consider. The brutal conditions in which Petitioners are detained – devoid of meaningful contact with loved ones, subject to grinding isolation and despair – only magnify the consequences of the Executive's claimed authority to detain, and highlight the corresponding need for robust judicial review.[4] Petitioners cannot be made to endure such grievous deprivation

---

[4]     Although it is difficult to quantify the extent of human suffering endured by the Petitioners who have been subject to the government's program of interrogation and disorientation and who are held in the cramped cells of the Guantanamo prison camp, numerous institutions believe these conditions represent a serious human rights concern. *See, e.g.*, Amnesty Int'l, *Conditions of isolation for detainees at Guantánamo Bay*, at 4 (April 2007) ("the

of liberty "upon no higher degree of proof than applies in a negligence case." *Woodby v. INS*, 385 U.S. 276, 285 (1966).

The Supreme Court has repeatedly held that, where the government seeks to impose similarly substantial deprivations of liberty, the government must justify the sufficiency of its case by clear and convincing evidence. *See Woodby*, 385 U.S. at 286 (deportation); *Schneiderman v. United States*, 320 U.S. 118 (1943) (denaturalization); *Kansas v. Hendricks*, 521 U.S. 346, 353 (1997) (indefinite civil commitment of sex offender); *Foucha v. Louisiana*, 504 U.S. 71, 81 (1992) (continued commitment of criminal defendant found not guilty by reason of insanity); *United States v. Salerno*, 481 U.S. 739, 750 (1987) (pre-trial detention based on dangerousness).

Finally, as *Boumediene* expressly recognizes, these cases have presented a "considerable risk" of erroneous detention. 128 S. Ct. at 2270. Indeed, despite the boastful claims of the administration made prior to the Court's ruling in *Rasul v. Bush*, that all the detainees were the "worst of the worst," it is now beyond argument that there are many innocent men detained at Guantanamo. As early as 2002, the former Guantanamo commander stated that "[s]ometimes we just didn't get the right folks," yet "[n]obody wants to be the one to sign the release papers.

---

cells have no access to natural light or air, and are lit by fluorescent lighting which is on 24 hours a day and controlled by guards"); *Locked Up Alone: Detention Conditions and Mental Health at Guantanamo*, Human Rights Watch, June 2008, at 2, 34, 37 (describing the severe mental deterioration of many of the 185 detainees held in "supermax-security" conditions in Guantanamo, including hallucinations, multiple suicide attempts, and an "an array of painful and incapacitating psychiatric symptoms"); *Broken Laws, Broken Lives: Medical Evidence of Torture by US Personnel and Its Impact*, Physicians for Human Rights, June 2008 (documenting severe psychological and physical effects of certain prisoners subject to Guantanamo's interrogation regime); *see also* William Glaberson, *Detainees Mental Health is Latest Battle*, N.Y. Times, Apr. 26, 2008 (citing military statistics acknowledging that three-quarters of Guantánamo detainees are in conditions of solitary confinement in Camps 5 and 6); Ben Fox, *Life harsher for detainees in Guantanamo's new unit*, Associated Press, February 4, 2007.

There's no muscle in the system."[5]   A 2002 CIA report similarly concluded that "a substantial number of the detainees appeared to be either low-level militants . . . or simply innocents in the wrong place at the wrong time."[6]   Media and academic studies of Defense Department data and CSRT decisions concluded that many detainees denominated "enemy combatants" did not belong there:

> A high percentage [of the detainees] . . . were not captured on any battlefield . . . . Fewer than 20 percent . . . have ever been Qaeda members.  Many scores, and perhaps hundreds, of the detainees were not even Taliban foot soldiers, let alone Qaeda terrorists.  They were innocent, wrongly seized combatants with no intention of joining the Qaeda campaign to murder Americans.[7]

---

[5]      Christopher Cooper, *Detention Plan: In Guantanamo, Prisoners Languish in a Sea of Red Tape*, Wall St. J., Jan. 26, 2005, at A1, A10.  *See also Frontline: Son of Al Qaeda* (PBS television broadcast, Apr. 11, 2004), transcript available at http://www.pbs.org/wgbh/pages/ frontline/shows/khadr/interviews/khadr.html (quoting CIA operative who had spent a year undercover at Guantanamo as estimating that "only like 10 percent of the people that are really dangerous, that should be there and the rest are people that don't have anything to do with it, don't even, don't even understand what they're doing here"); Tom Lassetter, *America's Prison for Terrorists Often Held the Wrong Men*, McClatchy Newspapers, June 15, 2008, *available at* http://www.mcclatchydc.com/detainees/story/38773.html (quoting U.S. intelligence analyst, "Over about three years, I assessed around 40 of these individuals, mostly Afghans. . . . I only can remember recommending that ONE should be kept at GITMO").

[6]      *See also* Tim Golden & Don Van Natta, Jr., *U.S. Said to Overstate Value of Guantanamo Detainees*, N.Y. Times, Jun. 21, 2004 (also reporting that "[o]fficials of the Department of Defense now acknowledge that the military's initial screening of the prisoners for possible shipment to Guantanamo was flawed"); Chris Mackey & Greg Miller, *The Interrogators* 85 (2004) (according to account of interrogators who worked at Kandahar Air Force Base in 2002 "every Arab we encountered was in for a long-term stay and an eventual trip to Cuba").

[7]      Stuart Taylor, Jr., *Falsehoods About Guantanamo*, Nat'l J. Feb. 4, 2006, at 13; Corine Hegland, *Who Is at Guantanamo Bay*, Nat'l J., Feb. 4, 2006, at 33-35.  *See also* Mark Denbeaux *et al.*, Seton Hall University School of Law, *Report on Guantanamo Detainees: A Profile of 517 Detainees through Analysis of Department of Defense Data* 2-4 (2006), *available at* http://law.shu.edu/aaafinal.pdf (according to DoD data, 55% detainees not accused of having committed any hostile act); Lassetter, *America's Prison*, *supra* note 5 ("an eight-month McClatchy investigation in 11 countries on three continents has found that [there were] dozens of men – and, according to several officials, perhaps hundreds – whom the U.S. has wrongfully imprisoned in Afghanistan, Cuba and elsewhere on the basis of flimsy or fabricated evidence, old personal scores or bounty payments."); Carol Leonnig, *Panel Ignores Evidence on Detainee: U.S. Military Authorities, German Intelligence Conclude No Ties to Terrorists*, Wash. Post, Mar.

The feared risk of wrongful detention is in fact a stark reality, weighing heavily in favor of a meaningful burden upon the government to offer proof to support continued detention.

Clear and convincing in this context refers both to the quantum of evidence – that is, a standard higher than preponderance but less than beyond a reasonable doubt – and to the quality of evidence, a substantial concern in many of Petitioners' cases. *See, e.g. Parhat*, 2008 WL 2576977, at *11 (documents supporting authority to detain petitioner Parhat "repeatedly describe [his] activities and relationships as having 'reportedly' occurred, as being 'said to' or 'reported to' have happened, and as things that 'may' be true or are 'suspected of' having taken place. But in virtually every instance, the documents do not say who 'reported' or 'said' or 'suspected' those things"); Declaration of Stephen Abraham, Lieutenant Colonel, U.S. Army Reserve, Joint Appendix, *Boumediene v. Bush*, No. 06-1195, at 103 (evidence provided to the CSRT panel on which he served "lacked even the most fundamental earmarks of objectively credible evidence.").

**B.    Neither the Government's Decision to Detain Nor the Government's Evidence in Support of the Detention Is Entitled to Any Presumption of Validity**

As Petitioners have described, habeas in the executive detention context entitles them to a plenary review of the legal and factual basis of their detention and should require that the government demonstrate the lawfulness of the detention by clear and convincing evidence. Under the statute, the government is obligated to file a factual return, and a Petitioner is entitled to traverse the return. The court must "admit and consider relevant exculpatory evidence"

---

30, 2005, at A1 (reporting that CSRT concluded detainee was enemy combatant despite evidence in the record exonerating him).

*Boumediene*, 128 S. Ct. at 2270, and, where material issues of fact are created by the filings, the court should resolve them by an evidentiary hearing.

A district court has discretion in determining whether a hearing is ultimately necessary and need not hold one where a petitioner's allegations are highly "vague, conclusory or palpably incredible." *Machibroda v. United States*, 386 U.S. 487, 495 (1962). However, "the Government's contention that [a Petitioner's] allegations are improbable or unbelievable cannot serve to deny him an opportunity to support them by evidence [and a] right to be heard." *Id*.

At no point during this process should either side's evidence be afforded any presumption of validity or reliability. Certainly, the CSRT's designation of a Petitioner as an "enemy combatant" is entitled to no deference whatsoever. CSRTs were implemented by the military nine days after the Supreme Court's decision in *Rasul v. Bush*, and *after* many of the habeas petitions before this Court were filed. By their own terms, the CSRTs were an internal, administrative, non-adversarial process evaluating the executive's prior classification of detainees as "enemy combatants," and were specifically created for the purpose of developing a record to submit to the courts for a deferential habeas review of the executive's decision. *See, e.g.*, *In re Guantanamo Bay Detainee Cases*, Letter from Terry Henry, Esq., Dep't Justice, to Hon. Joyce Hens Green, dated August 31, 2004, at 1 ("the submission of factual returns containing the factual bases for the detention of petitioner-detainees . . . will follow the assembly and finalization of an administrative record" by the CSRT). Under this scheme, the transcript of the CSRT and its corresponding exhibits represent (at most) nothing more than the government's return to the habeas petition, pursuant to 28 U.S.C. § 2243, and are subject to traverse and evidentiary hearing.

Any doubt about the status of the CSRTs was conclusively resolved by the Supreme Court in *Boumediene*, which affirmed that the need for plenary habeas review into the "sufficiency of the Government's evidence against the detainee" arises from the fact that the CSRTs were not a competent "court of record" entitled to any deference by the reviewing court. 128 S. Ct. at 2268-70. As the Court explained:

> A criminal conviction in the usual course occurs after a judicial hearing before a tribunal disinterested in the outcome and committed to the procedures designed to insure its own independence. These dynamics are not inherent in executive detention orders or executive review procedures. In this context, the need for habeas corpus is urgent.

*Id.* at 2269, *see also id.* at 2269 (quoting *Frank v. Mangum*, 237 U.S. 309, 346 (1915) (Holmes, J., dissenting) ("habeas corpus cuts through all forms and goes to the very tissue of the structure. It comes from the outside, not in subordination to the proceedings, and although every form may have been preserved opens the inquiry whether they have been more than an empty shell.")).[8]

The Court also specifically foreclosed an argument that the government's evidence is entitled to any presumption of reliability or correctness. It recognized that a central defect of the CSRT-DTA process as compared to habeas process is that in the CSRT, the "Government's

---

[8]     At long last, there should be no more question that the CSRTs were a grossly defective process, devoid of any of the core attributes of a fair adversary proceeding. Hundreds of pages have been devoted to demonstrating to the courts their inherent, irremediable deficiencies. Suffice it to say that no court that has actually reviewed the CSRT process has found it satisfactory under any standard of measurement. *See In re Guantanamo Bay Detainee Cases*, 355 F. Supp. 2d at 442-80 (highlighting "fundamental unfairness" of CSRT process and cataloguing numerous ways in which CSRTs fell short of elementary due process); *Boumediene*, 128 S. Ct. at 2270 (acknowledging petitioners' concerns regarding the CSRT's "myriad deficiencies," highlighting several and concluding that, because CSRTs present "considerable risk of error," appellate review of CSRT determinations for the sufficiency its findings are an inadequate substitute for habeas corpus review); *Parhat*, 2008 WL 2576977, at *13 (D.C. Cir. June 20, 2008) (finding evidence relied upon by CSRTs inherently unreliable and, quoting Lewis Carroll, observing that "the fact that the government has 'said it thrice' does not make an allegation true.").

evidence is accorded a presumption of validity," *id*. at 2260, and that there is a "considerable risk of error in the [CSRT's] finding of fact" – a risk it agreed was "inherent in any process that is 'closed and accusatorial'" as was the CSRT. 128 S. Ct. at 2270 (internal citations omitted). *See also Parhat*, 2008 WL 2576777 (rejecting hearsay evidence in CSRT record because it lacked indicia of reliability).[9]

De novo review accords with the process undertaken by habeas courts at common law. For example, in *Ex parte Bollman*, 8 U.S. 75, 125 (1807), Chief Justice Marshall declined to defer to a magistrate's determination that the facts justified holding a pre-trial detainee for treason; instead, the Court held five days of factual hearings during which time it "fully examined and attentively considered" the relevant evidence and ordered the petitioner released. Similarly, in *Ex parte Randolph*, 20 F. Cas. 242 (C.C.D. Va. 1833), Chief Justice Marshall, riding circuit, reviewed the commitment of a civil debtor by local municipal authorities, took new evidence and reached his own conclusions despite prior factual findings by executive officials. *Accord*, *Boumediene*, 128 S. Ct. at 2268 (citing *Ex parte Robinson*, 20 F. Cas. 969, 971

---

[9]      Nothing in *Hamdi* supports a contrary view in these cases.  First, in noting that in *Hamdi*'s case, "the Constitution would not be offended" were the government offered a presumption, 542 U.S. at 534, the plurality opinion set no categorical rule regarding procedures to adjudicate all future habeas cases.  As the controlling opinion in the recent decision in *Al-Marri v. Pucciarelli* explained in denying a categorical presumption in favor of the government's evidence, the default entitlement to full due process procedures must prevail unless the executive can demonstrate "exigent circumstances" entitling it to any departure from due process.  __ F. 3d. __, 2008 WL 2736787 *49 (4th Cir. July 15, 2008) (en banc) (Traxler, J.) (quoting *Hamdi*). Indeed, because *Boumediene* already identified the use of such a presumption as a defect of the CSRT process, no general presumption can prevail in these habeas cases.  Second, in *Hamdi* the Court's due process calculus was informed by a far more narrow definition of "enemy combatant" – requiring affirmative acts of belligerency – than the government now promotes. *See Hamdi*, 542 U.S. at 516 ("for purposes of this case, the 'enemy combatant' that [the government] is seeking to detain is an individual who, it alleges, was 'part of or supporting forces hostile to the United States or coalition partners' in Afghanistan *and* who 'engaged in an armed conflict against the United States' there") (emphasis added).  Finally, the balancing of competing interests under the due process calculus adopted in *Hamdi* tips decidedly in greater favor of these Petitioners.  *See infra* at p. 27.

(C.C. Ohio 1855) (McLean, J.)).  Indeed, at common law, no habeas court was bound to defer to a prior and presumptively self-serving judgment of an executive official.  One court aptly summarized the state of the law:

> [T]o require the court in its investigation to be governed by the decision of an executive officer, acting under instructions from the head of the department in Washington, would be an anomaly wholly without precedent, if not a flagrant absurdity.

*In re Jung Ah Lung*, 25 F. 141, 143 (D. Cal. 1885); *see also* Jared Goldstein, *Habeas Without Rights*, 2007 Wisc. L. Rev. 1165 (2007) (Appendix) (collecting cases).

## III.    SCOPE OF DISCOVERY

### A.    While Discovery Is Authorized in Every Habeas Proceeding, the Specific Scope of Discovery Will Depend on the Circumstances of a Particular Case

The federal habeas statute expressly authorizes discovery in habeas proceedings.  Section 2246 provides that, if a party introduces an affidavit, the opposing party "shall have the right to propound written interrogatories to the affiants."  *See Harris v. Nelson*, 394 U.S. 286, 296 (1969) (noting that § 2246 provides for "interrogatories for the purpose of obtaining evidence from affiants where affidavits were admitted into evidence").    Further, in *Harris v. Nelson*, the Supreme Court held that, pursuant to the All Writs Act, 28 U.S.C. § 1651, habeas courts are authorized to expand discovery beyond measures specified in § 2246, and declared that it is "the inescapable obligation of the courts" to grant leave for discovery in appropriate circumstances. 394 U.S. at 299.   The *Harris* Court instructed district courts to "fashion appropriate modes of procedure, by analogy to existing rules or otherwise in conformity with judicial usage," to permit a petitioner to "secur[e] facts where necessary to accomplish the objective of the proceedings." *Id.*

A Petitioner is thus entitled to "the taking of evidence in habeas proceedings by deposition, affidavit or interrogatories." *Hamdi*, 542 U.S. at 525 (citing § 2246). *See also Al-Marri*, 2008 WL 2736787, at \*49 n. 16 (Traxler, J., concurring) (citing "discovery" as part of the "process normally available [to persons] who challenge their executive detention"); *El-Banna v. Bush*, No. 04-CV-1144, 2005 WL 1903561 (D.D.C. 2005) (Roberts, J.) (ordering the government to preserve evidence regarding petitioners' detention at Guantanamo, in view of the habeas court's plenary power of inquiry, and petitioners' right to discovery); Rule 6 of the Rules Governing Section 2254 Cases (authorizing discovery in § 2254 cases; applicable to other types of habeas cases through Rule 1(b)).

*Boumediene* specifically noted that the availability of discovery to a habeas petitioner counted among the procedural rights that, historically, "preserved the writ and its function." 128 S.Ct. at 2263 (citing *Harris*, 394 U.S. at 299-300). Indeed, the notable absence of discovery in DTA review contributed to the Supreme Court's conclusion that a DTA proceeding "falls short of being a constitutionally adequate substitute." 128 S. Ct. at 2272 (noting, under DTA review, the detainee's lack of opportunity "to present evidence discovered after the CSRT proceeding concluded").[10]

Though it is clear that discovery is permissible in the habeas context, the scope of discovery in these cases is not amenable to common resolution. Discovery in habeas cases generally requires leave of court and should be allowed if the request is based on "specific

---

[10]    *Boumediene* further noted the habeas court's discretion to "accommodate" the government's interest in protecting sources and methods of intelligence gathering.   128 S. Ct. at 2276.  By instructing habeas courts to "accommodate" the government's interests in secrecy in certain information, the Supreme Court implied that, in the first instance, habeas petitioners would be able to make requests for disclosure of information.

Of course, nothing in the Court's opinion should be read to foreclose discovery of alleged "sources and methods" where such information is material and exculpatory.

allegations" by the petitioner.  *See Harris*, 394 U.S. at 300 (where "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry").

The availability of discovery in habeas litigation therefore depends on "the facts of [a] particular case." *Compare Bracy v. Gramley*, 520 U.S. 899, 909 (1997) (Rehnquist, C.J.) (9-0) (holding that "given the facts of this particular case," the habeas court abused its discretion when it denied discovery to the petitioner), *with Murphy v. Johnson*, 205 F.3d 809, 814 (5th Cir. 2000) (affirming denial of habeas discovery where discovery request was "based purely on speculation").  Different Petitioners, moreover, might legitimately adopt different litigation strategies with respect to discovery because of significant differences in the facts of their cases, requiring individual judges to assess the issues raised by the corresponding requests.  *Compare Parhat*, 2008 WL 2576777, at * 5 (noting that petitioners, though entitled to production of all "Government Information," asked the court to first review CSRT determinations based on the CSRT record alone), *with* Order, *Hamdi v. Rumsfeld*, No. 02-439, Dkt. 81, at 1 (E.D. Va. Oct. 11, 2004) (government ordered to produce copies of all documents on which it intended to rely in case-in-chief against Hamdi before hearing took place).

Regardless of the variations between cases in Petitioners' approach to discovery, in all detainee cases district courts should be more permissive in considering discovery requests than even the *Harris* court, which considered a collateral attack on a prior state court judgment.   In such a typical habeas proceeding, a petitioner would have already had (in the earlier proceeding) a full opportunity for discovery pursuant to state or federal rules of criminal procedure, would have been provided full access to exculpatory material pursuant to *Brady v. Maryland*, 373 U.S.

83 (1963), and would have had the full opportunity to confront and cross-examine all the evidence ultimately supporting a judgment in his case. A regime of partially constrained discovery thus makes sense in a post-conviction context, where the full apparatus of criminal procedure and constitutional law presumptively affords the habeas petitioner all the discoverable information he would need. By contrast, in the present challenges to executive detention, where Petitioners have not had a prior adjudication consistent with due process, ordinary post-conviction presumptions do not apply. *Boumediene*, 128 S. Ct. at 2267 ("[T]he common-law habeas court's role was most extensive in cases of pretrial and noncriminal detention, where there had been little or no previous judicial review of the cause for detention"); *St. Cyr*, 533 U.S. at 301 (protections of habeas corpus "have been strongest" in the context of executive detention). Accordingly, the need for discovery in these cases will be much greater.

Not only has there been no discovery in any prior proceeding, these cases present a number of unique challenges to Petitioners in gathering evidence. Substantial time has passed, the events at issue occurred in and involve distant countries, English is not the native language of most detainees, Petitioners' ability to communicate with their attorneys is severely circumscribed, and their mental health may have suffered as a result of their confinement. Individual Petitioners may need to undertake some preliminary discovery in order to be able to identify the evidence that is helpful to their case. Others may need to investigate whether statements against them were obtained by coercion or torture, and are therefore unreliable. Habeas law has long recognized that "[t]he very nature of the writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected." *Harris*, 394 U.S. at 291. These cases will especially require "initiative and flexibility" in the administration of discovery if the court is to

remain faithful to the spirit of habeas corpus. The application of that principle must be made by the judge in each case, based on an evaluation of the facts, arguments and legitimate needs for discovery on the matters at issue in that case.

### B. The Government Has An Affirmative Duty to Disclose Exculpatory and Impeaching Evidence, Which Should Be Confirmed by a Standing Order of the Court

One aspect of discovery that would benefit from an across-the-board adjudication at this juncture by this Court involves the government's duty and ongoing obligation to disclose to Petitioners evidence in its possession that falls within the definition of "exculpatory" and "impeaching" material, concepts well known and understood by the government. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963); *see also United States v. Agurs*, 427 U.S. 97 (1976); *United States v. Bagley*, 473 U.S. 667 (1985). The government "has a duty to learn of any favorable evidence known to the others acting on the government's behalf," *Kyles v. Whitley*, 514 U.S. 419, 437 (1995), and must disclose exculpatory and impeaching evidence that is "material," *Bagley*, 473 U.S. at 668.

Failure to disclose exculpatory information "undermines confidence in the outcome." *Bagley*, 473 U.S. at 668. Thus, this obligation not only guarantees fair treatment for detainees subject to a substantial liberty deprivation, *Brady*, 373 U.S. at 87, but it is also necessary to preserve the fundamental truth-seeking function of a serious, adjudicatory proceeding. *Monroe v. Blackburn*, 476 U.S. 1145, 1148 (1986); *Freeport-McMoRan Oil & Gas Co. v. F.E.R.C.*, 962 F.2d 45, 47 (D.C. Cir. 1992) (Mikva, C.J.) (reiterating Supreme Court's admonition in *Berger v. United States*, 295 U.S. 78, 88 (1935), now chiseled on the walls of the Justice Department, that a government lawyer "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation . . . is not that it shall win a case, but that justice shall be done").

22

Indeed, in light of the "considerable risk of error" inherent in the CSRTs determinations, *Boumediene*, 128 S. Ct. 2270, and the widely-disclosed reports of large numbers of innocent men detained at Guantanamo, an order regarding exculpatory evidence is not mere housekeeping, proposed to serve a routine administrative obligation.   Rather, it is necessary to fulfill this Court's role in assessing "the sufficiency of the Government's evidence against a detainee," *id*. – evidence which may well exist outside the CSRT records which comprise the current factual returns.   *See id*. (noting the habeas court's "authority to admit and consider relevant exculpatory evidence that was not introduced during the earlier proceeding").[11]

In the criminal context, it is well-settled that the government has a duty to disclose exculpatory material in the possession of the prosecution regardless whether the defendant requests such material.   *Agurs*, 427 U.S. at 112-13.   Similarly, the government's duty to disclose here should be independent of a request from a Petitioner, or even an order from a court, and continues during the pendency of habeas proceedings.   *See Steidl v. Fermon*, 494 F.3d 623, 469 (7th Cir. 2007) (state's "ongoing duty to disclose exculpatory information . . . extends throughout the legal proceedings that may affect guilt or punishment, including post-conviction proceedings.").   Petitioners submit that it would be appropriate for the court to put the government on notice, well in advance, that *sua sponte* disclosure of these materials is an essential element of its production obligations.

---

[11]    According to Lt. Col. Stephen Abraham, a reserve military intelligence officer who gathered information for CSRT proceedings from government agencies and sat on a CSRT panel that reviewed a detainee's enemy combatant status, the CSRTs did not have access to important and potentially exculpatory information about detainees and were pressured by superiors to designate detainees as enemy combatants.   *See Upholding the Principles of Habeas Corpus for Detainees, 2007: Hearing before the House Armed Services Comm.*, 110th Cong., 1st Sess. (Jul. 26, 2007) (statement and testimony of Lt. Col. Abraham).   Further, Petitioners' counsel are aware of numerous instances where exculpatory materials in the possession of the government were discovered by happenstance, and not as a result of disclosure by the government.

Thus, Petitioners propose that this Court order as follows:

> The government shall disclose to a detainee or counsel all exculpatory evidence, including impeaching evidence, in its possession relating to that detainee. Disclosure by the government should occur as soon as it discovers this evidence, and shall in no event occur later than thirty (30) days prior to the scheduled date of the evidentiary hearing in a case. The term "exculpatory material," including impeaching evidence, refers to evidence that falls within the definition of this term in ordinary criminal proceedings in the United States. *See Kyles v. Whitley*, 514 U.S. 419 (1995).

In requesting that the government disclose exculpatory materials, Petitioners are not asking to send the government on a "fishing expedition," but are holding it to its commitments at the July 8, 2008, status conference before this Court. The government stated then that it intended to review government files relating to detainees in order to ensure that its future returns contained up-to-date information, and to determine whether its existing factual returns should be amended to reflect such information. The government's search for exculpatory materials can therefore occur expeditiously, concomitant with this review.

## III.    THE LIMITED ADMISSIBILITY OF HEARSAY

The question of the admissibility of hearsay evidence is not amenable to common resolution in the abstract. Evidentiary questions in general, and hearsay issues in particular, are highly context-dependent, and require consideration by the judge before whom the case is tried. Accordingly, any question as to what evidence, including hearsay evidence, should be admissible, what evidence should be excluded, and how to weigh admissible evidence should be left to the sound discretion of the individual judges in the context of their particular cases. That assessment is often the very function of the district court.

Centuries of legal experience have taught that hearsay is a particularly unreliable form of evidence. *See Ellicott v. Pearl*, 35 U.S. 412, 436 (1836). The common law thus developed a strong preference against the use of hearsay, and allowed only certain, narrowly-defined

exceptions for declarations made in circumstances tending to lend them particularized guarantees of trustworthiness. *See, e.g.*, *United States v. Kim*, 595 F.2d 755, 765 (D.C. Cir. 1979) (business records); *Murphy Auto Parts Co. v. Ball*, 249 F.2d 508, 510 (D.C. Cir. 1957) (excited utterances). These narrow exceptions to the rule against hearsay have, over the decades, been codified in the Federal Rules of Evidence, each pursuant to a well-recognized reason to expect the statement would have a circumstantial guarantee of trustworthiness.

By their terms, the Federal Rules of Evidence apply in habeas corpus proceedings "to the extent that matters of evidence are not provided for in the statutes which govern procedure therein or in other rules prescribed by the Supreme Court pursuant to statutory authority." Fed. R. Evid. 1101(e). *See Greiner v. Wells*, 417 F.3d 305, 325-26 (2d Cir. 2005), *cert. denied.*, 546 U.S. 1184 (2006) (excluding hearsay in a habeas case pursuant to Federal Rules of Evidence). Therefore, rules against hearsay and their exceptions apply in habeas corpus proceedings except as otherwise established by statute or by rule propounded in accordance with the Rules Enabling Act, 28 U.S.C. §§ 2072, *et seq.* The habeas statute permits admission of affidavits in habeas corpus cases, in the court's discretion, but such permission triggers the opposing party's "right to propound written interrogatories to affiants, or to file answering affidavits." 28 U.S.C. § 2246. Discretion to admit evidence by affidavit must be exercised with caution. *See Herrera v. Collins*, 506 U.S. 390, 417 (1993) ("affidavits are disfavored [in a habeas corpus action] because the affiants' statements are obtained without the benefit of cross-examination and an opportunity to make credibility determinations").

In acknowledging that hearsay "may" sometimes—in the specific context of a traditional battlefield[12] detention—be accepted as "the most reliable available evidence," the *Hamdi* plurality did not express any intent to repeal the Federal Rules of Evidence as they are applied to habeas corpus proceedings. *See Hamdi* 542 U.S. at 533-34. Rather, the plurality's comment should be viewed merely as acknowledging that the district court has discretion to admit affidavits under 28 U.S.C. § 2246 or other hearsay under Rules 803 through 807 of the Federal Rules of Evidence, and that the reliability of such hearsay will frequently be the decisive factor as to whether it should be admitted. *See also Al-Marri*, 2008 WL 2736787 *45 (Traxler, J., concurring) (hearsay is admissible only if government bears its burden to demonstrate that reliance on non-hearsay evidence would be "unduly burdensome"). The Rules of Evidence and applicable statutes remain in place after *Hamdi*, as they must under the Rules Enabling Act. Therefore, any hearsay not admissible under Rules 803-807 of the Federal Rules of Evidence should be under oath and subject to the statutory procedural requirements of 28 U.S.C. § 2246.

Significantly, these Petitioners – detained for seven years thousands of miles from the sites of their seizure and with no prior meaningful access to witnesses – will often face greater evidence-gathering hardships than the government, which presumptively has great resources and access to the evidence it has already collected, in procuring evidence in support of their case. Accordingly, affidavits may be admitted under 28 U.S.C. § 2246 based on a Petitioner's showing that they are reliable and that they are necessary due to hardship in obtaining other evidence.

---

[12]    The *Hamdi* plurality addressed only "the narrow question" of the process due an enemy soldier captured during combat against the U.S. and its allies on a foreign battlefield. 542 U.S. at 516 (plurality op.); *id.* at 513, 517, 522 n.1; *see also id.* at 549 (Souter, J., concurring) ("[T]he government here repeatedly argues that Hamdi's detention amounts to nothing more than customary detention of a captive taken on the field of battle."). In a traditional battlefield capture where there are obvious visible signs of hostility, there may be a diminished risk of error. That is not true for the non-battlefield circumstances in which the vast majority of Guantánamo detainees were taken into custody.

In determining whether to allow admission of an affidavit or other hearsay in lieu of live testimony or a deposition, the Court's discretion should be guided by a number of considerations. The application of these considerations will vary widely from case to case – and this evidentiary issue therefore must be decided by each Judge based on the evidence and issues presented. *See Al-Marri*, 2008 WL 2736787, *45 (Traxler, J., concurring) (before admitting hearsay evidence, court must also "weigh the competing interests of the litigants in light of the factual allegations and burdens placed before it for consideration."). Nevertheless, a non-exhaustive list can be gleaned from the case law.

1.    As with each of the procedural issues on which this Court has ordered briefing, the Court must consider the Petitioners' substantial liberty interests and the high risk of error. Petitioners are effectively on trial for their lives. *See, e.g.*, *Boumediene*, 128 S. Ct. at 2238 ("the consequence of error may be detention of persons for the duration of hostilities that may last a generation or more"). Based on the government's own records, the vast majority of the Petitioners were not captured by the U.S. military, were not captured on any battlefield, and are not alleged to have committed any hostile acts against the United States or its allies. *See* Denbeaux, *Report on Guantanamo Detainees*, *supra* note 7 (only five percent of detainees were captured by U.S. forces on the battlefield). Under these circumstances, the risk of factual error is exceptionally high, as most detentions are not justified by the direct testimony or observations of U.S. military members. *Cf. Hamdi*, 542 U.S. at 512-13 (petitioner was captured with an assault rifle and was part of a "Taliban unit" in a "foreign combat zone" during active hostilities).

Although the Petitioners' significant liberty interest may be balanced with national security considerations, those national security considerations have become weaker, and the Petitioners' interest has become stronger, as the years of indefinite detention have dragged on.

*See Rasul*, 542 U.S. at 488 (Kennedy, J., concurring) ("[A]s the period of detention stretches from months to years, the case for continued detention to meet military exigencies becomes weaker").  With respect to most of the Petitioners, the government has had six and a half years in which to perfect its case, and this Court has allowed the government the opportunity over the next several months to seek leave to amend the factual returns it has already filed.  If the government cannot marshal reliable evidence in the substantial time it has been allowed, it is fair to infer that it is because no reliable evidence exists to justify continued detention.

   2. The Court must, of course, consider the availability of the declarant, and whether the hearsay affidavit is necessary and is the "most reliable available evidence," *Hamdi*, 542 U.S. at 533-34; *see also United States v. Dunford*, 148 F.3d 385, 392 (4th Cir. 1998) (the requirement of circumstantial guarantees of trustworthiness is the "most important element" for admissibility under the residual hearsay exception).  Out-of-court statements should be viewed skeptically and can and should be excluded if they lack reliability.  *See Parhat*, 2008 WL 2576777 (rejecting hearsay evidence that lacked indicia of reliability); *United States v. Fernandez*, 892 F.2d 976, 983 (11th Cir. 1989) (rejecting hearsay based on unreliability of declarant); *Jian An Li v. Canarozzi*, 142 F.3d 83, 88 (2d Cir. 1998) (affirming exclusion of deposition testimony under Fed. R. Evid. 403, due to lack of reliability of source).

   Therefore, before admitting hearsay evidence, the court must have adequate information to assess the reliability of the source and to determine that the information presented is credible. In *Parhat*, for example, the D.C. Circuit addressed government intelligence reports containing assertions regarding a group's supposed connections with al Qaida and the Taliban.  Similar reports can be found throughout the CSRT records for many Guantanamo detainees.  In rejecting the intelligence reports as a basis for supporting the petitioner's classification as an "enemy

combatant", the court noted that there was no information concerning the sources of the allegations allowing the court to assess their reliability. 2008 WL 2576777, at *13. As the D.C. Circuit held, information concerning the reliability of the declarant is essential in evaluating the evidence. *See id.* This conclusion is in line with the spirit of the Federal Rules of Evidence, which liberally allow evidence attacking the credibility of a hearsay declarant, *see* Fed. R. Evid. 806, and require disclosure of the identity of the declarant of any hearsay admitted under the residual hearsay exception, *see* Fed. R. Evid. 807.

Although the Court may take into consideration the government's interest in protecting its sources and methods of intelligence gathering, *Boumediene*, 128 S. Ct. at 2276, such interests cannot be an excuse for admitting hearsay without sufficient information to assess its reliability. *Parhat*, 2008 WL 2576777, at *13 ("[W]e do not suggest that hearsay evidence is never reliable -- only that it must be presented in a form, or with sufficient additional information, that permits the Tribunal and court to assess its reliability"). As the D.C. Circuit suggested in *Parhat*, the courts have the tools and experience necessary to protect national security interests without sacrificing reliable factfinding, including, for example, providing information only to counsel with security clearances or by adapting procedures under the Classified Information Procedures Act ("CIPA"), 18 U.S.C. App. III, § 4. *See Parhat*, 2008 WL 2576777, at *13.

The mere existence of supposedly corroborating evidence which itself lacks indicia of reliability must be considered insufficient to support the admission of hearsay. *See Parhat*, 2008 WL 2576777, at *13-14. For example, the D.C. Circuit did not find persuasive the government's contention that its evidence in *Parhat* was more reliable simply because its assertions had appeared "in at least three different documents." *Id.* ("[T]he fact that the government has 'said it thrice' does not make an allegation true"). The trustworthiness of a statement cannot be

analyzed "solely on the basis of the facts corroborating the authenticity of the statement." *United States v. Bailey*, 581 F.2d 341, 349 (3rd Cir. 1978) (analyzing admissibility of evidence under residual hearsay exception); *see also Huff v. White Motor Corp.*, 609 F.2d 286, 293 (7th Cir. 1979).  Instead, each piece of hearsay must be analyzed according to its own circumstantial guarantees of trustworthiness. *See id.*

Among other circumstances that must be considered with regard to the credibility of the source is the manner by which any hearsay declaration was obtained.  Among other things, the proponent of hearsay must be prepared to disclose to the district court and opposing counsel the interrogation techniques employed on its sources.  It is well recognized that evidence obtained through torture or threats, for example, is too unreliable to be admitted into evidence.  *See Stein v. New York*, 346 U.S. 156, 182 (1953) ("The tendency of the innocent, as well as the guilty, to risk remote results of a false confession rather than suffer immediate pain is so strong that judges long ago found it necessary to … treat[] any confession made concurrently with torture or threat of brutality as too untrustworthy to be received as evidence of guilt"); *see also Dickerson v. United States*, 530 U.S. 428, 432 (2000).  Indeed, the judge in the military trial of Salim Hamdan, Navy Captain Keith Allred, recently excluded evidence obtained by the military from Mr. Hamdan in a series of interrogations at the Bagram Air Force Base and in Panshir, Afghanistan, because of the "highly coercive environments and conditions under which they were made."  Mike Melia, *Detainee-trial judge bars coerced evidence*, Associated Press, July 22, 2008.  Declarations procured by the government from other detainees implicating an individual Petitioner may well be a product of a similarly "highly coercive environment," and therefore should be inadmissible in a habeas proceeding.

As one of the leading studies on modern torture and interrogation documented:

> [T]he Guantanamo interrogation system was "hopelessly flawed from the get-go," according [to] Lt. Col. Anthony Christino. Christino was the senior watch officer for the Joint Intelligence Task Force Combating Terrorism (JITF-CT). Christino concludes that the Guantanamo interrogations were overvalued and their results "wildly exaggerated." The hopeless flaws had two sources, poor selection of people to be interrogated and poor methods of interrogation. . . . Even if torture were entirely reliable, the way the government selected individuals for detention guaranteed unreliable information since many had no information to give. In reality, torture probably compounded the errors implicit in the selection process. . . . Guantanamo is a textbook case of what not to do. Social scientists know that . . . "the longer people are detained, the greater the risk that what they say will be unreliable". . . .

Darius Rejali, Torture and Democracy 509, 510 (2007). Similarly, it is now widely revealed that much of the "evidence" about those detained came from informants to whom the government paid a comparatively large financial bounty.[13] In light of the obvious financial incentive in these cases to embellish or fabricate facts, such evidence would presumably be deemed unreliable.

Thus, among other things, the judge considering the admissibility of hearsay testimony must have the ability to ensure that there is an adequate record to evaluate whether the evidence is reliable, including the methods and circumstances in which allegedly inculpatory evidence has been procured from a Petitioner or another alleged witness.

3.    Before considering an affidavit under 28 U.S.C. § 2246, the Court must consider the materiality of the evidence to be presented by affidavit, the reliability of the evidence, and whether it relates to a disputed factual issue in the case. Although a habeas petition may be decided on the basis of affidavits, contested facts may not be decided on affidavits alone unless there is other evidence in the record supporting them. *See Jordan v. Estelle*, 594 F. 2d 144, 146

---

[13]    Richard Leiby, *When Bombs Are Not Enough: The Army's Psyop Warriors Deploy an Arsenal of Paper*, Wash. Post, Dec. 10, 2001 (noting that 18 million leaflets were distributed in Afghanistan, with a population of 26 million, and that former Secretary of Defense Donald Rumsfeld stated, "We have leaflets that are dropping like snowflakes in December in Chicago"); *Guantanamo inmates say they were 'sold': Warlords, others 'trumped up charges' for U.S. cash rewards*, MSNBC, May 31, 2006 (former CIA officer says Afghan warlords like Gen. Rashid Dostum were among those who received bundles of notes).

(5th Cir. 1979). It is well-established that the affidavit procedure of 28 U.S.C. § 2246 cannot be used to resolve substantial disputed questions of material fact. *See supra* Section I(B) (requirement of evidentiary hearing to resolve disputed issue of material fact); *Jones v. Cunningham*, 313 F.2d 347, 353 n. 4 (4th Cir. 1963) ("[I]ssues of fact presented in habeas corpus proceedings may not be established by ex parte affidavits"); *Campbell v. Minnesota*, 487 F.2d 1, 4 n. 3 (8th Cir. 1973) (affidavits under 28 U.S.C. § 2246 "cannot be used to resolve substantial disputed questions of fact"); *Owens v. Frank*, 394 F.3d 490, 498 (7th Cir. 2005) ("When the issue is one of credibility, resolution on the basis of affidavits can rarely be conclusive").

4.      Finally, even in cases where the Court may determine that national security and other considerations warrant the admission of a particular affidavit, there is no statutory or other authority that would permit the Court to admit the affidavit without allowing the opposing party the opportunity to propound written interrogatories or to obtain and present an answering affidavit. 28 U.S.C. § 2246. Nor is there any authority for admission of hearsay not otherwise allowed by the Federal Rules of Evidence except by deposition or affidavit under 28 U.S.C. § 2246. *See* Fed. R. Evid. 1101(e) (Federal Rules of Evidence apply in habeas cases except as provided by statute or other rules).

Of course, the Court has discretion in appropriate cases to admit hearsay under the residual hearsay exception under Rule 807 of the Federal Rules of Evidence if such hearsay has "circumstantial guarantees of trustworthiness" equivalent to the recognized exceptions to the rule against hearsay. But even reliable hearsay under Rule 807 is admissible only if the Court makes the requisite findings that the statement is "offered as evidence of a material fact," that it is "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts," and that its admission would best serve "the general

purposes of [the Federal Rules of Evidence] and the interests of justice." Fed. R. Evid. 807. Hearsay under the residual exception may not be introduced unless there is an opportunity to inquire into its reliability and unless the proponent of the evidence gives the opposing party sufficient notice to allow the opposing party the fair opportunity to meet it, "including the name and address of the declarant." *Id.* As the D.C. Circuit has held, the residual hearsay exception is "a narrow exception to the hearsay rule, applying only in exceptional cases." *United States v. Kim*, 595 F.2d at 765.

In sum, because of the unique concerns raised by hearsay evidence, each judge must be able to address the admissibility of proffered hearsay after assessment of its reliability and fairness, and in light of the facts and circumstances presented by a particular case.

## IV. CONFRONTATION AND COMPULSORY PROCESS RIGHTS

The habeas statutes and the Federal Rules of Evidence plainly anticipate that the Petitioners, through their counsel, will have the right to cross-examine available witnesses, either in court or by deposition, and to object to inadmissible hearsay. *See* Fed. R. Evid. 1101(e); 28 U.S.C. § 2246. Moreover, the Court plainly has the power to compel the attendance of witnesses within its jurisdiction and to authorize the taking of depositions outside of its jurisdiction. *See* Fed. R. Civ. P. 45. All of the considerations identified above with respect to admissibility of hearsay are equally applicable with respect to confrontation of witnesses and the exercise of this Court's subpoena powers.

There is no doubt that the opportunity to confront a witness is a central and crucial feature of the common law adversarial system. *Pointer v. Texas*, 380 U.S. 400, 408 (1965) (Harlan., J., concurring) (the "right of confrontation is "implicit in the concept of ordered liberty") (quoting *Palko v. Connecticut*, 302 U.S. 319, 325 (1937)). As Justice Scalia explained,

"[i]t is a rule of the common law, founded on natural justice, that no man shall be prejudiced by evidence which he had not the liberty to cross examine." *Crawford v. Washington*, 541 U.S. 36, 49 (2004) (citation omitted). This feature is not limited to the criminal context:

> Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so he has an opportunity to show that it is untrue. . . . [This principle] is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. . . . This Court has been zealous to protect these rights from erosion . . . . [including] in all types of cases where administrative and regulatory actions were under scrutiny.

*Greene v. McElroy*, 360 U.S. 474, 496-97 (1959). *See also In re Oliver*, 333 U.S. 257, 273 (1948) (the right to the opportunity to be heard in one's defense includes one's "right to examine the witnesses against him").

Indeed, in upholding the legality of other administrative detention schemes, the Supreme Court has insisted on the preservation of this principle. *See, e.g. Hendricks*, 521 U.S. at 353 (civil commitment of violent sexual offenders). It is a necessary requirement in a deportation proceeding, *see, e.g. Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 (1953), for a hearing involving the termination of government benefits, *see Goldberg v. Kelly*, 397 U.S. 254, 270 (1970), and as part of the trials under the Uniform Code of Military Justice, *see, e.g. United States v. Anderson*, 51 M.J. 145, 149 (C.A.A.F. 1999) ("There are few subjects perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement").

As with the admissibility of hearsay, the particular considerations as to confrontation and compelling attendance of witnesses are not amenable to common preliminary decision. Such

decisions will depend on the particular circumstances surrounding the evidence and the witnesses involved, including the availability of the witness, the materiality of the evidence, the reliability of other means of presenting the evidence, and how important the evidence is to the dispute. Where the materiality of the evidence submitted is greater, the importance of confrontation and cross-examination must correspondingly increase.   Likewise, where a Petitioner asserts that evidence is unreliable, he should be permitted to argue that it must be excluded unless cross-examined.   A variety of intersections between the individual right and the government burden will have to be crossed in individual cases.

## CONCLUSION

Consistent with the habeas statute and the substantial liberty deprivations at issue in these cases of executive detention, Petitioners are in all cases entitled to discovery and an evidentiary hearing on disputed issues of material fact in which the government must justify its detention by clear and convincing evidence.   Because of the equitable and adaptable nature of the habeas remedy and the command of the habeas statute to "dispose of the case as law and justice require," 28 U.S.C. § 2243, most of the issues related to the scope of discovery, the scope of the confrontation right and the admissibility of hearsay evidence will have to be decided by individual judges based on the facts and circumstances of the particular cases before them.

Dated: July 25, 2008

Respectfully submitted,

_____/s/ sdk_____
Shayana D. Kadidal (D.C. Bar No. 454248)
J. Wells Dixon
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY  10012
Tel: (212) 614-6438

Fax: (212) 614-6499

Baher Azmy
SETON HALL LAW SCHOOL
Center for Social Justice
One Newark Center
Newark, NJ  07102
Tel: (973) 642-8700

*On Behalf of Petitioners*

David J. Cynamon (D.C. Bar No. 182477)
Matthew J. MacLean (D.C. Bar No. 479257)
PILLSBURY WINTHROP SHAW PITTMAN LLP
2300 N Street, N.W.
Washington, DC  20037
Tel: (202) 663-8000
Fax: (202) 663-8007

*Attorneys for Petitioners Fawzi Khalid Abdullah*
*Fahad Al Odah, et al.*

Paul M. Rashkind (D.C. Bar No. 345496)
Supervisory Assistant Federal Public Defender
Timothy Cone (D.C. Bar No. 465005)
Assistant Federal Public Defender
OFFICE OF THE FEDERAL PUBLIC DEFENDER
150 W. Flagler Street, Suite 1500
Miami, FL  33130
Tel: (305) 536-6900
Fax: (305) 530-7120

*Attorneys for Petitioner Bostan Karim*